## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

THOMAS SILVERSTEIN,

     Plaintiff,

v.

FEDERAL BUREAU OF PRISONS; HARLEY
LAPPIN, Director, Federal Bureau of Prison;
JOYCE CONLEY, Assistant Director, Correctional
Programs Division; Federal Bureau of Prisons;
MICHAEL NALLEY, Regional Director, Federal
Bureau of Prisons; and RON WILEY, Warden,
United States Penitentiary Administrative Maximum;
sued in their official capacities,

     Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

### INTRODUCTION

Plaintiff Thomas Silverstein, who is incarcerated in the United States Penitentiary Administrative Maximum ("ADX") in Florence, Colorado, submits his complaint for violations of the First, Fifth, and Eighth Amendments to the United States Constitution, and the Religious Freedom Restoration Act (RFRA).

### JURISDICTION AND VENUE

1. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 2201, and 2202.

2.  Venue is proper within this district pursuant to 28 U.S.C. § 1391 as the majority of the Defendants reside here and the ongoing events giving rise to Plaintiff's claims have occurred and continue to occur in this judicial district.

<u>PARTIES</u>

3.  Plaintiff THOMAS SILVERSTEIN is a prisoner in the custody of the United States Federal Bureau of Prisons since 1978.  Plaintiff has been continuously confined in segregation on a "no human contact" status at various Federal Penitentiaries since 1983, and has been confined in ADX since July 2005.

4.  Defendant FEDERAL BUREAU OF PRISONS ("BOP") is an agency of the United States charged with the confinement of prisoners in federal prison facilities.

5.  Defendant HARLEY LAPPIN is the Director of the BOP.  Defendant Lappin has decision-making authority regarding transfer and placement of prisoners in prisons operated by the BOP, such as ADX.

6.  Defendant JOYCE CONLEY is BOP Assistant Director for Correctional Programs Division.  Defendant Conley, as BOP Assistant Director for Correctional Programs, is responsible for inmate management and program functions including security, inmate case management, and delivery of mental health and religious services.

7.  Defendant MICHAEL NALLEY is BOP Regional Director for the North Central Region.   Defendant Nalley has decision-making authority regarding transfer and placement of prisoners in prisons operated by the BOP within the North Central Region.   ADX and the United States Penitentiaries in Marion, Illinois and Leavenworth, Kansas are all located within the North Central Region.

8.  Defendant RON WILEY is the Warden of ADX.  Defendant Wiley, as Warden, is

responsible for the administration, operation, maintenance, policies, procedures and functions at ADX Florence, including decisions regarding an inmate's ability to participate in the step-down program and placement in a less restrictive unit, the ability of prisoners to practice their religious faith and the amount and type of exercise opportunities that a prisoner receives.

9. Defendants BOP, Lappin, Conley, Nalley, and Wiley are sued in their official capacities for declaratory and injunctive relief. All Defendants were acting under color of federal law as to the claims raised in this matter.

<u>FACTS</u>

10. Plaintiff was first confined with the Bureau of Prisons in 1978.

11. Plaintiff was incarcerated in "General Population" at United States Penitentiary (USP) Leavenworth (LVN) in Leavenworth, Kansas from 1978 to November 1980. In which he could spend approximately 10 hours or more out of his cell.

12. Plaintiff was transferred to USP Marion (Marion) in Marion, Illinois in November 1980. He was moved to Marion for the murder of prisoner Danny Atwell, which resulted in his conviction of First Degree Murder. However, this conviction was subsequently reversed, and he was never retried for it. *See* U.S. v. Silverstein, 737 F.2d 864 (10th Cir. 1984).

13. From November 1980 to November 1983, Plaintiff was incarcerated in the Control Unit at USP Marion where he was allowed out of his cell without restraints and allowed to participate in recreation with other inmates. At that time, Marion Control Unit was the highest level security prison in the Federal system,

14. Plaintiff was convicted for the November 22, 1981 murder of inmate Robert

Chappelle, a member of the D.C. Blacks prison gang.

15. After the killing, the BOP did not place Plaintiff on permanent lockdown status. Plaintiff continued to be allowed out of his cell without restraints and was allowed to participate in recreation with other inmates.

16. After Chappelle's death the BOP transferred inmate Raymond Smith (Smith) to Marion. Smith was widely known as a leader of the gang called D.C. Blacks and swore to kill Plaintiff as retribution for Chappelle's death.

17. Prior to Smith's transfer to Marion, prison staff knew that Smith had repeatedly threatened to kill Plaintiff

18. Despite these known threats against Plaintiff's life, BOP Officials and Marion staff placed Smith on the same unit level as Plaintiff, putting the inmates within three cells of each other.

19. While confined on the same unit level at Marion, it was known to the BOP and Marion staff that Smith had attempted to kill Plaintiff on two separate occasions.

20. Despite these incidents, BOP prison staff failed to separate Plaintiff and Smith.

21. Plaintiff was convicted for the September 27, 1982 murder of Smith.

22. After the killing of Smith, Plaintiff was placed in restraints whenever he was removed from his cell. Plaintiff continued to be allowed to participate in recreation with other inmates.

23. Plaintiff was convicted of the October 22, 1983 murder of prison guard Merle Clutts.

24. On or about October 22, 1983, as a result of killing prison guard Clutts, then Director of the BOP, Norman Carlson, placed Plaintiff on permanent "no human contact" status.

25. Under "no human contact" status Plaintiff is allowed absolutely no physical contact with any outside people, or with any inmates. "No human contact" status severely restricts and limits Plaintiff's visitation with outsiders such as family, friends, legal counsel, and people that Plaintiff knew prior to incarceration. Though Plaintiff may visit with strangers approved by the BOP as "prison visitors," he is denied visitation with any friends he has come to know since first being incarcerated.

26. Plaintiff received no notification of his placement under permanent "no human contact" status.

27. Plaintiff received no notification as to the justification for his placement under permanent "no human contact" status.

28. Plaintiff received no opportunity to be heard in opposition to his placement under "no human contact" status.

29. Plaintiff received no notification of the projected duration of his confinement under "no human contact" status.

30. Plaintiff received no periodic reviews of his placement on "no human contact" status from the time of imposition until 1992.

31. On information and belief, "no human contact" status was imposed on Plaintiff with the intent of keeping him confined to this segregation status permanently.

32. On information and belief, the BOP imposed "no human contact" status on Plaintiff with the intention of never allowing Plaintiff to return to a general population prison regardless of any change in behavior.

33. Soon after the prison guard Clutts killing at Marion in 1983, Plaintiff was transferred to USP Atlanta (ATL) in December 1983.

34. At ATL, a special area, known as the "side pocket" was designated for the confinement of Plaintiff.

35. Prior to his arrival at ATL, Prison staff specially added more bars to the sally port and cell area of the "side pocket" where Plaintiff would be confined.

36. The "side pocket" had three adjacent cells. The cell lengths were approximately six feet. The third cell was a shower. The prison guards moved Plaintiff between the two cells daily, except on weekends. There was no air conditioning or heating in any of these cells.

37. At ATL, none of the "side pocket" cells had windows. Added to that, the lack of air conditioning or heat led to extreme conditions of hot and cold for Plaintiff during the years that he was confined in these cells.

38. For example, Plaintiff would be subjected to such hot conditions during the summers that he would strip himself naked, wet the floor, and lay down on the wet floor in an attempt to alleviate the extreme degree of heat to which he was subjected.

39. At ATL, Plaintiff was subjected to bright lights 24 hours a day, 7 days a week, for 365 days a year. There were also surveillance cameras located outside of Plaintiff's cell, in the hallway, thereby denying Plaintiff any and all privacy.

40. During Plaintiff's first year at ATL he was allowed no outside visitors whatsoever. Moreover, he was not allowed any telephone privileges during his first year at ATL. Furthermore, Plaintiff was denied any and all reading materials for the first year at ATL.

41. Also during his first year at ATL, Plaintiff was denied any and all privileges such as art supplies, a radio/tape player, or a TV.

6

42. During his first year at ATL, Plaintiff had no meaningful in-person contact with any other human being or any access to outside resources. Plaintiff's mail correspondence was strictly limited to immediate family members only. He was prevented from having contact with or corresponding with any other visitor, attorney, or anyone else.

43. On information and belief, these conditions of confinement were imposed on Plaintiff in part to cause Plaintiff's mental health to deteriorate.

44. On information and belief, in 1983, BOP officials and ATL prison staff had entered into an agreement to refrain from all unnecessary communication with Plaintiff and adhered to this pact during his entire confinement at ATL.

45. After Plaintiff's first year at ATL and after Plaintiff filed grievances, the BOP lifted narrowed its restrictions and allowed Plaintiff to write letters, make limited phone calls, and have limited visitation privileges.

46. At ATL between 1983 and 1987, Plaintiff's contact with outside visitors was limited to prison support visitors. Prison support visitors are people previously unknown to prison inmates, who volunteer their time to visit prisoners. They are approved by the BOP before they are able to become prison support visitors.

47. At ATL, around the time period of 1984 or 1985, a radio was placed outside his cell. Plaintiff was able to turn the radio off and on by using an off/on switch located inside his cell. However, Plaintiff had to ask prison staff to switch radio stations since Plaintiff could not physically touch the radio.

48. At ATL, around the time period of 1985 or 1986, Plaintiff was allowed access to a tape player. Plaintiff requested the tape player primarily after hearing the New

Dimension program on the radio.  He had requested more information from the program and received tape cassettes in return.

49. At ATL, around the time period of 1986, Plaintiff was allowed to use art supplies, which included paints, brushes and canvasses.  Just prior to Plaintiff's transfer from ATL and sometime during 1987, he was given access to a TV.

50. Beginning with Plaintiff's incarceration at ATL, Plaintiff began a serious study of various religious and spiritual materials, including but not limited to Buddhism, yogism, and New Age spiritualism.  Plaintiff has taken from these religions what he believes to be true and developed a personal form of spiritualism.  He has a sincerely held belief in his form of spiritualism, and relies on various texts and tapes from these religious and spiritual systems to nurture his belief.

51. BOP Program Statement PS 5360.09 states that all federal prisons will "provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices."

52. Throughout Plaintiff's first year at ATL, the BOP denied him access to any religious materials, such as Buddhism literature, yogism literature, and "New Dimension" tapes.  The tapes provide spiritual guidance and are an integral part of Plaintiff's belief.

53. After Plaintiff's first year at ATL, the BOP allowed him limited access to religious materials, such as Buddhism literature, yogism literature, and "New Dimension" tapes.

54. In 1987, Cuban inmates confined at ATL rioted and took control of the prison.  The Cuban inmates kept hostage ninety-eight members of the prison staff.

55. The inmates who had control of ATL released Plaintiff from his isolation cell.

56. While released, Plaintiff came into contact with prison staff hostages, and even though some of these hostages were guards who had harassed him while he was confined at ATL, he did not seek or attempt to seek retribution against these guards.

57. During the riot Plaintiff actively protected several hostages from harm, including a food porter and a corrections officer. Plaintiff displayed peaceful, non-threatening behavior in an environment where he had opportunities to harm others.

58. On information and belief, during the hostage crisis BOP officials, Federal Bureau of Investigation (FBI) Agents, and ATL staff viewed recapturing Plaintiff as the first and highest priority, despite the presence of ninety-eight hostages.

59. FBI and BOP negotiated the capture of Plaintiff with the Cuban inmates. Once BOP staff regained custody of Plaintiff at ATL he was then transferred to USP Leavenworth (LVN).

60. During his entire confinement at ATL, from December 1983 through December 1987 Plaintiff received only one disciplinary report, for possession of contraband on July 5, 1985.

61. On information and belief, Plaintiff was not allowed outdoor or indoor exercise during his incarceration at ATL.

62. During his entire time at ATL, the light was left on in Plaintiff's cell 24 hours a day, 7 days a week for 365 days a year.

63. During his incarceration at ATL, Plaintiff never received review of his "no human contact" status (see paragraph 25).

64. During his incarceration at ATL, Plaintiff never received an opportunity to appeal or
be heard in opposition to his placement under "no human contact" status.

65. From December 1983 through December 198**7,** Plaintiff was subjected to extreme
solitary confinement and reduced environmental stimulation within ATL.

66. The extreme solitary confinement and reduced environmental stimulation that
Plaintiff was subjected to at ATL continued during his entire confinement at LVN,
from December 1987 through July 2005.

67. Plaintiff was imprisoned in a special cell at LVN.  The cell was deep in the basement,
with walls and a roof that were made of one-inch-thick steel.  Prison staff specially
added more bars, a visiting booth, and a recreation cage for Plaintiff's arrival.  These
additions assured that "no human contact" status would remain intact.

68. In the LVN basement cell, Plaintiff was subjected to fluorescent lights and two
cameras inside his cell 24 hours a day, 7 days a week, for 365 days a year.  It was so
isolated that you could not hear any human voices, toilets, doors opening or closing,
or other televisions.  There was no window, no mirror, and no bed in the cell.  The
lights emitted a low, consistent buzzing sound.

69. The cell at LVN contained a thin mattress on the floor, a metal sink, a shower stall,
and a toilet without a lid.

70. Plaintiff had a TV inside his cell, and a radio/tape player outside his cell.  Plaintiff
was able to turn the radio/tape player off and on by using an off/on switch located
inside his cell.  However, Plaintiff had to ask prison staff to put any tapes in the tape
player, and switch radio stations, etc. since Plaintiff could not physically touch the
radio/tape player.

71. Plaintiff was denied any and all outdoor and indoor recreation privileges while confined to the basement cell at LVN.

72. After eighteen months in the basement cell at LVN, Plaintiff was moved to what became known as "the Silverstein suite," a special cell in the Special Housing Unit (SHU), at the end of the east prison yard.

73. The "Silverstein suite" had lights on 24 hours a day, 7 days a week, and for days a year.  Plaintiff was also subjected to camera surveillance 24 hours a day, 7 days a week, for 365 days a year, thereby denying Plaintiff any and all privacy in every area of the "Silverstein suite."

74. Before Plaintiff was moved to the "Silverstein suite," it was known as "the hole," and was an extremely isolated unit of LVN where prisoners were normally sent to be punished.  The area had a separate entrance, and was a separate building at the end of the regular segregation unit.  Plaintiff was confined to the "Silverstein suite" for at least 23 hours a day.

75. The "Silverstein suite" at LVN consisted of a 9' by 16' cell.  Inside the cell, Plaintiff had a bed, shower, desk, TV and toilet.

76. Adjacent to and on the other side of Plaintiff's cell was Plaintiff's outdoor recreation yard.  The cement yard was 17' by 14 1/2' and contained a strip cell.  The ceiling was open to the sky but covered with two sets of heavy-duty screen and bars.

77. Adjacent to Plaintiff's cell was Plaintiff's indoor recreation yard.  The cement yard was 9' by 16' and only contained one stationary bike, a cement block that Plaintiff could sit on, and a telephone.

78. Adjacent to and opposite the indoor recreation yard was Plaintiff's visiting room.

11

The visiting room contained a telephone and chair for visitors. Thus, Plaintiff's indoor recreation room served the dual purpose of recreation room and visiting room for Plaintiff when he had visitors. However, visitors were an extremely rare occurrence. In addition, the attached visiting booth ensured further isolation from other inmates, and continued confinement to the "Silverstein suite."

79. Opposite and adjacent to Plaintiff's cell was the hallway the guards used to monitor Plaintiff as they saw fit.

80. On information and belief, in 1987, BOP officials and LVN prison staff had entered into an agreement to refrain from all unnecessary communication with Plaintiff. LVN staff adhered to this pact during the first five years of his incarceration at LVN.

81. On information and belief, during this time LVN staff would only communicate with Plaintiff to berate him and claimed that he would never be released into a general population unit.

82. At LVN, Defendants restricted Plaintiff's access to mental health care to impersonal psychological review sessions conducted via television through a closed circuit signal, despite the severe psychological damage resulting from the "no human contact" status.

83. Plaintiff's psychological reviews included an assessment of Plaintiff's "threat to others." From 1987 through 2004, Plaintiff "threat to others" fluctuated arbitrarily and capriciously between high, moderate, and low.

84. At LVN, Plaintiff gained access to art supplies eight months to one year after arrival at LVN. Plaintiff used art as a therapeutic method to relieve stress and as a method the try to avoid the deterioration of his mental health. Plaintiff's psychologist noted

the therapeutic effects art had on Plaintiff.

85. At LVN, after a number of years and after Plaintiff was moved to the "Silverstein Suite," Plaintiff was given access to a radio/tape player inside his cell.

86. While at LVN, Plaintiff received free literature from a Buddhist monk, which he was allowed to possess and read. He also listened to "New Dimension" tapes.

87. On information and belief, on an unidentified date in January 1992 Plaintiff received the initial review of his assignment to "no human contact" status.

88. On information and belief, due to Plaintiff's confinement under permanent "no human contact" status any such reviews of his placement in solitary confinement at LVN were meaningless. Though Plaintiff repeatedly and consistently asked for an explanation of what he needed to do to be released from segregation, he never received any criteria for release into general population.

89. From 1983 through 2005, Plaintiff's contact with outside visitors was limited to prison support visitors (see paragraph 46), and to people Plaintiff had known prior to incarceration. During any and all visits, Plaintiff was not allowed to have any physical contact whatsoever with outside visitors.

90. From 1983 through 2005, no BOP official or ATL staff or LVN staff informed the Plaintiff as to how much longer he would remain on "no human contact" status (see paragraph 25).

91. From 1983 through 2005, Plaintiff's mental state deteriorated due to his conditions of confinement at ATL and LVN.

92. From December 1983 through July 2005, Plaintiff did not engage in disruptive or assaultive behavior during his confinement at ATL and LVN.

93. On July 12, 2005, Plaintiff was transferred to ADX and into a special segregation unit known as "Z-Unit."

94. Conditions at ADX are more restrictive than any other form of incarceration within the BOP system.

95. On information and belief, ADX opened in 1995. According to the BOP's Program Statement P5100.08, ADX is designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution.

96. Any justification BOP had to transfer Plaintiff to ADX ceased to exist over fifteen years ago. Plaintiff has not violated any BOP policies or regulations nor received a misconduct citation for over twenty years.

97. During that time Plaintiff has demonstrated the ability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institutions he has been confined in.

98. On information and belief, BOP's decision to transfer Plaintiff to ADX was done in an arbitrary and capricious manner.

99. Between the opening of ADX in 1995 and Plaintiff's transfer to ADX in 2005, Plaintiff did not demonstrate any inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of LVN.

100. During that time, BOP officials and LVN staff rewarded Plaintiff for his continued adherence to BOP policies by allowing him access to some religious materials and art supplies.

101. On information and belief, BOP officials never notified Plaintiff of their decision

to transfer him to ADX.  During the transfer and prior to his arrival at ADX, Plaintiff was led to believe he was being transferred to an open population prison.  Only upon his arrival at ADX did Plaintiff realize the magnitude of his situation and realize that he had been transferred to a more restrictive environment, not a less restrictive one.

102.    According to ADX's mission statement, prisoners are eligible to transfer out of ADX through the Step-Down Program upon demonstrating improved behavior and the ability and motivation to reintegrate into an open population prison.

103.    BOP Institutional Supplement 5321.06F(1) states that to be placed in the Step-Down Program and transferred to a less restrictive unit a prisoner must maintain twelve months of clear conduct, participate in prison programs, maintain proper hygiene standards, and interact appropriately with staff.

104.    Although Plaintiff has fully complied with all standards set forth in Institutional Supplement 5321.06F(1), Defendants have refused to consider Plaintiff for placement in the Step-Down Program.

105.    Since his arrival at ADX, Plaintiff has been indefinitely incarcerated in the Special Housing Unit (SHU) commonly known as "Z Unit."  Though Z Unit is identified as SHU, in practice it is operated neither as SHU nor Control Unit.

106.    Conditions in Z Unit are more restrictive than any other form of incarceration within ADX, and are more restrictive than any other form of SHU or Control Unit incarceration within the BOP system, including ADX.

107.    BOP Institutional Supplement 5212.07 states that for a prisoner to be released from a control unit he must demonstrate the ability to function in a less restrictive environment without posing a threat to others and adhere to BOP policies and

15

procedures.  If a prisoner demonstrates such behavior he may be returned to general population at the institution from which he was originally transferred.

108.    Although Plaintiff has fully complied with all standards set forth in Institutional Supplement 5212.07 and BOP Institutional Supplement 5321.06F(1), Defendants have refused to consider him for transfer out of ADX.  Plaintiff has demonstrated his ability for release from segregation.  Were Plaintiff confined in the Control Unit or Special Housing Unit at an open population prison he would be placed in general population.

109.    Since Plaintiff's transfer to ADX, the BOP has continued to impose "no human contact" status on Plaintiff.

110.    Plaintiff has shown over more than fifteen years that there is no justification for continuing his "no human contact" status, or for confining him at ADX.

111.    Additionally, during his confinement at ADX, Plaintiff has not acted in any way that would suggest he remains a risk of threat to others or to the secure and orderly operation of the institution.

112.    During his confinement at ADX from July 2005 to present, Plaintiff has maintained clear conduct, participated in prison programs made available to him, maintained proper hygiene standards, and interacted appropriately with staff at all times.

113.    BOP Program Statement 5270.07 states that an inmate confined in a SHU will receive a formal hearing and review regarding their SHU placement at least every 30 days to determine whether he can be transferred into a less restrictive environment. See also 28 C.F.R. 541.22(c)(1).

114.    BOP Program Statement also 5270.07 states that an inmate shall be released from SHU confinement when reasons for that placement cease to exist.  See also 28 C.F.R. 541.22(c)(1).

115.    On information and belief, since Plaintiff's initial status review hearing at LVN in January 1992 he has received status review hearings only twice a year.  Since Plaintiff's transfer to ADX these reviews have continued to be administered only twice a year.

116.    On information and belief, present at these six-month reviews at ADX are BOP Regional Director Nalley, ADX Warden Wiley, and other BOP officials and ADX staff.  At each of his six-month reviews Plaintiff has requested explanation of criteria for removal from permanent "no human contact" status, and when he will be removed from this status.

117.    Whenever Plaintiff has addressed these questions to Defendant Wiley, Wiley has answered that the decision is not his but is for the BOP Regional Director to determine.

118.    Conversely, whenever Plaintiff has addressed these questions to Regional Director Nalley, Nalley has answered that the decision is not his but is for the ADX Warden to determine.

119.    As such, Plaintiff has never been informed by Defendants or their agents what criteria he must meet for removal from "no human contact" status and/or removal from Z Unit or ADX.

120.    On information and belief, due to Plaintiff's confinement under permanent "no human contact" status by the Director of the BOP that any such reviews of his

placement in solitary confinement at LVN and ADX by local prison staff have been meaningless.

121.     On information and belief, during his entire confinement at ADX Plaintiff has not engaged in disruptive or assaultive behavior.

122.     During his time on "no human contact" status, Plaintiff has demonstrated the ability and motivation to reintegrate into an open population and eventually transfer into a general population prison.

123.     Plaintiff has been continuously subjected to extreme solitary confinement and reduced environmental stimulation within ADX, from July 2005 until the present date without any hope of release into a general population unit.

124.     At ADX, Plaintiff is confined to an 8 1/2' x 10' cell for at least 23 hours a day. Plaintiff is confined in Z-Unit where he is moved between two cells every three months.  Each cell contains a bed with metal restraint rings, a sink, toilet, and shower.

125.     At ADX, the two cells assigned to Plaintiff are cells 2-030-L and 2-040-L.

126.     In cell 2-030-L, Plaintiff has a mirror, cement walls, and a small horizontal window that Plaintiff can only see out of when he stands on his desk.

127.     In cell 2-040-L, Plaintiff does not have a mirror, but has enforced metal walls and a small horizontal window that is covered with mesh and painted over, disallowing Plaintiff any possibility of seeing out the window.  In addition, if Plaintiff were to be able to look out the window, Plaintiff would have to stand on his desk to do so.

128.     Z-Unit is entombed by a sound proof door that was built after Plaintiff's arrival at ADX to ensure that Plaintiff cannot pursue any human contact whatsoever with the only other inmate in Z-Unit.

129.    Defendants prohibit Plaintiff from any form of verbal contact with any other inmates.

130.    Plaintiff's cell is structured to completely restrict any and all conversation between fellow inmates.  Plaintiff must exercise by himself as well as take his meals alone in his cell.

131.    At ADX Z-Unit, Plaintiff is subjected to 24 hour camera surveillance, 7 days a week, 365 days a year, thereby denying Plaintiff any and all privacy.

132.    Plaintiff exercises five days a week for one hour in an individual 10' x 10' dog kennel-like, cement yard that is attached to his cell.

133.    The yard is so restrictive that Plaintiff can walk no more than approximately ten steps in any direction and approximately thirty steps in a circle.

134.    Upon transfer to ADX, Defendants arbitrarily and without explanation deprived Plaintiff of most of his art supplies, knowing that Plaintiff used art supplies as a method of therapy.

135.    At ADX, Defendants have severely limited Plaintiff's opportunities to contact the outside world by restricting phone calls and social visits.

136.    At ADX Plaintiff is forced to conduct legal visits at a "visiting room" located within feet of his cell in Z Unit.  The "visiting room" provided for Plaintiff's visitors is approximately 4' x 4', has no ventilation, and contains a single telephone-style intercom device attached to the wall via a 2' chord.  The "visiting room" also contains no "pass-through" slot, preventing Plaintiff or his attorneys from exchanging documents.

137.    The visiting room does not have holes drilled into the glass so that counsel and client can talk without shouting.

138.    During any attorney-client visit, at least one guard will sit outside the door to the visiting room, thus allowing the guard(s) to hear what is discussing between attorney(s) and client.  When one guard comes to relieve the other sitting guard, the attorneys can hear what the guards are saying.

139.    Within each part of the visiting booth, there are cameras to record all actions of the parties, and on information and belief, are able to either record the conversation or at least listen to what is being said between attorney and client.

140.    These conditions of the "visiting room" hinder Plaintiff's ability to conduct meaningful visits with his attorneys.

141.    Any time Plaintiff is transported out of his cells he is subjected to extreme physical discomfort: he is subjected to an invasive strip search and is then not only handcuffed, but also shackled to chains protruding from a black box suspended by a chain wrapped around his stomach.  Additionally, he is shackled at his ankles.

142.    Following each transport, Plaintiff is strip-searched again.

143.    Despite the severe psychological damage that has arisen from these conditions, Defendants restrict Plaintiff's access to mental health care to monthly, extremely short impersonal psychological review sessions conducted at his door.

144.    On information and belief, there are numerous other inmates confined within ADX or other prisons who have committed murder while in prison, which includes the killing of guards and/or other inmates.

145.    On information and belief, Plaintiff is the only inmate convicted of such crimes and subjected to "no human contact" status, and placed in ADX "Z unit."

146.    At the time of filing this lawsuit, Plaintiff was still confined in "Z unit" at ADX.

147.    Plaintiff's "no human contact" status has continued for 24 years.

148.    Defendants' actions were and are wanton, malicious and willful.

149.    Any justification Defendants had for placing Plaintiff under "no human contact" status ceased to exist over fifteen years ago.  Plaintiff has not violated any BOP policies or regulations nor received a misconduct citation for over twenty years. Additionally, Plaintiff displayed peaceful, non-threatening behavior in an environment where he had opportunities to harm others twenty years ago during the 1987 Cuban riots.

150.    The lack of contact with the outside world, lack of religious freedoms, continual exposure to unnatural light, arbitrary deprivation of art supplies, constant video surveillance denying any and all privacy, and lack of any human contact fit together under totality of conditions and further compound Plaintiff's mental anguish, resulting in cruel and unusual punishment by Defendants.

151.    The extreme length of Plaintiff's solitary confinement, the indefinite nature of such confinement, and other conditions depriving Plaintiff of basic life necessities result in cruel and unusual punishment.

152.    Defendants' deliberate indifference has resulted in Plaintiff suffering deprivations that cause mental harm that goes beyond the boundaries of what most human beings can psychologically tolerate.

153.    Plaintiff's mental harm has manifested itself through depression, physiological harms, hallucinations, disorientation, memory loss and other unexpressed harms and/or symptoms.

154.    Plaintiff's inconceivably prolonged and indefinite solitary confinement is causing him severe psychological damage, such that mental illness and mental incompetence threaten to debilitate him.

155.    On information and belief, Defendants continue to impose "no human contact" status on Plaintiff to cause severe mental harm and inflict cruel and usual punishment on him.

156.    While confined at ATL and LVN, the BOP granted Plaintiff access to art supplies.

157.    Plaintiff used the art supplies as a therapeutic measure to avoid mental health deterioration.

158.    While confined at ATL and LVN, Plaintiff was eventually allowed access to a TV, and a radio/tape player which allowed him to fully realize his spiritual practice. At LVN, Plaintiff was also allowed access to a VCR, which also allowed him to realize his spiritual practice.

159.    At ADX, Plaintiff has been denied almost all art supplies and religious/spiritual materials without any notice or explanation.

160.    According to 18 U.S.C. 4205(a), for all convictions taking effect prior to November 1, 1987, "Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving … ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law."

161.    Plaintiff was convicted of all crimes prior to November 1, 1987.  Plaintiff was

sentenced to life imprisonment for each of his murder convictions.

162.    According to 18 U.S.C. 4206(a) when a prisoner has "substantially observed the

rules of the … institutions to which he has been confined" and the Parole

Commission determines that release would not depreciate the seriousness of the

offense nor jeopardize the public welfare, the prisoner shall be released on parole.

163.    Plaintiff has not engaged in disruptive or assaultive behavior nor received a

disciplinary report since July 5, 1985.

164.    Plaintiff has substantially observed the rules of ATL, LVN, and ADX and has not

received a misconduct ticket since July 5, 1985.

## CAUSES OF ACTION

### Claim 1

### **DEFENDANTS VIOLATED PLAINTIFF'S LIBERTY INTEREST BY INDEFINITELY CONFINING HIM TO A "NO HUMAN CONTACT" ISOLATION STATUS.**

165.    Plaintiff realleges and incorporates paragraphs 1 through 164.

166.    Under the Fifth Amendment to the United States Constitution Plaintiff may not be

deprived of a liberty interest by subjecting him to atypical and significant hardship.

167.    Defendants' placement of plaintiff on indefinite "no human contact" status based

upon an incident from twenty-four years ago creates atypical and significant hardship.

168.    Plaintiff's confinement under indefinite "no human contact" status violates his

liberty interest by imposing atypical and significant hardship in relation to the

ordinary incidents of prison life.

169.  Defendants' continuation of indefinite "no human contact" status upon Plaintiff was done in an arbitrary and capricious manner.

170.  Defendant's confinement of Plaintiff under "no human contact" status prevents him from being considered for parole.

## Claim 2

## DEFENDANTS VIOLATED PLAINTIFF'S LIBERTY INTEREST BY TRANSFERRING HIM TO ADX.

171.  Plaintiff realleges and incorporates paragraphs 1 through 164.

172.  Under the Fifth Amendment to the United States Constitution Plaintiff may not be deprived of a liberty interest without due process of law.

173.  Defendants' transfer of Plaintiff to ADX was done in an arbitrary and capricious manner.

174.  Defendants' transfer of Plaintiff to ADX violated his liberty interest by further imposing upon him atypical and significant hardship in relation to the ordinary incidents of prison life.

175.  Defendants denied Plaintiff his Fifth Amendment right to due process when they transferred him to ADX without notice, hearing, or justification.

## Claim 3

## DEFENDANTS VIOLATED PLAINTIFF'S LIBERTY INTEREST BY FAILING TO ADMIT HIM INTO STEP-DOWN PROGRAM

176.  Plaintiff realleges and incorporates paragraphs 1 through 164.

177.  Under the Fifth Amendment to the United States Constitution Plaintiff may not be deprived of a liberty interest without due process of law.

178.    Confining Plaintiff in the most restrictive unit at ADX in furtherance of indefinite "no human contact" status prevented him from being considered for participation in ADX's step-down program and transfer out of ADX.

179.    Defendants' refusal to consider Plaintiff for admittance to ADX's step-down program is done in an arbitrary and capricious manner.

180.    Defendants continued infringement of Plaintiff's liberty interest for consideration for transfer out of Z Unit violates his Fifth Amendment right to due process.

## Claim 4

### DEFENDANTS VIOLATED THE EIGHTH AMENDMENT BY HOLDING THE PLAINTIFF IN INDEFINITE "NO HUMAN CONTACT" STATUS

181.    Plaintiff realleges and incorporates paragraphs 1 through 164.

182.    The Eight Amendment to the United States Constitution forbids cruel and unusual punishment.

183.    Plaintiff's indefinite "no human contact" status constitutes cruel and unusual punishment.

184.    Indefinite "no human contact" status has had a substantial negative impact on Plaintiff's mental health.

185.    Plaintiff's lack of contact with the outside world, lack of religious freedoms, continual exposure to unnatural light, constant surveillance, and lack of any human contact constitutes totality of conditions that result in cruel and unusual punishment by Defendants.

## Claim 5

### DEFENDANTS RESTRICTIONS ON PLAINTIFF'S SPIRITUAL PRACTICE WAS IN VIOLATION OF THE FIRST AMENDMENT

186.    Plaintiff realleges and incorporates paragraphs 1 through 164.

187.    The First Amendment to the United States Constitution prohibits the restriction of

the free exercise of religion.

188.    Plaintiff has a sincerely held belief in a personal form of spiritualism that is based

primarily on Buddhism, yogism and New Age spiritualism.

189.    Defendants have violated Plaintiff's First Amendment right to practice religion by

their actions.

## Claim 6

### DEFENDANTS RESTRICTIONS ON PLAINTIFF'S SPIRITUAL PRACTICEWAS IN VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA)

190.    Plaintiff realleges and incorporates paragraphs 1 through 164.

191.    The Religious Freedom Restoration Act (RFRA) applies to the federal

government, and to the Federal Bureau of Prisons, as an agent thereof.

192.    RFRA states that the government shall not substantially burden religious exercise

without compelling justification.

193.    Plaintiff has a sincerely held belief in a personal form of spiritualism that is based

primarily on Buddhism, yogism and New Age spiritualism.

194.    Defendants have substantially burdened the exercise of Plaintiff's belief.

## Claim 7

### DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO PRIVATE, ATTORNEY-CLIENT CONSULTATION BY VIDEOTAPING CONSULTATION SESSIONS AND POSTING PRISON GUARDS NEAR DOOR OF VISITING ROOM

195.    Plaintiff realleges and incorporates paragraphs 1 through 164.

196.    Under the Federal Rules of Evidence Rule 501, the First Amendment and
common law Plaintiff may not be deprived of his right to private consultation and full
and frank communication with his attorneys.

197.    Defendants' video surveillance of any and all attorney client communications is a
violation of Plaintiff's right to private consultation and full and frank communication
with his attorneys.

198.    Defendant's requirement that counsel and Plaintiff communicate by telephone
while separated by soundproof glass barrier during visitation violates Plaintiff's right
of unfettered access to his counsel and the courts.

199.    Defendants' placement of prison staff in a position where that staff could hear the
privileged communication is in violation of Plaintiff's right to private consultation
and full and frank communication with his attorneys.

### Prayer for Relief

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

A       Issue a declaratory judgment that Defendants have deprived Plaintiff of his
liberty interest by placing him on indefinite "no human contact" status.

B       Issue a declaratory judgment that Defendants have violated RFRA.

C       Issue an injunction preventing Defendants from continuing the permanent "no
human contact" status.

D       Issue an injunction requiring Defendants to remove Plaintiff from "Z unit" and
ADX and place him into general population at a USP at a custody level based upon his
behavior for the past 24 years.

E       In the alternative, issue an injunction requiring Defendants to place Plaintiff in

27

the step-down program.

F        Issue an injunction requiring Defendants to provide Plaintiff access to religious

materials, such as video tapes, pertaining to the practice of Plaintiff's spiritual belief.

G        Issue an injunction requiring Defendants to incorporate into Plaintiff's visiting

room a pass-through slot and intercom system allowing simultaneous group

communication.

H        Issue an injunction that Defendants have interfere with the attorney-client

communications by its conduct.

I        Award reasonable attorney's fees, expenses and costs.

J        Plaintiff also requests any additional or alternative relief as may be just, proper,

and equitable.

Dated: November 28, 2007.

Respectfully submitted,

STUDENT LAW OFFICE

s/ Daniel Manville
Daniel Manville, Esq.
University of Denver Sturm College of Law
2255 East Evans Avenue, Suite 335
Denver, CO 80208
Tel: 303-871-6140
Fax:  303.871.6847
Email:  dmanville@law.du.edu
Counsel for Plaintiff