**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 07-CV-02471-MSK-KMT

THOMAS SILVERSTEIN,

     Plaintiff,

v.

FEDERAL BUREAU OF PRISONS; sued in its
official capacity; HARLEY LAPPIN, Director,
Federal Bureau of Prison; JOYCE CONLEY,
Assistant Director, Correctional Programs Division,
Federal Bureau of Prisons; MICHAEL NALLEY,
Regional Director, Federal, Bureau of Prisons; and
RON WILEY, Warden, United States Penitentiary
Administrative Maximum; all individuals sued in
their official and individual capacities,

     Defendants.

---

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF
AND DAMAGES**

---

## INTRODUCTION

Plaintiff Thomas Silverstein, incarcerated in the United States Penitentiary Administrative Maximum ("ADX") in Florence, Colorado, submits his amended complaint for violations of the First, Fifth, and Eighth Amendments to the United States Constitution, and the Religious Freedom Restoration Act (RFRA).

## JURISDICTION AND VENUE

1. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 2201, and 2202.

1

2. Venue is proper within this district pursuant to 28 U.S.C. § 1391 as the majority of the Defendants reside here and the ongoing events giving rise to Mr. Silverstein's claims have occurred and continue to occur in this judicial district.

PARTIES

3. Plaintiff THOMAS SILVERSTEIN is a prisoner in the custody of the United States Federal Bureau of Prisons since 1978. Mr. Silverstein has been continuously confined in segregation on a "no human contact" status at various Federal Penitentiaries since 1983, and has been confined in ADX since July 2005.

4. Defendant FEDERAL BUREAU OF PRISONS ("BOP") is an agency of the United States charged with the confinement of prisoners in federal prison facilities. Former Director Norm Carlson ordered that Plaintiff be placed on "no human contact" and to remain so while confined with the BOP.

5. Defendant HARLEY LAPPIN is the Director of the BOP. Defendant Lappin has decision-making authority regarding transfer and placement of prisoners in prisons operated by the BOP, such as ADX.

6. Defendant JOYCE CONLEY is BOP Assistant Director for Correctional Programs Division. Defendant Conley, as BOP Assistant Director for Correctional Programs, is responsible for inmate management and program functions including security, inmate case management, and delivery of mental health and religious services.

7. Defendant MICHAEL NALLEY is BOP Regional Director for the North Central Region. Defendant Nalley has decision-making authority regarding transfer and placement of prisoners in prisons operated by the BOP within the North Central Region. ADX and the United States Penitentiaries in Marion, Illinois and

Leavenworth, Kansas are all located within the North Central Region.

8.  Defendant RON WILEY is the Warden of ADX.  Defendant Wiley, as Warden, is responsible for the administration, operation, maintenance, policies, procedures and functions at ADX Florence, including decisions regarding an inmate's ability to participate in the step-down program and placement in a less restrictive unit, the ability of prisoners to practice their religious faith and the amount and type of exercise opportunities that a prisoner receives.

9.  Defendant BOP is sued in its official capacity for declaratory and injunctive relief.

10. Defendants Lappin, Conley, Nalley, and Wiley are sued in their official capacities for declaratory and injunctive relief, and in their individual capacities for damages. These Defendants were acting under color of federal law as to the claims raised in this matter.

FACTS

11. On November 3, 1975 Mr. Silverstein was sentenced under 18 U.S.C. 4205(b)[1] to fifteen years incarceration for armed bank robbery.

12. Mr. Silverstein was first confined with the Bureau of Prisons in 1978.

13. Mr. Silverstein was incarcerated in "General Population" at United States Penitentiary (USP) Leavenworth (LVN) in Leavenworth, Kansas from 1978 to November 1980.  During this time Mr. Silverstein could spend approximately 10

---

[1] 18 U.S.C. 4205(b) states: "Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court, or (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine."  18 U.S.C. 4205(b) (1976) (repealed 1986).  Though repealed in 1986, this law applied to all sentences prior to November 1, 1987.

hours or more out of his cell.

14. Mr. Silverstein was transferred to USP Marion (Marion) in Marion, Illinois in November 1980.  He was moved to Marion for the murder of prisoner Danny Atwell, which resulted in his conviction of First Degree Murder. However, this conviction was subsequently reversed, and he was never retried for it.  *See* U.S. v. Silverstein, 737 F.2d 864 (10th Cir. 1984).

15. From November 1980 to November 1983, Mr. Silverstein was incarcerated in the Control Unit at USP Marion where he was allowed out of his cell without restraints and allowed to participate in recreation with other inmates.  At that time, the conditions in the Marion Control Unit were the highest level of security in the Federal prison system.

16. In 1982, Mr. Silverstein was convicted for the murder of inmate Robert Chappelle, a member of the D.C. Blacks prison gang.

17. On August 25, 1982 Mr. Silverstein was sentenced under 18 U.S.C 4205(a)[2] to life imprisonment for this crime.

18. Also on August 25, 1982 Mr. Silverstein was sentenced under 18 U.S.C 4205(a) to a 20-year sentence for conspiracy to commit murder.

19. After the killing of inmate Chappelle, the BOP did not place Mr. Silverstein on permanent lockdown status.  Mr. Silverstein continued to be allowed out of his cell without restraints and was allowed to participate in recreation with other inmates.

20. After Chappelle's death the BOP transferred inmate Raymond Smith (Smith) to

---

[2] 18 U.S.C 4205(a) states "Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law."  18 U.S.C. 4205(a) (1976) (repealed 1986).  Though repealed in 1986, this law applied to all sentences prior to November 1, 1987.

Marion. Smith was widely known as a leader of the gang called D.C. Blacks and swore to kill Mr. Silverstein as retribution for Chappelle's death.

21. Prior to Smith's transfer to Marion, prison staff knew that Smith had repeatedly threatened to kill Mr. Silverstein.

22. Despite these known threats against Mr. Silverstein's life, BOP officials and Marion staff placed Smith on the same unit level as Mr. Silverstein, putting Smith within three cells of Mr. Silverstein.

23. While confined on the same unit level at Marion, it was known to the Marion staff that Smith had attempted to kill Mr. Silverstein on two separate occasions.

24. Despite these two attempted murders, BOP prison staff failed to place Mr. Silverstein and Smith in separate housing units.

25. On information and belief, prison staff Clutts refused to separate Mr. Silverstein and Smith even though he knew of the threats from Smith and the two attempted murders of Mr. Silverstein by Smith.

26. Mr. Silverstein was convicted for the September 27, 1982 murder of Smith.

27. On May 24, 1984 Mr. Silverstein was sentenced under 18 U.S.C 4205(a)[3] to life imprisonment for this crime.

28. After the killing of Smith, Mr. Silverstein was placed in restraints whenever he was removed from his cell. Mr. Silverstein continued to be allowed to participate in recreation with other inmates.

29. On October 22, 1983, two prison guards were murdered at Marion. Mr. Silverstein was convicted of the murder of prison staff Clutts and inmate Fountain was convicted of the murder of the other prison staff.

---

[3] See note 2, supra.

30. On information and belief, prior to October 22, 1983, there had never been a day within the history of the BOP where two prison staff had been murdered.

31. On or about October 22, 1983, as a result of killing prison guard Clutts, then Director of the BOP, Norman Carlson, placed Mr. Silverstein and Mr. Fountain on indefinite "no human contact" status and ordered that while confined with the BOP he would remain on that status.

32. In 1995, inmate Fountain died while confined with the BOP. At the time of his death, he was still confined on "no human contact."

33. Under "no human contact" status Mr. Silverstein is allowed absolutely no physical contact with any outside people, or with any inmates.

34. Under "no human contact" status Mr. Silverstein has been subjected to an accumulation of sensory deprivation, which has resulted in mental illness.

35. Mr. Silverstein received no notification of his placement under indefinite "no human contact" status.

36. Mr. Silverstein received no notification as to the justification for his placement under indefinite "no human contact" status.

37. Mr. Silverstein received no opportunity to be heard in opposition to his placement under "no human contact" status.

38. Mr. Silverstein received no notification of the projected duration of his confinement under "no human contact" status.

39. Mr. Silverstein received no periodic reviews of his placement on "no human contact" status from the time of imposition until 1992.

40. All periodic reviews of his placement on "no human contact" after 1992 were shams since it was already predetermined that Mr. Silverstein was never to release from such status.

41. On information and belief, "no human contact" status was imposed on Mr. Silverstein with the intent of keeping him confined on such isolation status indefinitely.

42. On information and belief, the BOP imposed "no human contact" status on Mr. Silverstein with the intention of never allowing Mr. Silverstein to return to a general population prison regardless of any change in behavior.

43. On May 24, 1984 Mr. Silverstein was sentenced under 18 U.S.C 4205(a) to life imprisonment for the killing of Clutts.

44. Also on May 24, 1984 Mr. Silverstein was sentenced under 18 U.S.C 4205(a) to a 10-year sentence for conveying a homemade knife in a USP.

45. Soon after the killing of prison guard Clutts at Marion, Mr. Silverstein was transferred to USP Atlanta (ATL) in December 1983.

46. At ATL, a special area known as the "side pocket" was designated for the confinement of Mr. Silverstein.

47. Prior to his arrival at ATL, prison staff specially added more bars to the sally port and cell area of the "side pocket" where Mr. Silverstein would be confined.

48. The "side pocket" had three adjacent cells. The cell lengths were approximately six feet. The third cell was a shower. The prison guards moved Mr. Silverstein between the two cells daily, except on weekends. There was no air conditioning or heating in any of these cells.

49. The dimensions of the "side pocket" were so small that Mr. Silverstein could touch

the walls and ceiling with both hands and the cell length was approximately the same length as the 7' bed.

50. At ATL, none of the "side pocket" cells had windows.  Added to that, the lack of air conditioning or heat led to extreme conditions of hot and cold for Mr. Silverstein during the years that he was confined in those cells.

51. For example, Mr. Silverstein would be subjected to such hot conditions during the summers that he would strip himself naked, wet the floor, and lay down on the wet floor in an attempt to alleviate the extreme degree of heat to which he was subjected.

52. At ATL, Mr. Silverstein was subjected to bright lights 24 hours a day, 7 days a week, 365-days a year.  There was also surveillance cameras located outside of Mr. Silverstein's cell in the hallway, thereby denying Mr. Silverstein any and all privacy.

53. During Mr. Silverstein's first year at ATL he was allowed no outside social visitors whatsoever.  Moreover, he was not allowed any telephone privileges during his first year at ATL.  Furthermore, Mr. Silverstein was denied any and all reading materials for the first year at ATL.

54. Also during his first year at ATL, Mr. Silverstein was denied any and all privileges such as art supplies, a radio/tape player, or a TV.

55. During his first year at ATL, Mr. Silverstein had no meaningful in-person contact with any other human being or any access to outside resources.  Mr. Silverstein's mail correspondence was strictly limited to immediate family members only.  He was prevented from having contact with or corresponding with anyone outside of his family or court systems.

56. On information and belief, these conditions of confinement were imposed on Mr.

Silverstein in part to cause Mr. Silverstein's mental health to deteriorate.

57. These restrictions that were imposed on Mr. Silverstein were done for punishment purposes and not security of the prison since his murders were not related to any of the restrictions imposed upon him.

58. On information and belief, in 1983, prison staff entered into an agreement to refrain from all unnecessary communication with Mr. Silverstein and adhered to this pact during his entire confinement at ATL.

59. After Mr. Silverstein's first year at ATL, the BOP narrowed its restrictions and allowed Mr. Silverstein to write letters, make limited phone calls, and have limited visitation privileges, which visitors were limited to prison support visitors. [4]

60. At ATL, around 1984 or 1985, a radio was placed outside his cell.  Mr. Silverstein was able to turn the radio off and on by using an off/on switch located inside his cell. However, Mr. Silverstein had to ask prison staff to switch radio stations since Mr. Silverstein could not physically touch the radio.

61. At ATL, around 1985 or 1986, Mr. Silverstein was allowed access to a tape player. Mr. Silverstein requested the tape player primarily after hearing the New Dimensions program on the radio.  He had requested more information from the program and received tape cassettes in return.

62. At ATL, around 1986, Mr. Silverstein was allowed to use art supplies, which included paints, brushes and canvasses.

63. Beginning with Mr. Silverstein's incarceration at ATL, Mr. Silverstein began a serious study of various religious and spiritual materials, including but not limited to

---

[4] Prison support visitors are people previously unknown to prison inmates, who volunteer their time to visit prisoners.  They are approved by the BOP before they are able to become prison support visitors

Buddhism, yogism, and New Age spiritualism.

64. From his studies, Mr. Silverstein has developed a religious belief founded upon Buddhism and also influenced by yogism and New Age spiritualism.

65. Mr. Silverstein has a sincerely held belief in Buddhism, which is influenced by yogism, and New Age spiritualism.

66. Mr. Silverstein's belief in yogism is directly derived from his belief in Buddhism.

67. Although Mr. Silverstein's religion is Buddhism, his religious belief is informed and guided by a New Age spiritualism component which consists primarily of information received from New Dimensions.

68. New Dimensions sets forth ultimate ideas about fundamental questions about life, purpose, and death because it strives to provide people with an experience of what it means to be human.

69. New Dimensions also expresses metaphysical beliefs through an exchange of ideas and information that people can be empowered and enabled to meet the future with greater energy and clarity, and explore creative solutions to urgent challenges facing humankind.

70. Additionally, New Dimensions fosters the process of living a more healthy life of mind, body and spirit while deepening connections to self, family, community, planet and the natural world.

71. In order to fully realize and practice his religious beliefs, Mr. Silverstein relies on various Buddhist texts and literature, New Dimensions tapes, New Dimensions publications, articles, and newsletters, New Dimensions public radio broadcasts,

advanced yoga classes, and other religious and spiritual texts and publications to facilitate the practice of his religious belief.

72. BOP Program Statement PS 5360.09 states that all federal prisons will "provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices."

73. Throughout Mr. Silverstein's first year at ATL, the BOP denied him access to any religious materials, such as Buddhist literature, yogism literature, and New Dimensions tapes, radio broadcasts, and literature.  These materials would have provided spiritual guidance and are an integral part of Mr. Silverstein's belief.

74. After Mr. Silverstein's first year at ATL, the BOP allowed him limited access to religious materials, such as Buddhist literature, yogism literature, and New Dimensions tapes and radio broadcasts.

75. In 1987, Cuban inmates confined at ATL rioted and took control of the prison.  The Cuban inmates kept hostage ninety-eight members of the prison staff.

76. The inmates who had control of ATL released Mr. Silverstein from his isolation cell.

77. While released, Mr. Silverstein came into contact with prison staff hostages, and even though some of these hostages were guards who had harassed him while he was confined at ATL, he did not seek or attempt to seek retribution against these guards.

78. During the riot Mr. Silverstein actively protected several hostages from harm, including a food porter and a corrections officer.  Mr. Silverstein displayed peaceful, non-threatening behavior in an environment where he had opportunities to harm others.

79. On information and belief, during the hostage crisis BOP officials, Federal Bureau of

Investigation (FBI) Agents, and ATL staff viewed recapturing Mr. Silverstein as the first and highest priority, despite the presence of ninety-eight hostages.

80. FBI and BOP negotiated the capture of Mr. Silverstein with the Cuban inmates. Once BOP staff regained custody of Mr. Silverstein at ATL he was then transferred to USP Leavenworth (LVN).

81. During his entire confinement at ATL, from December 1983 through December 1987 Mr. Silverstein received only one disciplinary report, for possession of contraband on July 5, 1985.

82. During his entire time at ATL, the light was left on in Mr. Silverstein's cell 24 hours a day, 7 days a week for 365 days a year.

83. During his incarceration at ATL, Mr. Silverstein never received review of his "no human contact" status.

84. During his incarceration at ATL, Mr. Silverstein never received an opportunity to appeal or be heard in opposition to his placement under "no human contact" status.

85. Such conditions of confinement were imposed on Mr. Silverstein to punish him for killing a prison guard and to punish him for inmate Fountain's killing of a prison guard on the same day.

86. The imposition of this punishment on Mr. Silverstein was done to send a message to other inmates that if you kill a guard be ready to suffer the same punishment.

87. The BOP Directors, past and present, imposed such conditions of confinement on Mr. Silverstein with the knowledge that the conditions were disproportionate punishment for killing a prison guard since it was imposed indefinitely.

88. The imposition and continuation of such conditions of confinement was done in an

arbitrary and capricious manner with no penological justification.

89. From December 1983 through December 198**7,** Mr. Silverstein was subjected to extreme solitary confinement and reduced environmental stimulation while imprisoned at ATL.

90. The extreme solitary confinement and reduced environmental stimulation that Mr. Silverstein was subjected to at ATL continued during his entire confinement at LVN, from December 1987 through July 2005.

91. Mr. Silverstein was imprisoned in a special cell at LVN. The cell was deep in the basement, with walls and a roof that were made of one-inch-thick steel. Prison staff specially added more bars, a visiting booth, and a indoor recreation cage to ensure that he would be subject to extreme sensory deprivation.

92. In the LVN basement cell, Mr. Silverstein was subjected to fluorescent lights and two cameras inside his cell 24 hours a day, 7 days a week, 365-days a year. It was so isolated that you could not hear any human voices, toilets, doors opening or closing, or other televisions. There was no window and no mirror in the cell. The lights emitted a low, consistent buzzing sound. These conditions of confinements were to ensure sensory deprivations to cause mental illness.

93. The cell at LVN contained a bed, a metal sink, a shower stall, and a toilet without a lid.

94. Mr. Silverstein was denied any and all outdoor and indoor recreation privileges while confined to the basement cell at LVN.

95. After eighteen months in the basement cell at LVN, Mr. Silverstein was moved to what became known as "the Silverstein suite," a special cell in the Special Housing

Unit (SHU), at the end of the east prison yard.

96. Such conditions of confinement were imposed on Mr. Silverstein to punish him for killing a prison guard and to punish him for inmate Fountain's killing of a prison guard on the same day.

97. The BOP Director imposed such conditions of confinement on Mr. Silverstein with the knowledge that the conditions were disproportionate punishment for killing a prison guard.

98. The imposition and continuation of such conditions of confinement was done in an arbitrary and capricious manner with no penological justification.

99. The "Silverstein suite" had lights on 24 hours a day, 7 days a week, 365-days a year. Mr. Silverstein was also subjected to camera surveillance 24 hours a day, 7 days a week, 365-days a year, thereby denying Mr. Silverstein any and all privacy in every area of the "Silverstein suite."

100.    Before Mr. Silverstein was moved to the "Silverstein suite," it was known as "the hole," and was an extremely isolated unit of LVN where prisoners were normally sent to be punished.  The area had a separate entrance, and was a separate building at the end of the regular segregation unit.  Mr. Silverstein was confined to the "Silverstein suite" for at least 24 hours a day, but was allowed an hour a day of exercise, usually five days a week.

101.    The "Silverstein suite" at LVN consisted of a 9' by 16' cell.  Inside the cell, Mr. Silverstein had a bed, shower, desk, TV and toilet.

102.    Adjacent to and on the other side of Mr. Silverstein's cell was Mr. Silverstein's outdoor recreation yard.  The cement yard was 17' by 14 1/2' and contained a strip

cell. The ceiling was open to the sky but covered with two sets of heavy-duty screen and bars.

103. Adjacent to Mr. Silverstein's cell was Mr. Silverstein's indoor recreation yard. The cement yard was 9' by 16' and only contained one stationary bike, a cement block that Mr. Silverstein could sit on, and a telephone.

104. Adjacent to and opposite the indoor recreation yard was Mr. Silverstein's visiting room. The visiting room contained a telephone and chair for visitors. Thus, Mr. Silverstein's indoor recreation room served the dual purpose of recreation room and visiting room for Mr. Silverstein when he had visitors. However, visitors were an extremely rare occurrence.

105. The attached visiting booth and exercise cage ensured total isolation

106. Opposite and adjacent to Mr. Silverstein's cell was the hallway the guards used to monitor Mr. Silverstein as they saw fit.

107. On information and belief, in 1987, prison staff had entered into an agreement to refrain from all unnecessary communication with Mr. Silverstein. LVN staff adhered to this pact during the first five years of his incarceration at LVN.

108. During this time LVN staff would only communicate with Mr. Silverstein to berate him and claim that he would never be released into a general population unit.

109. The above described conditions or confinement and conspiracy not to communicate with Mr. Silverstein was done to further expose him to a higher level of sensory deprivation. These actions were done in an attempt to cause Mr. Silverstein to go insane.

110. At LVN, Defendants restricted Mr. Silverstein's access to mental health care to

impersonal psychological review sessions.  The psychological review sessions were conducted either over television through a closed circuit signal or in person at the door of Mr. Silverstein's cell.

111.    On information and belief, the psychological review sessions were meaningless despite the severe psychological damage resulting from Mr. Silverstein's "no human contact" status.

112.    Mr. Silverstein's mental health care visits were limited to a short series of questions that did not address the substance of Mr. Silverstein's mental health issues.

113.    Mr. Silverstein's psychological reviews included an assessment of Mr. Silverstein's "threat to others."  From 1987 through 2004, Mr. Silverstein "threat to others" fluctuated arbitrarily and capriciously between high, moderate, and low.

114.    At LVN, Mr. Silverstein gained access to art supplies eight months to one year after arrival at LVN.  Mr. Silverstein used art as a therapeutic method to relieve stress and as a coping mechanism to try to avoid the deterioration of his mental health.  Mr. Silverstein's psychologist noted the therapeutic effects art had on Mr. Silverstein.

115.    At LVN, after a number of years and after Mr. Silverstein was moved to the "Silverstein Suite," Mr. Silverstein was given access to a radio/tape player and a VCR inside his cell.

116.    While at LVN, Mr. Silverstein received free literature from a Buddhist monk, which he was allowed to possess and read.  He listened to New Dimensions tapes and public radio broadcasts, and watched Buddhist and New Dimensions tapes on his VCR.

117.    Mr. Silverstein was able to order his own religious materials while at LVN.

118. On information and belief, on approximately November 2, 1990, Mr. Silverstein's fifteen-year sentence for armed robbery (see paragraph 11) terminated and he began serving the first of his consecutive sentences under 18 U.S.C. 4205(a), which was issued August 25, 1982 (see paragraph 17).

119. For all sentences imposed under 18 U.S.C 4205(a) there is a maximum ten-year period during which an inmate is ineligible for parole. No matter how many consecutive parolable sentences an inmate may have, the period of parole ineligibility under § 4205(a) cannot exceed a single ten-year period. *See U.S. v. Fountain*, 768 F.2d 790, 799 (7th Cir. 1985) ("[T]he federal prison and parole authorities, in an interpretation of section 4205(a) that has not to our knowledge been questioned, refuse to 'stack' beyond 30 years prison sentences of any length even when imposed consecutively for purposes of determining the date of eligibility for parole. You could be sentenced to ten consecutive life sentences and you would still be eligible for parole after 10 years, though the likelihood of parole would be slight."); *See also U.S. v. Parker*, 881 F.2d 945, 947 (10th Cir. 1989) (When sentenced under section 4205(a) a prisoner automatically becomes eligible for release on parole after serving one-third of his sentence, or ten years, whichever is less.).

120. BOP Program Statement 5880.30, Chapter VII, k. (1999) states: "Parole ineligibility periods will not be added together ("stacked") to exceed ten years (hereinafter called the ten year cap) in either concurrent or consecutive sentencing situations, regardless of the parole provisions involved. The maximum that any person must serve prior to becoming eligible for parole for any combination of parolable sentences is ten years, regardless of the length of the sentences involved,

including concurrent or consecutive life sentences. This rule is a long standing position that has been taken by the Bureau of Prisons, and concurred in by the Parole Commission, based on the interpretation of 18 USC § 4205(a)."

121. BOP Program Statement 5880.30, Chapter VII, m. (1999) states: "If a computation includes a non-parolable offense and a parolable offense, the person may **not**, of course, be paroled during the confinement portion of the sentence (calculated as if standing alone) for the non-parolable offense. PE for the parolable portion of the sentence, however, may not exceed the **ten year cap**."  (Emphasis added.)

122. On information and belief, on approximately August 21 1992, Mr. Silverstein should have become eligible for parole.

123. On information and belief, due to Mr. Silverstein's confinement under indefinite "no human contact" status he has never become eligible for parole.

124. On information and belief, Mr. Silverstein has repeatedly exhausted the BOP grievance process in the effort to ascertain when he would become eligible for parole and/or release.

125. On information and belief, on an unidentified date in January 1992 Mr. Silverstein received the initial review of his assignment to "no human contact" status.

126. Since the decision to place Mr. Silverstein on indefinite "no human contact" was imposed by the Director of the BOP and continued by each new Director, any such reviews of his placement in solitary confinement at LVN were meaningless.

127. Although Mr. Silverstein repeatedly and consistently asked for an explanation of what he needed to do to be released from segregation, he never received any criteria for release into general population.

18

128.    On information and belief, although Mr. Silverstein has repeatedly exhausted the BOP grievance process in the effort to ascertain what he must do to be released from indefinite "no human contact" statues he has never received any criteria for what he must do to be released into general population.

129.    From December 1983 through July 2005, no BOP official or ATL staff or LVN staff informed Mr. Silverstein how much longer he would remain on "no human contact" status.

130.    From December 1983 through July 2005, Mr. Silverstein's mental state deteriorated due to his conditions of confinement (extreme sensory deprivations) at ATL and LVN.

131.    From December 1983 through July 2005, Mr. Silverstein did not engage in disruptive or assaultive behavior during his confinement at ATL and LVN.

132.    Such conditions of confinement were imposed on Mr. Silverstein to punish him for killing a prison guard and to punish him for inmate Fountain's killing of a prison guard on the same day that he did.

133.    The BOP Director imposed such conditions of confinement on Mr. Silverstein with the knowledge that the conditions were disproportionate punishment for killing a prison guard.

134.    The imposition and continuation of such conditions of confinement was done in an arbitrary and capricious manner with no penological justification.

135.    On July 12, 2005, Mr. Silverstein was transferred to ADX and into a special segregation unit known as "13-Range," located on "Z-Unit."

136.    Conditions at ADX are more restrictive than any other form of incarceration

within the BOP system.

137.    When ADX opened in 1995, according to the BOP's Program Statement P5100.08, ADX was designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution.

138.    Any "claimed" justification the BOP had to transfer Mr. Silverstein to ADX ceased to exist over fifteen years ago.  Mr. Silverstein has not violated any BOP policies or regulations nor received a misconduct citation for over twenty years.

139.    During that time Mr. Silverstein has demonstrated the ability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institutions he has been confined in.

140.    On information and belief, the BOP's decision to transfer Mr. Silverstein to ADX was done in an arbitrary and capricious manner and to further punish him for the incidents at Marion prison in 1983.

141.    Between the opening of ADX in 1995 and Mr. Silverstein's transfer to ADX in 2005, Mr. Silverstein did not demonstrate any inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of LVN.

142.    During that time, prison staff rewarded Mr. Silverstein for his continued adherence to BOP policies by allowing him access to some religious materials and art supplies.

143.    On information and belief, BOP officials never notified Mr. Silverstein of their decision to transfer him to ADX.  During the transfer and prior to his arrival at ADX,

Mr. Silverstein was led to believe he was being transferred to an open population prison. Only upon his arrival at ADX did Mr. Silverstein realize the magnitude of his situation and realize that he had been transferred to a more restrictive environment, not a less restrictive one.

144. Mr. Silverstein was transferred to ADX to further punish him for killing a prison guard in 1983.

145. The transfer of Mr. Silverstein to ADX was arbitrary and capricious and had no penological justification.

146. According to ADX's mission statement, prisoners are eligible to transfer out of ADX through the Step-Down Program upon demonstrating improved behavior and the ability and motivation to reintegrate into an open population prison.

147. BOP Institutional Supplement 5321.06F(1) states that to be placed in the Step-Down Program and transferred to a less restrictive unit a prisoner must maintain twelve months of clear conduct, participate in prison programs, maintain proper hygiene standards, and interact appropriately with staff.

148. Although Mr. Silverstein has fully complied with all standards set forth in Institutional Supplement 5321.06F(1), Defendants have refused to consider Mr. Silverstein for placement in the Step-Down Program.

149. Since his arrival at ADX, Mr. Silverstein has been indefinitely incarcerated in the Special Housing Unit (SHU) commonly known as "13-Range." Though Z-Unit is identified as SHU, in practice 13-Range is operated neither as SHU nor Control Unit.

150. Conditions in 13-Range are more restrictive than any other form of incarceration within ADX, and are more restrictive than any other form of SHU or Control Unit

incarceration within the BOP system, including ADX.

151.    BOP Institutional Supplement 5212.07 states that for a prisoner to be released from a control unit he must demonstrate the ability to function in a less restrictive environment without posing a threat to others and adhere to BOP policies and procedures.  If a prisoner demonstrates such behavior he may be returned to general population at the institution from which he was originally transferred.

152.    Although Mr. Silverstein has fully complied with all standards set forth in Institutional Supplement 5212.07 and BOP Institutional Supplement 5321.06F(1), Defendants have refused to consider him for transfer out of ADX.  Mr. Silverstein has demonstrated his ability for release from segregation.  Were Mr. Silverstein confined in the Control Unit or Special Housing Unit at an open population prison he would be placed in general population.

153.    Since Mr. Silverstein's transfer to ADX, the BOP has continued to impose "no human contact" status on him.

154.    Mr. Silverstein has shown for more than fifteen years that there is no justification for continuing his indefinite "no human contact" status, or for confining him at ADX.

155.    Additionally, during his confinement at ADX, Mr. Silverstein has not acted in any way that would suggest he remains a risk of threat to others or to the secure and orderly operation of the institution.

156.    During his confinement at ADX from July 2005 to present, Mr. Silverstein has maintained clear conduct, participated in prison programs made available to him, maintained proper hygiene standards, and interacted appropriately with staff at all times.

157.    BOP Program Statement 5270.07 states that an inmate confined in a SHU will

receive a formal hearing and review regarding their SHU placement at least every 30

days to determine whether he can be transferred into a less restrictive environment.

See also 28 C.F.R. 541.22(c)(1).

158.    BOP Program Statement also 5270.07 states that an inmate shall be released from

SHU confinement when reasons for that placement cease to exist.  See also 28 C.F.R.

541.22(c)(1).

159.    On information and belief, since Mr. Silverstein's initial status review hearing at

LVN in January 1992 he has received status review hearings only twice a year.  Since

Mr. Silverstein's transfer to ADX these reviews have continued to be administered

only twice a year.  All of these reviews have been sham hearing since the officials

holding them do not have the authority to order Mr. Silverstein released from Unit 13

or ADX.

160.    On information and belief, present at these six-month reviews at ADX are BOP

Regional Director Nalley, ADX Warden Wiley, and other BOP officials and ADX

staff.  At each of his six-month reviews Mr. Silverstein has requested an explanation

of criteria for removal from indefinite "no human contact" status, and has requested a

removal date from "no human contact" status.

161.    Whenever Mr. Silverstein has addressed these questions to Defendant Wiley,

Wiley has answered that the decision is not his but is for the BOP Regional Director

to determine.

162.    Conversely, whenever Mr. Silverstein has addressed these questions to Regional

Director Nalley, Nalley has answered that the decision is not his but is for the ADX

Warden to determine.

163.    As such, Mr. Silverstein has never been informed by Defendants or their agents what criteria he must meet for removal from "no human contact" status and/or removal from 13-Range or ADX.

164.    On information and belief, any and all reviews of Mr. Silverstein's placement in solitary confinement at LVN and ADX by local prison staff have been meaningless due to Mr. Silverstein's confinement under indefinite "no human contact" status by various Directors of the BOP.

165.    The denial of placement in step-down at ADX is done to further punish Mr. Silverstein for killing a prison guard in 1983.

166.    Mr. Silverstein is denied placement in step-down in an arbitrary and capricious manner because the review members are aware that "no human contact" status was and is imposed on Mr. Silverstein by former and current Directors of the BOP. On information and belief, review members are intimidated from contradicting the Director's orders by placing Mr. Silverstein into step-down.

167.    On information and belief, although Mr. Silverstein has repeatedly exhausted the BOP grievance process in the effort to ascertain what he must do to be released from "no human contact" status, he has never received any criteria for what he must do to be released into general population.

168.    During his entire confinement at ADX Mr. Silverstein has not engaged in disruptive or assaultive behavior.

169.    During his time on "no human contact" status, Mr. Silverstein has demonstrated the ability and motivation to reintegrate into an open population and eventually

transfer into a general population prison.

170.     Mr. Silverstein has been continuously subjected to extreme solitary confinement and reduced environmental stimulation within ADX, from July 2005 until the present date without any hope of release into a general population unit.

171.     At ADX, Mr. Silverstein is confined to an 8 1/2' x 10' cell for at least 23 hours a day.  Mr. Silverstein is confined in 13-Range where he is moved between two cells every three months.  Each cell contains a bed with metal restraint rings, a sink, toilet, and shower.

172.     At ADX, the two cells assigned to Mr. Silverstein are cells 2-030-L and 2-040-L.

173.     In cell 2-030-L, Mr. Silverstein has a mirror, cement walls, and a small horizontal window that Mr. Silverstein can only see out of when he stands on his desk.

174.     In cell 2-040-L, Mr. Silverstein does not have a mirror, but has enforced metal walls and a small horizontal window that is covered with mesh and painted over, disallowing Mr. Silverstein any possibility of seeing out the window.  In addition, if Mr. Silverstein were to be able to look out the window, Mr. Silverstein would have to stand on his desk to do so.

175.     13-Range is entombed by a sound proof door that was built after Mr. Silverstein's arrival at ADX to ensure that Mr. Silverstein cannot pursue any human contact whatsoever with the only other inmate on 13-Range.

176.     There are four cells total on 13-Range, two cells for each inmate confined on that range.

177.     Defendants prohibit Mr. Silverstein from any form of verbal contact with any other inmates.

178.   Mr. Silverstein's cell is structured to completely restrict any and all conversation between fellow inmates. Mr. Silverstein must exercise by himself as well as take his meals alone in his cell.

179.   At ADX 13-Range, Mr. Silverstein is subjected to 24 hour camera surveillance, 7 days a week, 365 days a year, thereby denying Mr. Silverstein any and all privacy.

180.   Mr. Silverstein exercises five days a week for one hour in an individual 10' x 14' cement yard that is attached to his cell.

181.   The yard is so restrictive that Mr. Silverstein can walk no more than approximately ten steps in any direction and approximately thirty steps in a circle.

182.   Upon transfer to ADX, Defendants arbitrarily and without explanation deprived Mr. Silverstein of most of his art supplies, knowing that Mr. Silverstein used art supplies as a coping mechanism.

183.   At ADX, Defendants have severely limited Mr. Silverstein's opportunities to contact the outside world by limiting phone calls and social visits.

184.   At ADX Mr. Silverstein is forced to conduct legal visits in a "visiting room" located within feet of his cell in 13-Range. The "visiting room" provided for Mr. Silverstein's visitors is approximately 4' x 4', has no ventilation, and contains a single telephone-style intercom device attached to the wall via a 2' chord. The "visiting room" does not contain a "pass-through" slot, preventing Mr. Silverstein or his attorneys from exchanging documents. The visiting room is the size of a broom closet.

185.   The visiting room does not have holes drilled into the glass so that counsel and client can talk without shouting.

186.    During any attorney-client visit, at least one guard is posted outside the visiting room door, thereby allowing the guard(s) to hear what is discussed between attorney(s) and client.  When one guard relieves another guard, the attorneys can hear any and all conversations between guards.

187.    There is camera surveillance in and around the visiting room, which records all actions of attorney(s) and client.  On information and belief, the cameras allow Defendants to record conversations or at least listen to conversations between attorney(s) and client.

188.    The conditions of the "visiting room" hinder Mr. Silverstein's ability to conduct meaningful visits with his attorneys.

189.    Any time Mr. Silverstein is transported out of Range-13 he is subjected to extreme physical discomfort: he is subjected to an invasive strip search and is then not only handcuffed, but also shackled to chains protruding from a black box suspended by a chain wrapped around his stomach.  Additionally, he is shackled at his ankles.

190.    Following each transport, Mr. Silverstein is strip-searched again.

191.    On information and belief, Mr. Silverstein is removed from his cell only for the bi-annual "reviews" of his confinement status and for infrequent haircuts.

192.    On information and belief, since his transfer to ADX, the only physical contact Mr. Silverstein experiences occurs during the invasive process which precedes and concludes any transport from his cell, and during infrequent haircuts.

193.   Despite the severe psychological damage that has arisen from these extreme conditions, Defendants restrict Mr. Silverstein's mental health care access to monthly, extremely short impersonal psychological review sessions conducted at his door.

194.   On information and belief, there are numerous other inmates confined within ADX or other prisons who have committed murder while in prison, including murder of guards and/or other inmates.   None of these inmates have been placed under similar restrictive confinement such as Mr. Silverstein.

195.   On information and belief, Mr. Silverstein is the only inmate convicted of murder within the BOP that is subjected to "no human contact" status, and placed in ADX "13-Range" indefinitely.

196.   At the time of filing this lawsuit, Mr. Silverstein was still confined in "13-Range" at ADX.

197.   Mr. Silverstein's "no human contact" status has continued for twenty-four years.

198.   Defendants' actions were and are wanton, malicious and willful.

199.   Any justification Defendants had for placing Mr. Silverstein under "no human contact" status ceased to exist over fifteen years ago.  Mr. Silverstein has not violated any BOP policies or regulations nor received a misconduct citation for over twenty years.  Additionally, Mr. Silverstein displayed peaceful, non-threatening behavior in an environment where he had opportunities to harm others twenty years ago during the 1987 Cuban riots.

200.   Mr. Silverstein's prolonged and indefinite lack of contact with the outside world, continual exposure to unnatural light, constant video surveillance denying any and all

privacy, and lack of human contact create extreme deprivation and serious and significant mental injury, resulting in cruel and unusual punishment by Defendants.

201.    The extreme length of Mr. Silverstein's solitary confinement and the indefinite nature of such confinement, has subjected Mr. Silverstein to extreme sensory deprivation resulting in cruel and unusual punishment.

202.    Defendants' deliberate indifference has resulted in Mr. Silverstein suffering deprivations that cause mental harm that go beyond the boundaries of what most human beings can psychologically tolerate.

203.    Mr. Silverstein's mental harm has manifested itself through depression, physiological harms, hallucinations, disorientation, memory loss and other unexpressed harms and/or symptoms.

204.    Mr. Silverstein has repeatedly brought his mental health issues to BOP staff member's attention at ATL, LVN, and ADX.  He has received no remedy to assuage the mental harm caused.

205.    Mr. Silverstein's inconceivably prolonged and indefinite solitary confinement is causing him severe psychological damage, such that mental illness and mental incompetence threaten to debilitate him.

206.    On information and belief, Defendants continue to impose "no human contact" status on Mr. Silverstein to punish him, cause severe mental harm, and to inflict cruel and unusual punishment on him.

207.    While confined at ATL and LVN, the BOP granted Mr. Silverstein access to art supplies.  Mr. Silverstein used the art supplies as a therapeutic measure to avoid mental health deterioration.

208.    At ADX, Mr. Silverstein has been denied almost all art supplies.  Now that the lawsuit has been filed he has been offered more art supplies.

209.    While confined at ATL and LVN, Mr. Silverstein was eventually allowed access to a TV, and a radio/tape player which allowed him to fully realize his religious practice.  At LVN, Mr. Silverstein was also allowed access to a VCR, which also allowed him to realize his religious practice.

210.    At varying times during his confinement at ATL and LVN, Mr. Silverstein was granted access to Buddhist texts and literature, New Dimensions tapes, New Dimensions publications, articles, and newsletters, New Dimensions public radio broadcasts, advanced yoga classes, and other religious and spiritual texts and publications to facilitate the practice of his religious belief.

211.    Upon arrival at ADX, prison staff confiscated all of Mr. Silverstein's religious materials without any notice or explanation.

212.    The confiscation of Mr. Silverstein's Buddhist texts and literature, New Dimensions tapes, New Dimensions publications, articles, and newsletters, New Dimensions public radio broadcasts, advanced yoga classes, and other religious and spiritual texts and publications has barred Mr. Silverstein from exercising his religious practice.

213.    Since Mr. Silverstein's arrival at ADX and until the present, he has been continually denied any and all access to religious materials, including New Dimensions cassette tapes, public radio broadcasts, newsletters and articles, advanced yoga classes, and Buddhism texts and literature.

214.    On information and belief, no inmate has ever been paroled directly from ADX. Because of this, even if Mr. Silverstein's parole status were accurately acknowledged by the BOP, his confinement at ADX prevents him from being considered for parole.

215.    Since his placement on "no human contact," each Director of the BOP, up and through present Director Lappin, have rubber-stamped the directive from former Director Carlson to confine Mr. Silverstein indefinite on this "no human contact" status while confined with the BOP.

216.    This directive from then Director Carlson has been followed religiously by prison staff regardless of the conduct of Mr. Silverstein during his confinement with the BOP.

217.    On information and belief, all reviews of Mr. Silverstein that were undertaken by prison staff were shams since it had been predetermined that he would remain confined in indefinite isolation while confined with BOP.

218.    Defendant Lappin approved the continuation of indefinite solitary confinement of Mr. Silverstein on "no human contact" status without providing for meaningful review of such confinement. He has refused to release Mr. Silverstein from indefinite solitary confinement in segregation for retaliatory reasons and has acted arbitrarily and capriciously. Defendant Lappin was aware that the reviews provided to Mr. Silverstein were shams, yet he took no steps to ensure that meaningful hearings were held.

219.    Defendant Conley is responsible for reviewing Mr. Silverstein's confinement and has continued his indefinite solitary confinement even though he has met the criteria for release to general population, and she has refused to provide meaningful review of

31

his continued confinement.  She has refused to release Mr. Silverstein from indefinite solitary confinement in segregation for retaliatory reasons and has acted arbitrarily and capriciously.  Defendant Conley was aware that the reviews of Mr. Silverstein were shams, yet she took no steps to ensure that meaningful hearings were held.

220.    Defendant Nalley has continued the indefinite solitary confinement of Mr. Silverstein on "no human contact" status even though Mr. Silverstein has met all of the criteria for release to general population.  He has refused to release Mr. Silverstein from indefinite solitary confinement in segregation for retaliatory reasons and has acted arbitrarily and capriciously.  Defendant Nalley was aware that the reviews he took part in were shams, yet he took no steps to ensure that meaningful hearings were held.

221.    Defendant Wiley has continued Mr. Silverstein's indefinite solitary confinement on "no human contact" status even though Mr. Silverstein has met all criteria for release to general population.  He has refused to release Mr. Silverstein from indefinite solitary confinement in segregation for retaliatory reasons and has acted arbitrarily and capriciously.  Defendant Wiley was aware that the reviews he took part in were shams, yet he took no steps to ensure that meaningful hearing swere held.

222.    Each of the named individual Defendants were aware of the BOP's directive that Mr. Silverstein was to remain on "no human contact" isolation while he was confined with the BOP and, thus, refused to provide him meaningful reviews.

223.    Each of these named individual Defendants had predetermined, prior to any hearing, which regardless of what Mr. Silverstein's conduct was, he would be continued in "no human contact" isolation until his death.

## CAUSES OF ACTION

### Claim 1

**DEFENDANTS VIOLATED PLAINTIFF'S DUE PROCESS iINTEREST BY INDEFINITELY CONFINING HIM TO A "NO HUMAN CONTACT" ISOLATION STATUS.**

224.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

225.    Under the Fifth Amendment to the United States Constitution Mr. Silverstein may not be deprived of a liberty interest by subjecting him to atypical and significant hardship.

226.    Defendants' placement of Mr. Silverstein on indefinite "no human contact" status based upon an incident from twenty-four years ago creates atypical and significant hardship.

227.    Placement of Mr. Silverstein on "no human contact" status with the sole purpose of punishing him for a crime that he committed twenty-four years ago created an atypical and significant hardship.

228.    Mr. Silverstein's confinement under indefinite "no human contact" status violates his liberty interest by imposing atypical and significant hardship in relation to the ordinary incidents of prison life.

229.    Defendants' continuation of indefinite "no human contact" status upon Mr. Silverstein was done in an arbitrary and capricious manner.

230.    Defendants' confinement of Mr. Silverstein under "no human contact" status prevents him from being considered for parole.

### Claim 2

**DEFENDANTS VIOLATED PLAINTIFF'S LIBERTY INTEREST BY TRANSFERRING HIM TO ADX.**

33

231.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

232.    Under the Fifth Amendment to the United States Constitution Mr. Silverstein may not be deprived of a liberty interest without due process of law.

233.    Defendants' transfer of Mr. Silverstein to ADX was done in an arbitrary and capricious manner.

234.    Defendants' transfer of Mr. Silverstein to ADX violated his liberty interest by further imposing upon him atypical and significant hardship in relation to the ordinary incidents of prison life.

235.    Defendants' transfer of Mr. Silverstein to ADX was done solely to impose additional punishment on him and serves no penological justification.

236.    Defendants' transfer of Mr. Silverstein to ADX was done arbitrarily and capriciously.

237.    Defendants denied Mr. Silverstein his Fifth Amendment right to due process when they transferred him to ADX without notice, hearing, or justification.

**Claim 3**

**DEFENDANTS VIOLATED PLAINTIFF'S LIBERTY INTEREST BY FAILING TO ADMIT HIM INTO STEP-DOWN PROGRAM**

238.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

239.    Under the Fifth Amendment to the United States Constitution Mr. Silverstein may not be deprived of a liberty interest without due process of law.

240.    Confining Mr. Silverstein in the most restrictive unit at ADX in furtherance of indefinite "no human contact" status prevented him from being considered for participation in ADX's step-down program and transfer out of ADX.

241.    Defendants' refusal to consider Mr. Silverstein for admittance to ADX's step-down program is done in an arbitrary and capricious manner.

242.    Defendants' refusal to consider Mr. Silverstein for admittance into the ADX step-down program was done to further punish him for an incident that occurred twenty-four years ago.

243.    The hearings or reviews are shams as to whether Mr. Silverseten should be placed in the step-down program.

244.    Defendants continued infringement of Mr. Silverstein's liberty interest for consideration for transfer out of 13-Range violates his Fifth Amendment right to due process.

### Claim 4

### DEFENDANTS VIOLATED THE EIGHTH AMENDMENT BY HOLDING PLAINTIFF IN INDEFINITE "NO HUMAN CONTACT" STATUS

245.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

246.    The Eight Amendment to the United States Constitution forbids cruel and unusual punishment.

247.    Mr. Silverstein's indefinite "no human contact" status, which subjects him to sensory deprivation, constitutes cruel and unusual punishment.

248.    Indefinite "no human contact" status has had a substantial negative impact on Mr. Silverstein's mental health.

249.    Mr. Silverstein's lack of contact with the outside world, continual exposure to unnatural light, constant surveillance, and lack of human contact constitutes severe mental harm and results in cruel and unusual punishment by Defendants.

250.    Defendants subjected Mr. Silverstein to disproportionate punishment in violation of the Eighth Amendment by placing him on indefinite "no human contact" status.

251.    Defendants subjected Mr. Silverstein to severe sensory deprivation as part of the punishment that they sought to impose on him.

### Claim 5

### DEFENDANTS  RESTRICTIONS  ON  PLAINTIFF'S  RELIGIOUS PRACTICE WAS IN VIOLATION OF THE FIRST AMENDMENT

252.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

253.    The First Amendment to the United States Constitution prohibits the restriction of the free exercise of religion.

254.    Mr. Silverstein has a sincerely held religious belief that is based primarily on Buddhism, and influenced by yogism and New Age spiritualism.

255.    Defendants have violated Mr. Silverstein's First Amendment right to practice religion by their actions.

### Claim 6

### DEFENDANTS RESTRICTIONS ON PLAINTIFF'S SPIRITUAL PRACTICEWAS IN VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT (RFRA)

256.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

257.    The Religious Freedom Restoration Act (RFRA) applies to the federal government, and to the Federal Bureau of Prisons, as an agent thereof.

258.    RFRA states that the government shall not substantially burden religious exercise without compelling justification.

259.    Mr. Silverstein has a sincerely held religious belief that is based primarily on Buddhism, and influenced by yogism and New Age spiritualism.

260.    Defendants have substantially burdened the exercise of Mr. Silverstein's religious

belief by their actions.

**Claim 7**

**DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO PRIVATE, ATTORNEY-CLIENT CONSULTATION BY VIDEOTAPING CONSULTATION SESSIONS AND POSTING PRISON GUARDS NEAR DOOR OF VISITING ROOM**

261.    Mr. Silverstein realleges and incorporates paragraphs 1 through 223.

262.    Under the Federal Rules of Evidence Rule 501, the First Amendment and

common law Mr. Silverstein may not be deprived of his right to private consultation

and full and frank communication with his attorneys.

263.    Defendants' video surveillance of any and all attorney client communications is a

violation of Mr. Silverstein's right to private consultation and full and frank

communication with his attorneys.

264.    Defendant's requirement that counsel and Mr. Silverstein communicate by

telephone while separated by a soundproof glass barrier during visitation violates Mr.

Silverstein's right of unfettered access to his counsel and the courts.

265.    Defendants' placement of prison staff in a position where staff can hear the

privileged communication is in violation of Mr. Silverstein's right to private

consultation and full and frank communication with his attorneys.

**Prayer for Relief**

Wherefore, Mr. Silverstein respectfully requests this Court grant the following relief:

A        Issue a declaratory judgment that Defendants have deprived Mr. Silverstein of

his liberty interest by placing him on indefinite "no human contact" status.

B.       Issue a declaratory judgment that Defendants have deprived Mr. Silverstein of

due process or law in hold shams hearings and also acted arbitrary and capricious in extending his "no human contact" status without penological justification.

C  Issue a declaratory judgment that Defendants subjected Mr. Silverstein to cruel and unusual punishment by placing him on indefinite "no human contact" status.

D.  Issue a declaratory judgment that Defendants subjected Mr. Silverstein to cruel and unusual punishment by using the "no human contact" status as a form of punishment.

E  Issue a declaratory judgment that Defendants have violated RFRA.

F  Issue an injunction preventing Defendants from continuing the indefinite "no human contact" status.

G  Issue an injunction requiring Defendants to remove Mr. Silverstein from "13-Range" and ADX and place him into general population at another prison at a custody level based upon his behavior for the past twenty-four years.

H  In the alternative, issue an injunction requiring Defendants to place Mr. Silverstein in the step-down program at ADX and given credit as to the step-down program for the time he has spent on 10-Range.

I  Issue an injunction requiring Defendants to provide Mr. Silverstein access to religious materials, such as Buddhist texts and literature, New Dimensions tapes, publications, articles, newsletters, and radio broadcasts, advanced yoga classes, and other religious and spiritual texts and publications pertaining to the practice of Mr. Silverstein's religious belief.

J  Issue an injunction requiring Defendants to incorporate into Mr. Silverstein's visiting room a pass-through slot and intercom system allowing simultaneous group communication.

K       Issue an injunction that Defendants have interfered with the attorney-client communications by its conduct and to cease such violations.

J       Award nominal, compensatory and/or punitive damages.

L       Award reasonable attorney's fees, expenses and costs.

M       Mr. Silverstein also requests any additional or alternative relief as may be just, proper, and equitable.

Dated: March 15, 2008

Respectfully submitted,

STUDENT LAW OFFICE

s/ Daniel Manville
Daniel Manville, Esq.
Email:  dmanville@law.du.edu

Steven Baum
Student Attorney
Email: sbaum09@law.du.edu

Amber Trzinski
Student Attorney
Email:  atrzinski09@law.du.edu

University of Denver Sturm College of Law
2255 East Evans Avenue, Suite 335
Denver, CO 80208
Tel: 303-871-6140
Fax:  303.871.6847

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Marcy.cook@usjob.gov

I also hereby certify that on this 28th day of February, 2008, I have mailed or served the foregoing document to the following non-CM/ECF participant(s) in the manner (mail, e-mail, etc.) indicated by the nonparticipant's name:

None.

s/ Daniel E. Manville
Daniel E. Manville
Counsel for Plaintiff