## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-02471-PAB-KMT

THOMAS SILVERSTEIN,

     Plaintiff,

v.

FEDERAL BUREAU OF PRISONS; sued in its official capacity;
JOHN VANYUR, former Assistant Director, Correctional Programs Division, Federal
Bureau of Prisons; sued in his individual capacity;
JOYCE CONLEY, Assistant Director, Correctional Programs Division, Federal Bureau
of Prisons; sued in her official and individual capacities;
MICHAEL NALLEY, Regional Director, North Central Region, Federal Bureau of
Prisons; sued in his official and individual capacities;
DONALD DENNEY, Regional Psychology Administrator, North Central Region,
Federal Bureau of Prisons; sued in his official and individual capacities;
RONNIE WILEY, Warden, United States Penitentiary Administrative Maximum; sued in
his official and individual capacities;
MARIE BAILEY, Staff Psychologist, United States Penitentiary Administrative
Maximum; sued in her official and individual capacities;
PAUL ZOHN, Staff Psychologist, United States Penitentiary Administrative Maximum;
sued in his official and individual capacities,

     Defendants.

---

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF
## AND DAMAGES AND JURY DEMAND

---

### INTRODUCTION

Plaintiff Thomas Silverstein, incarcerated in the United States Penitentiary

Administrative Maximum ("ADX") in Florence, Colorado, submits his Second Amended

Complaint for violations of his rights under the Fifth and Eighth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

1.     This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 2201, 2202, the Administrative Procedure Act, 5 U.S.C. § 702, and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

2.     This Court possesses personal jurisdiction over each of the parties sued in their individual capacities pursuant to the factual circumstances set forth in this complaint.

3.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 as the majority of the Defendants reside here and the ongoing events giving rise to Mr. Silverstein's claims have occurred and continue to occur in this judicial district.

## PARTIES

4.     Plaintiff THOMAS SILVERSTEIN is an inmate who has been in the custody of the United States Federal Bureau of Prisons since 1978.  Mr. Silverstein has been held in solitary confinement at various United States Penitentiaries since 1983. Mr. Silverstein has been confined at the ADX since July 2005.

5.     Defendant FEDERAL BUREAU OF PRISONS ("BOP") is an agency of the United States charged with the confinement of prisoners in federal prison facilities. Defendant BOP is sued in its official capacity.

6.      Defendant JOHN VANYUR was the BOP Assistant Director for the Correctional Programs Division from June 2004 until May 2007. As BOP Assistant Director for Correctional Programs, Defendant VANYUR was responsible for inmate management and program functions including security, inmate case management, and delivery of mental health services. Defendant VANYUR was personally involved in Mr. Silverstein's case management while he was BOP Assistant Director for Correctional Programs. Defendant VANYUR was present for and directly participated in Plaintiff Silverstein's semi-annual reviews at the ADX, and he was present for and directly participated in Control Unit reviews every three months at the ADX. Defendant VANYUR is sued in his individual capacity.

7.      Defendant JOYCE CONLEY is the BOP Assistant Director for the Correctional Programs Division. Defendant CONLEY has held this position since May 2007. As BOP Assistant Director for Correctional Programs, Defendant CONLEY is responsible for inmate management and program functions including security, inmate case management, and delivery of mental health services. Defendant CONLEY was present for and directly participated in Plaintiff Silverstein's semi-annual reviews at the ADX, and she is present for and directly participates in Control Unit reviews every three months at the ADX. Defendant CONLEY is sued in her official and individual capacities.

8.      Defendant MICHAEL NALLEY is the BOP Regional Director for the North Central Region. Defendant NALLEY has held this position since 2004. Defendant NALLEY has decisionmaking authority regarding transfer and placement of

prisoners in prisons operated by the BOP, including the ADX, within the North Central Region. Defendant NALLEY was present for and directly participated in Plaintiff Silverstein's semi-annual reviews at the ADX, and he is present for and directly participates in Control Unit reviews every three months at the ADX. Defendant NALLEY is sued in his official and individual capacities.

9.    Defendant DONALD DENNEY is the Regional Psychology Administrator for the North Central Region. Defendant DENNEY is responsible for the delivery and oversight of psychological services to inmates confined within the North Central Region of the BOP. Defendant DENNEY is regularly present at the ADX for visits in which he sees all areas of the institution and interacts with inmates.  On more than one of these visits, Defendant DENNEY spoke directly with Plaintiff Silverstein about his conditions of confinement.  Defendant DENNEY is sued in his official and individual capacities.

10.    Defendant RONNIE WILEY is the Warden of the ADX.  Defendant WILEY is responsible for the administration, operation, maintenance, policies, procedures, and functions at the ADX, including decisions regarding an inmate's ability to participate in the step-down program. Defendant WILEY resides in the state of Colorado, is present at the ADX on a regular basis, and regularly interacts with Plaintiff Silverstein.  Defendant WILEY is sued in his official and individual capacities.

11.    Defendant MARIE BAILEY is a Staff Psychologist at the ADX.  Defendant BAILEY is responsible for the delivery of psychological services to inmates at the

ADX.  Defendant BAILEY resides in the state of Colorado, is present at the ADX

on a regular basis, and has delivered psychological services to Plaintiff Silverstein.

Defendant BAILEY is sued in her official and individual capacities.

12.    Defendant PAUL ZOHN is a Staff Psychologist at the ADX.  Defendant ZOHN is

responsible for the delivery of psychological services to inmates at the ADX.

Defendant ZOHN resides in the state of Colorado, is present at the ADX on a

regular basis, and has delivered psychological services to Plaintiff Silverstein.

Defendant ZOHN is sued in his official and individual capacities.

13.    Defendants VANYUR, CONLEY, NALLEY, DENNEY, WILEY, BAILEY, and

ZOHN were acting under color of federal law as to the claims raised in this matter.

## FACTS

**A.    Conviction and Initial Confinement within the BOP.**

14.    On November 3, 1975, Mr. Silverstein was sentenced to fifteen years in prison for

armed bank robbery.

15.    Mr. Silverstein was first confined within the BOP in 1978. From March 1978

until November 1980, Mr. Silverstein was incarcerated at the United States

Penitentiary ("USP") Leavenworth ("LVN") in Leavenworth, Kansas.

16.    In 1980, Mr. Silverstein was convicted for the murder of inmate Danny Atwell.

This conviction was subsequently reversed, and Mr. Silverstein was never retried.

*See* U.S. v. Silverstein, 737 F.2d 864 (10th Cir. 1984).

**B.**     **Transfer to USP Marion.**

17.     In November 1980, Mr. Silverstein was transferred from LVN to the Control Unit at USP Marion ("Marion") in Marion, Illinois.

18.     In 1982, Mr. Silverstein was convicted of the murder of inmate Robert Chappelle, a member of the D.C. Blacks prison gang.

19.     After Mr. Chappelle's death, the BOP transferred inmate Raymond Smith, a widely known leader of the D.C. Blacks, to Marion.  Mr. Smith promised to kill Mr. Silverstein as retribution for Mr. Chappelle's death.

20.     On information and belief, BOP officials knew that Mr. Smith had repeatedly threatened to kill Mr. Silverstein. Despite these threats to Mr. Silverstein's life, BOP officials placed Mr. Smith within three cells of Mr. Silverstein at Marion.

21.     On information and belief, Mr. Smith attempted to kill Mr. Silverstein on two separate occasions at Marion between December 1981 and September 1982. BOP officials knew of these repeated attempts on Mr. Silverstein's life, yet failed to place Mr. Silverstein and Mr. Smith in separate housing units.

22.     On information and belief, Marion Correctional Officer Merle Clutts knew of the threats and two attempted murders of Mr. Silverstein by Mr. Smith, yet Correctional Officer Clutts failed to take steps to separate Mr. Silverstein and Mr. Smith.

23.     Mr. Silverstein believed that, based on his actions, Mr. Smith would not stop his attacks until he killed Mr. Silverstein, and that the BOP, including Correctional Officer Clutts, would take no measures to protect him from Mr. Smith. On

September 27, 1982, Mr. Silverstein killed Mr. Smith.

24.    After the death of Mr. Smith, Correctional Officer Clutts constantly harassed Mr. Silverstein, leading Mr. Silverstein to believe that Correctional Officer Clutts would again place him in a situation whereby another inmate would attempt to kill Mr. Silverstein. On October 22, 1983, Mr. Silverstein killed Correctional Officer Clutts.

25.    Since October 22, 1983, the BOP has held Mr. Silverstein in conditions of extreme and indefinite solitary confinement as punishment for the killing of Correctional Officer Clutts.

**C.    Conditions of Confinement at ATL.**

26.    On November 2, 1983, Mr. Silverstein was transferred to USP Atlanta ("ATL").

27.    On information and belief, in August 1984, Norman Carlson, then-director of the BOP, issued a memorandum ordering that Mr. Silverstein be confined under "special security procedures." These "special security procedures" included a directive for the use of non-contact confinement.

28.    On information and belief, this memorandum effectively ordered that Mr. Silverstein be placed on "no human contact" status, and that he remain on that status for an indefinite time period.

29.    At ATL, a special area of the prison known as the "side pocket" was designated for the confinement of Mr. Silverstein. The side pocket had three adjacent cells. One of the three cells was a shower.

30.    The cells in the side pocket area did not have windows.

31.   Mr. Silverstein was not allowed to have a watch or a clock while confined in the side pocket cells.

32.   The side pocket was designed in such a way as to hold Mr. Silverstein in extreme isolation.

33.   The side pocket was structured in such a way as to isolate Mr. Silverstein from all other inmates.

34.   The side pocket was designed to minimize contact between Mr. Silverstein and staff.

35.   Prior to Mr. Silverstein's arrival at ATL, prison staff added more bars to the sallyport and cell area of the side pocket.

36.   The dimensions of a side pocket cell were approximately six feet by seven feet. Mr. Silverstein could simultaneously touch the opposite walls of the cell while standing in one place.

37.   While confined in these cells, Mr. Silverstein exercised alone and took all meals alone.

38.   In ATL, Mr. Silverstein was subjected to bright lights in his cell 24 hours a day, 7 days a week, 365 days a year.

39.   In ATL, Mr. Silverstein was subjected to continuous surveillance by cameras located in the hallway outside of the side pocket cells.

40.   There was no air conditioning or heating in any of the side pocket cells at ATL. In the summer months, the temperature in these cells would become so hot that Mr. Silverstein would strip himself naked, pour water on the floor, and lay down on the

wet floor in an attempt to alleviate the extreme heat.

41.     On information and belief, Mr. Silverstein was allowed to wear only his underwear for approximately the first year of his confinement in ATL.

42.     The only time Mr. Silverstein was removed from the side pocket cells was for outdoor recreation.  Mr. Silverstein received one hour of outdoor recreation per week in an outdoor recreation area that was isolated from all other inmates and prevented Mr. Silverstein from seeing any of the surrounding terrain.

43.     Mr. Silverstein received one hour of indoor recreation on Mondays, Tuesdays, Wednesdays, and Thursdays.  This indoor recreation occurred in the side pocket cell area.

44.     During the first year at ATL, Mr. Silverstein was not allowed social visits, telephone privileges, or reading materials. Mr. Silverstein's mail correspondence was strictly limited to only immediate family members and legal counsel.

45.     During the first year at ATL, Mr. Silverstein was denied all other privileges, including, but not limited to, art supplies, a radio/tape player, and a television.

46.     Prior to Mr. Silverstein's confinement at ATL, while at Marion, Mr. Silverstein became interested in art and began to teach himself to draw and paint. After the first year of confinement at ATL, Mr. Silverstein was granted limited access to art supplies. Mr. Silverstein began to use art as a therapeutic method to relieve stress and as a coping mechanism to try to avoid the deterioration of his mental health.

47.     The conditions of the "side pocket" cells were such that Mr. Silverstein was subjected to extreme sensory deprivation that led to physical and psychological

harm.

48.    In 1987, Cuban inmates confined at ATL rioted and took control of the prison, taking prison staff hostage.  The Cuban inmates released Mr. Silverstein from his cell.

49.    While outside of his cell, Mr. Silverstein came into contact with prison staff who had been taken as hostages, and actively protected several of them from harm, including a food porter and a correctional officer.

50.    The FBI and BOP negotiated the capture of Mr. Silverstein with the Cuban inmates. Once BOP staff regained custody of Mr. Silverstein, he was transferred to a special cell in the basement ("basement cell") of USP-Leavenworth (LVN) on December 1, 1987.

**D.    Conditions of Confinement in the Basement Cell at LVN.**

51.    In the basement cell, Mr. Silverstein continued to be held under "no human contact" status.

52.    Two of the four walls and the ceiling of the basement cell were made of solid steel. After Mr. Silverstein's transfer to the basement cell, prison staff added more bars, a visiting booth, and an indoor recreation cage to the cell, creating substantially similar conditions of confinement to those that existed in the "side pocket" cells at ATL.

53.    The basement cell contained a bed, a metal sink, a shower stall, and a toilet without a lid.

54.    The basement cell had no windows and no mirror.

55.   The conditions of the basement cell were such that Mr. Silverstein continued to be held in extreme isolation.

56.   The basement cell was structured in such a way as to isolate Mr. Silverstein from all other inmates.

57.   The basement cell was designed in such a way as to minimize contact between Mr. Silverstein and staff.

58.   While confined in the basement cell, Mr. Silverstein exercised alone and took all meals alone.

59.   While confined in the basement cell, Mr. Silverstein was subjected to fluorescent lights 24 hours a day, 7 days a week, 365 days a year. These lights emitted a constant low buzzing sound.

60.   In addition to the fluorescent lights, Mr. Silverstein was subjected to a flood light directed into the basement cell from the hallway. The flood light was on 24 hours a day, 7 days a week, 365 days a year.

61.   Mr. Silverstein was continuously monitored by two surveillance cameras located within the basement cell.

62.   While confined in the basement cell, Mr. Silverstein could not hear any human voices, doors opening or closing, or televisions in other areas of the prison.

63.   Mr. Silverstein was denied all outdoor recreation privileges while confined in the basement cell.

64.   Mr. Silverstein was confined in the basement cell 24 hours a day for the entire length of his confinement in the basement cell, which was approximately one year.

65.     While confined in the basement cell, Mr. Silverstein was denied access to sunlight and fresh air.

66.     The basement cell was infested with rats during the time Mr. Silverstein was confined there.

67.     The conditions in the basement cell were such that Mr. Silverstein was subjected to extreme sensory deprivation that led to physical and psychological harm.

68.     After approximately a year in the basement cell, Mr. Silverstein was moved to a special cell, previously known as "the hole", in the LVN Special Housing Unit (SHU). The area had a separate entrance, and it was in a separate building at the end of the regular segregation unit. There were no other inmates confined within this area of the SHU. After Mr. Silverstein was moved to this cell, it became known as the "Silverstein Suite."

**E.     Conditions of Confinement in the "Silverstein Suite" at LVN.**

69.     In the "Silverstein Suite," Mr. Silverstein continued to be held under "no human contact" status.

70.     The conditions in the "Silverstein Suite" were substantially similar to those that existed in both the ATL side pocket cells and the basement cell.

71.     The conditions in the "Silverstein Suite" were such that Mr. Silverstein continued to be held in extreme isolation.

72.     The "Silverstein Suite" was structured in such a way as to isolate Mr. Silverstein from all other inmates.

73.    The "Silverstein Suite" was designed in such a way as to minimize contact between Mr. Silverstein and staff.

74.    The "Silverstein Suite" consisted of four separate areas: a cell area, a strip search area, an outdoor recreation area, and an indoor recreation area.  To move between areas, Mr. Silverstein passed through solid doors that were controlled remotely by staff.

75.    The dimensions of the cell area were approximately 9'0" by 16'0".  Inside the cell area, Mr. Silverstein had a bed, shower, desk, TV, and toilet.

76.    The strip search area and the outdoor recreation area were adjacent to the cell area.  The dimensions of the outdoor recreation area were 17'0" by 14'6".  In order to enter the outdoor recreation area, Mr. Silverstein had to first pass through the strip search area.

77.    The outdoor recreation area was surrounded by concrete walls, with a roof constructed of two sets of wire mesh and bars.

78.    The indoor recreation area was adjacent to the cell area, but opposite the outdoor recreation area and strip search area. The dimensions of the indoor recreation area were approximately 9'0" by 16'0". The indoor recreation area was a concrete room that contained one stationary bike, a concrete stool, an intercom and a barred, glass-covered window that looked out into the visiting booth.

79.    The concrete stool and intercom located within the indoor recreation area were used by Mr. Silverstein when he had visitors.  Visitors would sit in a booth located on the opposite side of the barred, glass covered-window.

80.    While confined in the "Silverstein Suite," Mr. Silverstein exercised alone and ate

all meals alone.

81.    While confined in the "Silverstein Suite," Mr. Silverstein was subjected to

artificial light 24 hours a day, 7 days a week, 365 days a year.

82.    Mr. Silverstein was continuously monitored by audio and video surveillance

equipment located within the "Silverstein Suite."

83.    Mr. Silverstein was confined to the "Silverstein Suite" for 24 hours a day.

84.    For the first few years of Mr. Silverstein's confinement in the "Silverstein Suite,"

he was typically allowed to exercise in the adjacent outdoor recreation area one

hour per day, five days a week.

85.    At times, however, BOP staff would purposefully leave Mr. Silverstein in the

outdoor recreation area for extended periods of time in the snow and bitter cold.

86.    On information and belief, Mr. Silverstein was initially given only one phone call

per month, but his phone privileges increased over time.  By approximately 2001,

Mr. Silverstein was allowed to use the telephone for 300 minutes per month.

87.    While confined at LVN, the LVN psychology staff reviewed Mr. Silverstein

every thirty days.

88.    BOP Staff Psychologist Thomas White conducted the monthly psychological

reviews of Mr. Silverstein until March of 1989, when Defendant DENNEY was

assigned to Mr. Silverstein.

89.    Defendant DENNEY, a staff psychologist at LVN since August 1987, began

conducting the monthly psychological reviews of Mr. Silverstein on March 15,

1989. Defendant DENNEY continued reviewing Mr. Silverstein on a monthly basis until June 12, 2003.

90. On information and belief, all interactions between Mr. Silverstein and BOP staff while Mr. Silverstein was in the "Silverstein Suite," including the monthly psychological reviews, typically would last no longer than several minutes.

91. Mr. Silverstein's psychological reviews were conducted either over television through a closed circuit signal or in person through the solid steel door of Mr. Silverstein's cell.

92. Mr. Silverstein's psychological reviews included an assessment of Mr. Silverstein's "threat to others." From 1987 through 1999, Mr. Silverstein's "threat to others" was assessed as "high." Between 1999 and 2004, the assessment fluctuated arbitrarily between "moderate" and "low."

93. In 1988, Mr. Silverstein received an incident report for "altering government property." Since that time, he has received no additional incident reports.

94. At the beginning of Mr. Silverstein's confinement at LVN, his access to art supplies was limited to pencils and paper. However, over the course of Mr. Silverstein's confinement at LVN, his access to art supplies was gradually increased to include paints, brushes, and canvasses.

95. Defendant DENNEY, over the course of his psychological reviews of Mr. Silverstein, acknowledged that Mr. Silverstein used art as a therapeutic method to relieve stress and as a coping mechanism to try to avoid the deterioration of his mental health.

96.   The conditions in the "Silverstein Suite" were such that Mr. Silverstein was subjected to extreme sensory deprivation and social isolation that led to physical and psychological harm.

97.   From December 2002 to January 2003, Mr. Silverstein was again housed in the basement cell because the conditions of the "Silverstein Suite" had become inhospitable.

98.   In January 2003, Mr. Silverstein was moved back to the "Silverstein Suite," where he continued to be held in extreme isolation under "no human contact" status.

**F.    Transfer to the ADX.**

99.   In 2005, Defendants NALLEY and VANYUR decided to transfer Mr. Silverstein from LVN to the ADX.

100.   Defendants NALLEY and VANYUR determined that Mr. Silverstein should be confined in an area known as "Range 13" at the ADX.

101.   Defendants NALLEY and VANYUR determined that Mr. Silverstein should be confined on Range 13 at the ADX because they considered it necessary to continue to confine Mr. Silverstein in substantially the same conditions that he had been confined in for the previous 21 years.

102.   Defendants NALLEY and VANYUR decided to maintain Mr. Silverstein on "no human contact" status when transferring Mr. Silverstein to the ADX.

103.   Defendants NALLEY and VANYUR decided to maintain Mr. Silverstein in extreme isolation despite Mr. Silverstein's good behavior for the previous 17

years.

104.    Mr. Silverstein was never provided any meaningful information regarding the reason for his transfer to the ADX.

105.    Mr. Silverstein was not provided prior notice, a hearing, or other opportunity to contest his transfer to the ADX prior to such transfer.

106.    On July 12, 2005, Mr. Silverstein was transferred to Range 13 at the ADX.

**G.**     **Conditions of Confinement on Range 13 at the ADX.**

107.    Range 13 is located in Z-Unit, or the SHU, at the ADX.

108.    The ADX is the most restrictive institution within the BOP system.

109.    Range 13 is the most restrictive housing area within the ADX.

110.    On Range 13, Mr. Silverstein continued to be held under "no human contact" status.

111.    The conditions on Range 13 are substantially similar to those that existed in the ATL side pocket cells, the LVN basement cell, and the "Silverstein Suite."

112.    The conditions on Range 13 are such that Mr. Silverstein continued to be held in extreme isolation.

113.    Range 13 is structured in such a way as to isolate Mr. Silverstein from all other inmates.

114.    Range 13 is designed in such a way as to minimize contact between Mr. Silverstein and staff.

115.    There are a total of four cells on Range 13.

116.   While confined on Range 13, Mr. Silverstein was moved between two cells every three months.

117.   The cells where Mr. Silverstein was confined were separated from the other cells on Range 13 by a sound proof, solid steel door located in the hallway.  This door was built after Mr. Silverstein's arrival on Range 13 to ensure that inmates confined on Range 13, including Mr. Silverstein, would be unable to have any contact with each other.

118.   On Range 13, each cell where Mr. Silverstein was confined was approximately 8'6" by 10'0".  The cells each contained a cement bed with metal restraint rings, a cement desk, a sink, toilet, and shower.

119.   In one of the cells on Range 13, Mr. Silverstein had a mirror, cement walls, and a small horizontal window that he could only see out of while standing on his desk.  From the window, all that was visible to Mr. Silverstein was the concrete walls of the outdoor recreation area.

120.   In the other cell on Range 13, Mr. Silverstein did not have a mirror, but had steel walls and a small horizontal window similar to the window in the other cell.  However, this window was covered with mesh and paint, which prevented Mr. Silverstein from being able to see through the window.

121.   While confined on Range 13, Mr. Silverstein used one of two outdoor recreation areas connected to the cells via sallyports accessed by remotely operated doors.  The outdoor recreation areas were deep concrete pits that prohibited Mr. Silverstein from seeing any of the surrounding terrain.

122.   While confined on Range 13, Mr. Silverstein used one indoor recreation area. Each of the two cells in which Mr. Silverstein was confined on Range 13 connected to the indoor recreation area via sallyports accessed by remotely operated doors.

123.   On Range 13, Mr. Silverstein was allowed one hour of exercise per day, five days a week.

124.   Neither the indoor nor outdoor recreation areas contained exercise equipment. The recreation areas were so small that Mr. Silverstein could walk no more than approximately ten steps in any direction and approximately thirty steps in a circle.

125.   While confined in the cells on Range 13, Mr. Silverstein exercised alone and ate all meals alone.

126.   The lights in each sallyport, which illuminated each of the cells, remained on 24 hours a day, 7 days a week, 365 days a year.

127.   While confined on Range 13, Mr. Silverstein was continuously monitored by video surveillance cameras located within the cell areas on Range 13.

128.   Mr. Silverstein was confined to the cell areas on Range 13 for 24 hours a day.

129.   On information and belief, one of the cells on Range 13 would flood when it rained.

130.   Upon transfer to Range 13, Mr. Silverstein was denied privileges that he had earned during his confinement at LVN.   For example, at LVN, Mr. Silverstein was permitted 300 minutes of telephone usage per month.  However, on Range 13, his telephone use was limited to two 15 minute phone calls per month.

131.   While confined on Range 13, Mr. Silverstein had very limited social visitation privileges.

132.   On Range 13, Mr. Silverstein's visits occurred in a visiting booth located within the cell areas. Mr. Silverstein accessed the visiting booth via the same sallyports which led to the recreation areas.

133.   In the visiting booth, Mr. Silverstein was separated from his visitors by a reinforced glass partition that contained no holes or pass through slot.

134.   On Range 13, the ADX psychology staff reviewed Mr. Silverstein every thirty days.

135.   On Range 13, virtually all communication between Mr. Silverstein and staff occurred through two doors, one of which was solid steel. On rare occasion, staff would enter the sallyport to talk to Mr. Silverstein. However, no staff would enter the sallyport alone – each staff member would always be accompanied by a correctional officer with a club.

136.   On information and belief, all interactions with BOP staff, including psychological reviews, lasted no longer than several minutes.

137.   Defendant BAILEY performed Mr. Silverstein's psychological intake screening evaluation upon his transfer to Range 13 in 2005. Defendant BAILEY knew that Mr. Silverstein had been confined in substantially similar conditions of confinement since 1983, and failed to recommend any change in those conditions.

138.   Defendant BAILEY conducted Mr. Silverstein's monthly psychological review in August 2007. At that review, Defendant BAILEY classified Mr. Silverstein's

threat to others as "low."

139.   Defendant ZOHN conducted Mr. Silverstein's monthly psychological reviews from August 2005 to March 2008, with the exception of August 2007.  During the course of these evaluations, Defendant ZOHN did not recommend a change to Mr. Silverstein's conditions of confinement despite his continuing assessment that Mr. Silverstein is a "low" threat to others.

140.   Defendant DENNEY, as Regional Psychology Administrator, discussed Mr. Silverstein's conditions of confinement with Mr. Silverstein on at least one occasion during his confinement on Range 13.

141.   Upon his transfer to Range 13, Mr. Silverstein was deprived of all of his art supplies, aside from paper and pencil, thereby inhibiting his ability to use his art as a mechanism to cope with his extreme and indefinite isolation.  The positive psychological value of Mr. Silverstein's art was previously acknowledged by Defendant DENNEY and other BOP staff.

142.   In approximately December 2007, after the initial complaint in this case was filed, Mr. Silverstein was provided with more art supplies.

143.   While confined on Range 13, Mr. Silverstein was removed from his cell only for semi-annual reviews and infrequent haircuts.

144.   On the few occasions when Mr. Silverstein was transported out of his cells on Range 13, he was subjected to an invasive strip search.  Then, he was handcuffed and shackled to chains protruding from a black box suspended by a chain wrapped

around his stomach.  He was also shackled at his ankles, and he was always escorted by at least three guards whenever he was moved from Range 13.

145.    Following each transport, Mr. Silverstein was subjected to a second invasive strip search before being returned to his cell.

146.    On information and belief, while confined on Range 13, the invasive strip searches and infrequent hair cuts were the only physical contact Mr. Silverstein experienced with other human beings.

147.    The conditions on Range 13 were such that Mr. Silverstein was subjected to extreme sensory deprivation and social isolation that led to physical and psychological harm.

148.    On April 7, 2008, Mr. Silverstein was moved from Range 13 to D-Unit at the ADX, where he is currently confined.

**H.    Conditions of Confinement on D-Unit at ADX.**

149.    The BOP describes D-Unit as a "general population" unit. The unit is comprised of single cells that are 87 square feet.  Each cell contains a concrete bed, concrete desk, concrete stool, shower, sink and toilet.

150.    All inmates in D-Unit are held in solitary confinement.

151.    All of the cells on a particular range on D-unit are on one side of the hallway. Each cell is separated from the hallway by two doors, one of which is solid steel.

152.    The cells in D-Unit are configured in such a way as to minimize contact between inmates.

153.    The cells in D-Unit are configured in such a way as to minimize contact between inmates and staff.

154.    The D-Unit cell configurations limit inmate access to outside light. All inmates take meals alone in their cells.

155.    On information and belief, inmates on D-Unit are confined in their cells 22 hours a day for five days a week, and 24 hours a day for the two days remaining in the week.

156.    ADX Institution Supplement FLM 5321.06H(1) states "inmates will ordinarily be afforded a minimum of 10 hours out of cell exercise per week."

157.    Pursuant to the ADX policy, inmates on D-Unit are supposed to receive two hours of exercise, five days a week, in an indoor or outdoor recreation area, based on a predetermined schedule.

158.    On information and belief, however, recreation time on D-Unit is often cancelled for unspecified reasons, thereby limiting the actual out-of-cell exercise inmates are afforded. For example, in September 2008, Mr. Silverstein was only afforded an average of 3 hours of out-of-cell exercise time per week.

159.    All indoor and outdoor recreation areas consist of separate single occupancy exercise areas. There is a large outdoor recreation area that contains a series of single occupancy steel exercise cages.

160.    Inmates confined in the ADX "general population" units are escorted by two officers whenever they are removed from their cells.

161.   Inmates confined in the ADX "general population" units are allowed to have both social and legal visits in the institution visiting room on Thursdays, Fridays, Saturdays, and Sundays. Multiple inmates can conduct visits at the same time.

162.   Pursuant to memorandums approved by Defendant WILEY, Mr. Silverstein is under special restrictions regarding his daily management while he is confined on D-Unit.

163.   These special restrictions regarding the daily management of Mr. Silverstein on D-Unit serve to maintain his "no human contact" status.

164.   Upon Mr. Silverstein's transfer to D-Unit, Defendants BOP and WILEY intentionally confined Mr. Silverstein on a range where no other inmates were housed.  He remained isolated on this range for a period of several months.

165.   During his confinement on D-Unit, Mr. Silverstein's telephone privileges have continued to remain restricted to two 15 minute phone calls per month.

166.   During the first two months of Mr. Silverstein's confinement on D-Unit, Defendants BOP and WILEY restricted Mr. Silverstein's indoor recreation to a specific range only, permitting no other inmates to simultaneously participate in inside recreation on that range.

167.   During the first two months of Mr. Silverstein's confinement on D-Unit, Defendants BOP and WILEY restricted Mr. Silverstein's outdoor recreation to one of two outside recreation areas located immediately in front of the D-Unit control center. No other inmates were permitted to attend indoor recreation on the range

adjacent to these outside recreation areas when Mr. Silverstein was at outside recreation.

168.   After the first two months of Mr. Silverstein's confinement on D-Unit, Defendants BOP and WILEY began to allow Mr. Silverstein to attend outside recreation in the steel cages in the large outdoor recreation area. However, initially, Defendants BOP and WILEY refused to allow other inmates to attend recreation in the exercise cages adjacent to the exercise cage where Mr. Silverstein was placed. This restriction was removed in January 2009.

169.   From April 2008 until January 2009, Defendants BOP and WILEY required that Mr. Silverstein be escorted by three staff, one being a Lieutenant, whenever he was moved to or from his cell. Since January 2009, Defendants BOP and WILEY require that Mr. Silverstein be escorted by two officers, like other general population inmates, when being moved within D-Unit. When being moved outside of D-Unit, however, Defendants BOP and WILEY still require that Mr. Silverstein be escorted by a Lieutenant.

170.   Since Mr. Silverstein has been confined in D-Unit, Defendants BOP and WILEY have restricted Mr. Silverstein's social and legal visits to Mondays, Tuesdays, and Wednesdays, excluding federal holidays. Absent special approval by Defendant WILEY, Mr. Silverstein is permitted to have visits only when there are no other prisoners in any of the other visiting booths.

171.   Pursuant to the memoranda approved by Defendant WILEY, if Mr. Silverstein is to be placed in Administrative Detention or Disciplinary Segregation, he will be

returned back to Range 13, rather than to the cells in the SHU normally utilized for these purposes.

**I.**   **Denial of Access to the Step-Down Program.**

172.   Pursuant to BOP policy, upon a demonstration of good behavior and an ability to reintegrate into an open population prison, inmates confined at the ADX are eligible for transfer through the Step-Down Unit Program.

173.   ADX Institution Supplement 5321.06H(1), General Population and Step-Down Unit Programs, lists the following factors as considerations in determining an inmate's ability to enter the Step-Down Unit Program:

    a.   twelve months of clear conduct in a "general population" unit;

    b.   active participation in and completion of all programs recommended by the unit team;

    c.   positive institutional adjustment, proper personal hygiene, and proper cell sanitation;

    d.   appropriate interaction with staff; and

    e.   whether the factors which led to placement in the ADX have been successfully mitigated.

174.   Inmates housed in "general population" units who do not have a year of clear conduct, and all other inmates not already in the "general population" at the ADX, such as those on Range 13, are not eligible for entry into the Step-Down Unit Program.

175.   BOP personnel additionally consider other factors, not set forth in any BOP

policies or communicated to inmates, in determining whether an inmate otherwise eligible for entry into the Step-Down Unit Program will in fact be recommended for such entry. On information and belief, inmates at the ADX are routinely informed that they are "eligible" for entry into the Step-Down Unit Program, but are denied such entry for reasons that are never specified to them.

176.   Defendant WILEY must approve all inmates recommended for the Step-Down Unit Program prior to the inmate's movement into step-down.

177.   Defendants BOP, VANYUR, CONLEY, NALLEY, and WILEY have never provided Mr. Silverstein access to a step-down program while Mr. Silverstein was confined on Range 13.

178.   Since being transferred to the ADX in August 2005, Defendants have not allowed Mr. Silverstein to enter the ADX Step-Down Unit Program.

179.   Since being transferred to the ADX in August 2005, Mr. Silverstein has maintained clear conduct.

180.   Since being transferred to the ADX in August 2005, Mr. Silverstein has participated in and completed all programs recommended by his unit team.

181.   Since being transferred to the ADX in August 2005, Mr. Silverstein has continued to demonstrate positive institutional adjustment.

182.   Since being transferred to the ADX in August 2005, Mr. Silverstein has continued to maintain proper hygiene standards.

183.   Since being transferred to the ADX in August 2005, Mr. Silverstein has continued to maintain appropriate interaction with staff.

184.   At no time prior or subsequent to his transfer to the ADX has Mr. Silverstein been apprised or provided meaningful notice of the reasons for his initial transfer to the ADX.

185.   Not having been provided meaningful notice of the reasons for his initial transfer to the ADX, Mr. Silverstein is prevented from mitigating the reasons for his transfer to the ADX.

**J.   Extreme and Indefinite Solitary Confinement for over 25 Years.**

186.   Since 1983, Defendants have continued to hold Mr. Silverstein in extreme and indefinite solitary confinement.

187.   By holding Mr. Silverstein in extreme and indefinite solitary confinement for over 25 years in the conditions described above, Defendants have deprived Mr. Silverstein of human contact and human dignity.

188.   In 1984, former BOP Director Norman Carlson placed Mr. Silverstein on "no human contact" status, thereby officially subjecting him to extreme and indefinite solitary confinement with the knowledge that the conditions were disproportionate punishment for killing a correctional officer.

189.   Since 1984, Defendants have continued to hold Mr. Silverstein on "no human contact" status, imposing conditions of extreme social and sensory deprivation on Mr. Silverstein with the knowledge that the conditions were disproportionate punishment for killing a correctional officer.

190.   The imposition and continuation of such conditions of confinement for the past twenty-five years was done in an arbitrary and capricious manner with no

legitimate penological justification.

191.    Since 1983, Mr. Silverstein was continuously confined in cells that prohibited any

contact with other inmates.

192.    Since 1983, Mr. Silverstein has continuously been confined in cells that require

the least amount of contact between Mr. Silverstein and staff.

193.    Mr. Silverstein has not received an incident report since 1988.

194.    Defendants DENNEY, BAILEY, and ZOHN have assessed Mr. Silverstein's

threat to others as "low."

195.    Despite the clear lack of security concerns, each Defendant knowingly subjected

Mr. Silverstein to a substantial risk of harm by continuing to maintain Mr.

Silverstein in extreme and indefinite solitary confinement for over twenty-five

years.

196.    On various occasions throughout Mr. Silverstein's extreme and indefinite solitary

confinement, BOP psychological staff, including Defendants DENNEY, BAILEY,

and ZOHN, recorded, in monthly psychological reports, troublesome signs and

symptoms indicating that Mr. Silverstein was suffering from physical and

psychological harm as a result of his conditions of confinement.

197.    Despite the clear indications of harm resulting from his prolonged, extreme, and

indefinite solitary confinement, Defendants failed to take meaningful action to

ameliorate Mr. Silverstein's conditions of confinement.

198.   Defendant DENNEY, as a psychologist, knew that Mr. Silverstein's conditions of confinement created a substantial risk of harm. Defendant DENNEY failed to take steps to meaningfully ameliorate Mr. Silverstein's conditions of confinement.

199.   Defendant BAILEY, as a psychologist, knew that Mr. Silverstein's conditions of confinement created a substantial risk of harm. Defendant BAILEY failed to take steps to meaningfully ameliorate Mr. Silverstein's conditions of confinement.

200.   Defendant ZOHN, as a psychologist, knew that Mr. Silverstein's conditions of confinement created a substantial risk of harm. Defendant ZOHN failed to take steps to meaningfully ameliorate Mr. Silverstein's conditions of confinement.

201.   At all times, Defendants' refusal to release Mr. Silverstein from extreme and indefinite solitary confinement was made with deliberate indifference to his physical and mental health, and in reckless disregard of his right to be free from cruel and unusual punishment.

202.   The conditions of extreme isolation under which Mr. Silverstein has been confined for the past twenty-five years have created severe social and sensory deprivations leading to physical and psychological harm.

203.   Mr. Silverstein's physical harm has manifested itself at various times throughout his confinement in various ways, including, but not limited to, eyesight damage, hypertension, anxiety attacks, sleep disturbances, pain, stiffness of joints, chest tightness, shortness of breath, and aggravated symptoms of diabetes and Hepatitis C.

204.   Mr. Silverstein's psychological harm has manifested itself at various times throughout his confinement in various ways, including, but not limited to, anxiety attacks, depression, hallucinations, disorientation, memory loss, cognitive impairment and other various physiological problems.

205.   Since 1983, Mr. Silverstein has never received a meaningful review of his conditions of confinement.

206.   In 1991, then-BOP Director Michael Quinlan directed an annual review of Mr. Silverstein by the entire Executive Staff of the BOP.

207.   From June 2004 to May 2007, Defendant VANYUR was a member of the Executive Staff.

208.   Defendant NALLEY has been a member of the Executive Staff since October 2004.

209.   Defendant CONLEY has been a member of the Executive Staff since May 2007.

210.   On information and belief, as members of the Executive Staff, Defendants NALLEY and VANYUR participated in one Executive Staff review in 2004, and Defendants NALLEY and CONLEY participated in one Executive Staff review in 2008.

211.   On information and belief, Mr. Silverstein was never notified of the Executive Staff reviews, nor was he provided the opportunity to respond to the Executive Staff's assessment of his conditions of confinement.

212.   On information and belief, in November 2005, the Executive Staff decided to discontinue the annual Executive Staff reviews of Mr. Silverstein. Instead, Mr.

Silverstein began to receive in-person, semi-annual reviews by the Executive Panel.

213. The Executive Panel consists of the North Central Regional Director and the Assistant Director of the Correctional Programs Division.

214. Defendant NALLEY has been a member of the Executive Panel since October 2004.

215. Defendant VANYUR was a member of the Executive Panel from June 2004 until May 2007.

216. Defendant CONLEY has been a member of the Executive Panel since May 2007.

217. On information and belief, Defendant WILEY, though not an official member of the Executive Panel, was present at each semi-annual review that Mr. Silverstein received at the ADX.

218. On information and belief, at each Executive Panel review, Defendant WILEY recommended whether or not to change Mr. Silverstein's conditions of confinement.

219. On information and belief, Defendants NALLEY, VANYUR, and CONLEY always followed the recommendation of Defendant WILEY regarding Mr. Silverstein's conditions of confinement.

220. On information and belief, at each review Mr. Silverstein received from 1983 until 2007, Defendants continued Mr. Silverstein's extreme and indefinite solitary confinement.

221.  On information and belief, the only justification offered by Defendants for maintaining Mr. Silverstein in these conditions was that his "institutional history" required extreme security controls.

222.  From 1983 until 2007, Mr. Silverstein repeatedly asked Defendants for an explanation of what he needed to do to be released from solitary confinement. Defendants never gave Mr. Silverstein any criteria for release from his extreme and indefinite solitary confinement.

223.  On information and belief, Defendant NALLEY, at a December 2007 Executive Panel review, determined that Mr. Silverstein would be moved from Range 13 to D-Unit in ADX. This determination was made after the initial complaint in this case was filed.

224.  After Mr. Silverstein was moved to D-Unit, the semi-annual reviews by the Executive Panel were discontinued.

225.  On information and belief, the Executive Staff reviewed Mr. Silverstein's conditions of confinement on at least one occasion since December 2007.

226.  Pursuant to federal regulation, "[t]he Bureau of Prisons awards extra good time credit for performing exceptionally meritorious service, or for performing duties of outstanding importance or for employment in an industry or camp." 28 C.F.R. § 523.10(a). This provision allows an "old law" inmate to earn credit toward reducing his sentence.

227.    On information and belief, Defendants prevented Mr. Silverstein from earning extra good time credit by maintaining him on "no human contact" status for the past 25 years.

228.    From 1983 until 2007, the reviews by both the Executive Staff and the Executive Panel were sham proceedings, totally devoid of any meaning or substance. No review actually occurred. The entire process at both types of reviews would take no longer than several minutes. Defendants automatically extended Mr. Silverstein's extreme and indefinite solitary confinement at each review. Defendants continued Mr. Silverstein's extreme and indefinite solitary confinement to punish him for killing a correctional officer in 1983. Defendants never meaningfully attempted to determine if Mr. Silverstein still required the security controls imposed by his conditions of confinement.

229.    Since 1988, Mr. Silverstein has demonstrated the ability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of any BOP institution.

### CAUSES OF ACTION

#### Claim 1
**[Fifth Amendment:  Deprivation of Liberty Interest Without Due Process of Law by Defendants BOP, VANYUR, CONLEY, NALLEY AND WILEY]**

230.    Mr. Silverstein realleges and incorporates paragraphs 1 through 229.

231.    Defendants' placement of Mr. Silverstein in extreme and indefinite solitary confinement created a liberty interest in that the conditions of his confinement were atypical and significant as compared to the ordinary incidents of prison life.

232.   Under the Fifth Amendment to the United States Constitution, Mr. Silverstein may not be deprived of a liberty interest without due process of law.

233.   Defendants' purported reviews of Plaintiff's conditions of confinement failed to provide sufficient process to protect Plaintiff's liberty interest.

234.   Defendants' continuation of Plaintiff's solitary confinement was done in an arbitrary and capricious manner without legitimate penological justification.

### Claim 2
**[Fifth Amendment: Deprivation of Liberty Interest Without Due Process of Law by Defendants BOP, VANYUR, and NALLEY]**

235.   Mr. Silverstein realleges and incorporates paragraphs 1 through 229.

236.   Defendants' transfer of Mr. Silverstein to the ADX created a liberty interest in that the conditions of his confinement at the ADX are atypical and significant as compared to the ordinary incidents of prison life.

237.   Under the Fifth Amendment to the United States Constitution, Mr. Silverstein may not be deprived of a liberty interest without due process of law.

238.   Defendants' transfer of Mr. Silverstein to the ADX was done in an arbitrary and capricious manner without penological justification.

239.   Defendants transferred Mr. Silverstein to the ADX without notice, hearing, or justification.

### Claim 3
**[Fifth Amendment: Deprivation of Liberty Interest Without Due Process of Law By Defendants BOP, VANYUR, CONLEY, NALLEY, and WILEY]**

240.   Mr. Silverstein realleges and incorporates paragraphs 1 through 229.

241.   Defendants' continued confinement of Plaintiff at the ADX creates a liberty interest in that Mr. Silverstein's conditions of confinement at the ADX are atypical and significant as compared to the ordinary incidents of prison life.

242.   Under the Fifth Amendment to the United States Constitution, Mr. Silverstein may not be deprived of a liberty interest without due process of law.

243.   Defendants' confinement of Mr. Silverstein's on Range-13, the most restrictive unit at the ADX, prevented him from being considered for participation in the ADX Step-Down Unit Program.

244.   The special restrictions Defendants BOP and WILEY have placed on Mr. Silverstein during his confinement on D-Unit bar Mr. Silverstein from meaningful consideration for participation in the ADX Step-Down Unit Program.

245.   Defendants' purported reviews of Plaintiff's conditions of confinement failed to provide due process to protect Plaintiff's liberty interest in entering the ADX Step-Down Unit Program.

**Claim 4**
**[Eighth Amendment: Violation of Plaintiff's Right to be Free of Cruel and Unusual Punishment by all Defendants]**

246.   Mr. Silverstein realleges and incorporates paragraphs 1 through 229.

247.   The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment.

248.   The totality of the conditions of Mr. Silverstein's confinement, which has subjected and continues to subject him to extreme social and sensory deprivation and isolation, constitutes cruel and unusual punishment.

249.   Mr. Silverstein's extreme and indefinite solitary confinement has had a substantial negative impact on Mr. Silverstein's physical and mental health. This negative impact has manifested itself at various times throughout his confinement in various ways, including, but not limited to, eyesight damage, hypertension, anxiety attacks, sleep disturbances, pain, stiffness of joints, chest tightness, shortness of breath, aggravated symptoms of diabetes and Hepatitis C, depression, hallucinations, disorientation, memory loss, cognitive impairment, and other various physiological problems.

250.   Defendants placed Mr. Silverstein in extreme and indefinite solitary confinement for over 25 years, knowing that such conditions placed Mr. Silverstein in substantial risk of physical and psychological harm.

251.   Defendants placed Mr. Silverstein in extreme and indefinite solitary confinement for over 25 years, knowing that such conditions of confinement would subject Mr. Silverstein to disproportionate punishment in violation of the Eighth Amendment.

**Prayer for Relief**

Wherefore, Mr. Silverstein prays for judgment against Defendants as follows:

A.   For a declaration that Mr. Silverstein has been and is being deprived by Defendants of his liberty interest in avoiding extreme and indefinite solitary confinement, such deprivation being without due process of law in violation and contravention of the Fifth Amendment to the United States Constitution;

B.   For a declaration that Mr. Silverstein has been and is being deprived by Defendants of his liberty interest in avoiding indefinite confinement at the ADX,

under conditions constituting an atypical and significant hardship, such deprivation being without due process of law in violation and contravention of the Fifth Amendment to the United States Constitution;

C.   For a declaration that Mr. Silverstein has been and is being deprived by Defendants of his right to be free from cruel and unusual punishment in violation and contravention of the Eighth Amendment to the United States Constitution;

D.   For an order requiring Defendants to immediately discontinue Mr. Silverstein's extreme and indefinite solitary confinement;

E.   For an order requiring Defendants to transfer Mr. Silverstein from the ADX to another facility with less restrictive and severe conditions of confinement, or, alternatively and at a minimum, to assign Mr. Silverstein to a step down or other program through which he will have a reasonable prospect of earning and advancing to less restrictive conditions of confinement, according to reasonable specified criteria consistent with legitimate penological interests, such advancement not to be denied or delayed without adequate and reasonable notice of and opportunity to be heard regarding the reasons for such denial or delay;

F.   For an order requiring Defendants to report to this Court for review of the adequacy of the programs and responses implemented in response to this Court's direction;

G.   For an award of nominal damages;

H.   For an award of compensatory damages;

I.   For an award of punitive damages;

J. For such fees and costs as this Court may determine that Mr. Silverstein is entitled by law to recover; and

K. For such further relief as the Court may deem appropriate.

Mr. Silverstein requests a trial by jury.

Dated: April 14, 2009

Respectfully submitted,

STUDENT LAW OFFICE

s/Katherine Stevens
Katherine Stevens, Student Attorney

s/Nicole Godfrey
Nicole Godfrey, Student Attorney

s/Steven Baum
Steven Baum, Student Attorney

s/Rachel Proctor
Rachel Proctor, Student Attorney

s/Laura L. Rovner
Laura L. Rovner, Esq.
University of Denver Sturm College of Law
2255 E. Evans Ave., Ste. 335
Denver, Colorado 80208
Telephone: (303) 871-6140
Fax: (303) 871-6847
E-mail: lrovner@law.du.edu
Counsel for Plaintiff