IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-02471-PAB-KMT

THOMAS SILVERSTEIN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS, et al.,

      Defendants.

## MOTION FOR DETERMINATION OF WAIVER

### BACKGROUND AND RELEVANT FACTS

Plaintiff Thomas Silverstein, by and through his attorneys, the University of Denver Student Law Office, respectfully requests a determination of waiver from this Court as follows:

**A.**     **Intentional Disclosure of the 10/04 Document to Plaintiff**

In Fall of 2008, Defendants produced a privilege log. The first entry in that log refers to an October 2004 Memorandum ("10/04 document") regarding "Whether to Continue Annual Reviews of Inmate Thomas Silverstein." (Privilege Log, attached hereto as Ex. A.) The privilege log indicates that the 10/04 document was created by the Bureau of Prisons' ("BOP") Office of Counsel General, and that it was distributed to the Director of the BOP. (Ex. A, at 1.)

On January 16, 2009, counsel for Defendants, Ms. Marcy Cook, wrote a letter to Plaintiff's counsel, attaching the 10/04 document as supplemental discovery. (Jan. 16, 2009 Letter, attached hereto as Ex. B; 10/04 Document, Ex. C, filed under seal at Docket No. 231.) At

or around this date, counsel for Plaintiff spoke to Ms. Cook. (*See* Decl. of Nicole B. Godfrey, attached hereto as Ex. D, at ¶ 7.) Ms. Cook explained that she had believed the document in question to be covered by the attorney-client privilege. (Ex. D, at ¶ 8.) However, she stated that she spoke to agency counsel for her client, the BOP, and that she was specifically informed that the document was disclosable. (*Id.*) In accordance with this statement, Defendants produced the document pursuant to a protective order. (Ex. B at 1.) The 10/04 document, which is four pages long, was the only document produced on this date. (*Id.*)

      **B.**      **Defendants' Failure to Timely Object to Use of the 10/04 Document.**

On February 11, 2009, Plaintiff noticed a 30(b)(6) deposition in this matter. Two topics listed in this 30(b)(6) deposition notice involved the 10/04 document, which was attached to the notice. (Notice of 30(b)(6) Deposition, attached hereto as Ex. E.) Topics Eleven and Twelve requested specific information regarding the "creation, drafting, promulgation, issuance, and use of the 10/04 document" and its "distribution and implementation." (*Id.* at 3.) After receiving this notice, and the related information sought by Plaintiff, Defendants did not make any attorney-client privilege, or work-product privilege, objections.

On March 23, 2009, Defendants responded to the 30(b)(6) notice. (March 23, 2009 Letter, attached hereto as Ex. F.) Defendants specifically designated individuals to testify about the topics related to the 10/04 document. (*Id.* at 3-4.) Defendants' response failed to assert any attorney-client privilege or work-product privilege objections. (*Id.*) Rather, the *only* potential privilege asserted by Defendants was that, "to the extent any prior drafts or versions of the 10/04 Document exist, they may be protected by the deliberative process privilege." (*Id.* at 4.) Defendants designated Mr. Paul Layer to testify concerning Topics Eleven and Twelve. (*Id.*)

2

Throughout this case and others, Defendant BOP has consistently informed counsel for Plaintiff that obtaining 30(b)(6) designees is a lengthy and complicated process. (*See* Nov. 4, 2009 email, attached hereto as Ex. G (discussing BOP's 30(b)(6) designation process).) According to the procedure, the BOP reviews each potential designee to determine if he is the appropriate individual and then the individual's supervisor must consent to the designation. (*Id.*) As two of the topics raised in Plaintiff's 30(b)(6) designation involve the 10/04 document, multiple BOP employees, including Mr. Layer, who is an attorney in the Bureau's Office of Counsel General, and his supervisor, would have reviewed and considered the 10/04 document and the related information requests. Despite this scrutiny, no one requested the return of the 10/04 document or objected to the sought testimony as protected under the attorney-client, work-product, or deliberative process privileges.

On May 27, 2009, Plaintiff noticed an amended 30(b)(6) deposition. (Amended Notice of 30(b)(6) Deposition, attached hereto as Ex. H.) Topics Seven and Eight mirrored the prior requests for the person most knowledgeable about the "creation, drafting, promulgation, issuance, and use of, and the factual bases for, the 10/04 document" and its "distribution and implementation." (*Id.* at 2.)

Defendants did not respond to the amended notice until August 12, 2009. (Aug. 12, 2009 Letter, attached hereto as Ex. I.) BOP Attorney Paul Layer was again designated to testify regarding the creation, bases, use, distribution and implementation of the 10/04 document. (*Id.* at 4.) For the *first time* since providing the document in January 2009, Defendants now raised a *potential* objection to the use of 10/04 document at the Rule 30(b)(6) deposition of Mr. Layer. (*Id.*) Defendants "reserve[d] the right to assert the attorney-client, work-product, and

3

deliberative process privileges, where appropriate." (*Id.*) Defendants did not assert any privilege related to the use of the document itself, nor did they request the return of the 10/04 document.

Mr. Layer's deposition was scheduled for November 13, 2009. (Oct. 6, 2009 email from Asst. U.S. Attorney Susan Prose, attached hereto as Ex. J, *accord* Decl. of Laura L. Rovner, attached hereto as Ex. K, at ¶ 2.)

Eleven months after producing the 10/04 document, on November 12, 2009, Defendants stated that "it has come to our attention as a result of my conversation with Paul Layer today that the [10/04 document] is protected by the attorney-client privilege." (Nov. 12, 2009, 3:47 p.m., email from Asst. U.S. Attorney Susan Prose, attached hereto as Ex. L.) Defendants noted the document "also may be protected by the work product privilege" and requested the immediate return of the document and any copies. (*Id.*) Defendants indicated they would invoke this privilege for any "questions relating to this document." (*Id.*) Plaintiff's counsel immediately contacted opposing counsel to confer about how to proceed. (Ex. K at ¶ 4.) Defense counsel confirmed that, as the entirety of the 30(b)(6) designation topic concerned the 10/04 document, the deponent would be instructed not to answer any substantive questions. (*Id.* at ¶ 5.) At that time, the parties contacted Magistrate Judge Tafoya's chambers and arranged for a hearing on this matter the following day. (*Id.* at ¶ 6.) Following the scheduling of the hearing, defense counsel wrote an email apologizing for "not realizing that, as a result of Defendants' over-production, the [10/04 document] was indeed . . . protected by the attorney client privilege." (Nov. 12, 2009, 5:25 p.m., email from Asst. U.S. Attorney Susan Prose, attached hereto as Ex. M.) At no point on November 12th, did Defendants assert that the document was protected by the deliberative process privilege.

4

In an emergency hearing conducted via telephone with Magistrate Judge Tafoya's chambers on November 13th, the instant briefing was ordered. Defendants did not raise any deliberative process protection arguments during the hearing.

On November 16, 2009, Defendants informed Plaintiff that they also planned to assert that the 10/04 document is protected by the deliberative process privilege. (Nov. 16, 2009 email from Asst. U.S. Attorney Marcy Cook, attached hereto as Ex. N.) Plaintiff has not been provided with an affidavit or other document detailing the basis of the deliberative process privilege.

### C.     Intentional Disclosure of the 10/04 Document to Defendants' Experts

During this same time period, Defendants sent the 10/04 document to all of their testifying experts in this case. (*See* Transcript of deposition of Les Smith, attached hereto as Ex. O, at 11:24-12:7; Transcript of Richard Derr, attached hereto as Ex. P, at 10:5-9; Index of Materials Reviewed by Dr. Harold Bursztajn, attached hereto as Ex. Q, at 23.) It is beyond dispute that the content of the 10/04 document was specifically reviewed and considered by all of the designated experts. (Ex. O, at 11:18-23, Ex. P, 10:6-9; Ex. Q at 23.) Plaintiff also sent this document to his experts, Drs. Haney and Friedman, as well as correctional expert Steve Martin.

While all of Plaintiff's experts reviewed and considered this production, Mr. Martin relied on it specifically in his report. (*See* Report of Plaintiff's Expert Steve J. Martin, attached hereto as Ex. R, at 13-15.) Defendants designated three experts specifically to rebut Mr. Martin: Warden David Duncan,[1] Unit Manager Richard Derr, and Chief Les Smith. (Defendants' Rebuttal Expert Designation, attached hereto as Ex. S.) As these individuals are BOP

---

[1] Defendants recently withdrew Warden Duncan, and his potential substitute expert, AW Oliver, from the rebuttal designation. *See* Docket Entry No. 219.

5

employees, they did not produce expert reports detailing what they considered. However, each necessarily reviewed and considered Mr. Martin's report, including his use of the 10/04 document, to provide rebuttal testimony.

In Mr. Martin's report, he opined that the 10/04 document indicated that the review process provided to Plaintiff was not meaningful, but rather relied on "boiler-plate language" and that Defendants justified his continued placement in solitary confinement by "apparently rel[ying] solely on the Plaintiff's violent acts precipitating his initial placement . . ." (Ex. R at 15.) Mr. Martin used the 10/04 document to support his opinion that the only basis for Plaintiff's continued detention was his precipitating conduct while in custody. (*Id*.) Additionally, Mr. Martin opined that this document demonstrated that the Annual Executive Staff Reviews ("Annual Reviews") lacked clear or stated criteria for consideration. (*Id.* at 14-15.)

Mr. Derr, a Unit Manager at ADX, offered rebuttal testimony to Mr. Martin's opinions. (*See* Ex. P, at 72:7-73:9.) At his deposition, Mr. Derr offered an opinion that the BOP does have objective criteria to utilize in reviewing inmates, and that Mr. Martin did not consider or cite all of the objective criteria used by the BOP in forming his opinions. (*Id.*) Mr. Derr stated, "[Mr. Martin] did not address all of the issues contained in the Security Designation and Custody Classification Manual . . . most importantly public safety factors." (*Id.* at 72:16-18, 25-73:1.) Again, this opinion purports to undermine Mr. Martin's opinion that there was not meaningful review, criteria, or a basis beyond Plaintiff's initial reasons for placement to justify his detention in solitary confinement, conclusions Mr. Martin drew from the 10/04 document. Whether the criteria listed by Mr. Derr were considered in the Annual Reviews, and in the drafting of the 10/04 document, is essential information for Plaintiff's due process claims.

6

Mr. Smith also was designated specifically to rebut the expert opinion offered by Mr. Martin.[2] (Ex. S at 3.) During his deposition, Mr. Smith opined about criteria that he believed Mr. Martin had failed to consider: "[Mr. Martin] never did reference anything about [Mr. Silverstein's] Aryan Brotherhood activities. . . . I'd like to go into depth with what Mr. Silverstein's history is with the Aryan Brotherhood and how influential he is with the Aryan Brotherhood; its members." (*Id.* at 59:12-13, 61:7-10) Mr. Smith continued on, detailing a list of other "criteria" that may be relevant to housing and security determinations, including "his AB activities, his influence with the AB, his propensity for violence, his history of violence, the possibility that he could be targeted himself by other gangs," and "his ability to communicate with others…his demeanor towards staff…his demeanor towards other inmates…" (*Id.* at 134:1-6; 136:21-24.) Specifically, Mr. Smith criticizes the basis of Mr. Martin's opinion stating, "[Mr. Martin] gets into detail on the housing assignments. He gets into detail as to how long the inmate was isolated. He doesn't reference why." (*Id.* at 67:10-12.) The crux of Mr. Martin's opinion is that the criteria used to evaluate Mr. Silverstein—the "why" referred to by Mr. Smith—were not clear, an opinion derived by relying, at least in part, on the 10/04 document. Mr. Smith offers information directly counter to this conclusion, information that may have been the basis for the 10/04 document, however, information to which Plaintiff does not have access.

> **D.   The Information Related to the 10/04 Document is not Attainable Through Other Sources.**

On its face, the 10/04 document identifies and analyzes the reviews being provided to Plaintiff. These reviews are specifically relevant to Plaintiff's due process claim. The 10/04

---

[2] Defendants assert that Mr. Smith is qualified as an expert due to his years of experience in the BOP . (Ex. S at 3.) Since Mr. Smith has testified on numerous occasions and is currently Chief of the Counter-Terrorism office, it is reasonable to conclude his expertise is, in part, based on repeated interactions with legal counsel. (*See, e.g.* Ex. O at 101:12-17.)

7

document indicates that there were semi-annual reviews of Plaintiff, as well as Annual Executive Staff Reviews ("Annual Reviews").  (Ex. C at 1.)  The 10/04 document recommends that the Annual Reviews be discontinued and replaced by an alternate review process.  (*Id.*)  As part of the 30(b)(6) deposition, Defendants designated Mr. Layer to discuss the "creation, drafting, promulgation, issuance, and use of, and the factual basis for the 10/04 document."  (Ex. I at 4.)  As the 10/04 document analyzed and recommended discontinuing the Annual Reviews, it follows that Mr. Layer, on behalf of the BOP, would have provided information related to the process and procedures used at these reviews.

Though Plaintiff has continually sought information regarding the process and procedures related to the Annual Reviews, he has not been able to obtain this essential information.  Several of the 30(b)(6) topics sought this information specifically.  Topic Five requested the person(s) most knowledgeable regarding "[t]he factors considered in determining when and why Plaintiff should begin to receive an 'annual review by the entire Executive staff,'"  (Ex. H at 2.)  Topic Six requested testimony regarding "[t]he standards applied and/or procedures used in these 'annual reviews[s]' by the entire Executive Staff . . ."  (*Id.*)  Defendants did not designate anyone concerning Topic Five, stating that they were unable to find any current or former employee with information on this topic. (Ex. I at 3.)  Regarding Topic Six, Defendants stated that "Plaintiff has already deposed two BOP individuals – Regional Director Nalley and former Assistant Director Vanyur – who were personally present at Executive Staff meetings . . . Plaintiff has already had ample opportunity to obtain the requested information by [these] depositions. . . Defendants do not believe they should have to designate yet another witness to testify about Topic [Six]." (*Id.* at 3-4.)

8

Despite the prior opportunity to speak with Mr. Nalley and Mr. Vanyur, these depositions did not provide any information about the standards and/or procedures related to the Annual Reviews. When asked if he took part in any of the Annual Reviews when he was Regional Director, Mr. Nalley responded, "I don't remember. To be honest with you I don't remember." (Transcript of Deposition of Michael Nalley, Ex. T filed under seal at Docket No. 233, at 71:24-25.) Even though Mr. Nalley's electronic signature was on the October 15, 2004 Information Paper sent to the Executive Panel, and presumably used to review Mr. Silverstein's conditions, Mr. Nalley denied that he had ever seen, or signed, this document. (*See id.* at 52:26-23, 54:17-20 ("[E]vidently this was a document that was created. And as regional director, my name was placed on it. Q: Okay. How do you know you did not sign it? A: My signature is not on it. Q: It's electronically. A: I don't do electronic signatures. … I went on the payroll on October the 3rd, I was in travel and transit. And I just don't recall this document.").)

Mr. Vanyur's deposition also provided little information regarding the standards and/or procedures of the Annual Reviews. First, he only became a member of the Executive Staff in 2004, and accordingly was present for only one of the fourteen total Annual Reviews performed. (Transcript of Deposition of John Vanyur, Ex. U filed under seal at Docket No. 234, at 29:15-19.) He stated that the recommendation to continue Plaintiff's housing program was based on the Information Paper provided by the Regional Director—the same paper Mr. Nalley testified he did not recall seeing and did not sign—because the Regional Director is "much more knowledgeable [about Mr. Silverstein] on a day-to-day basis than the rest of the executive staff." (*Id.* at 42:25-43:7.) Mr. Vanyur testified that the Annual Review decision would also be "based on our knowledge of how to manage difficult, violent inmates" and stated that Plaintiff was

9

"extremely violent" as indicated by his murder of an officer in 1983.  (*Id.*)  When asked about his decades of clear conduct, Mr. Vanyur stated that there needed to be a "threat assessment" and this needed to be "individualized" and "updated frequently."  (*Id.* at 45:8-11.)  However, it was not clear if any threat assessment was considered at the Annual Review, as it was not included in the Information Paper, and Mr. Vanyur could not remember any other papers being provided.  (*Id.* at 46:5-8.)  Mr. Vanyur testified that he did not know if Plaintiff was informed that the Annual Review was taking place or whether Plaintiff received notification of the results of this review.  (*Id.* at 47:22-48:2.)   Thus, following specific questioning of the individuals Defendants deemed to be most knowledgeable about the standards and/or procedures for the Annual Reviews, Plaintiff lacked substantial information.

     Plaintiff also sought information about the Annual Review process at other depositions.  Troy Allen was designated[3] to provide information on "the decision-making that determined that Plaintiff would continue to be housed under these 'special security procedures…'"  (Ex. I at 2-3.)  Even though the Annual Reviews specifically address "if continued security controls are warranted" (Oct. 15, 2004 Information Paper, Ex. V, filed under seal at Docket No. 232, at 1), defense counsel continually objected to any questions related to the Annual Reviews, claiming the topic was outside of the scope of the designation and informing counsel the questions were improper because "you have an entirely separate 30(b)(6) topic to that subject."  (*See e.g.*, Transcript of Deposition of Troy Allen, attached hereto as Ex. W, at 73:18-20).

---

[3] Defendants originally designated Mike Junk to respond to Topics One and Two, however, they later verbally requested to substitute Troy Allen for these topics.  Plaintiff did not oppose this substitution.

# ARGUMENT

A.  **Defendants have waived any privilege related to the 10/04 Document by intentionally disclosing it and failing to object to its repeated use for nearly a year.**

Federal Rule of Evidence 502 requires that any privilege to a disclosed document is waived unless (1) the disclosure was inadvertent, (2) the holder of the privilege took reasonable steps to prevent disclosure, *and* (3) the holder promptly took reasonable steps to rectify the error. Fed. R. Evid. 502(b).

If the holder of the privilege cannot demonstrate that *all three* of these factors apply, any privilege related to the document will be considered waived. *Id.* "The burden of showing that the privilege has *not* been waived remains with the party claiming the privilege." *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 426 (D. Kan. 2009) (emphasis in original); *accord United States v. Lewis*, 943 F.2d 58 (Table), No. 90-4066, 1991 WL 172666, *3 (10th Cir. 1991) (attached hereto as Ex. X). Accordingly, the party seeking to withhold "information on the basis of privilege must make a clear showing that the asserted privilege applies and must establish all elements of the privilege." *Prince Lionheart, Inc. v. Halo Innovations, Inc.*, No. 06-cv-324-WEM-KLM, 2007 WL 2728343, *2 (D. Colo. Sept. 18, 2007) (attached hereto as Ex. Y).

Here, Defendants fail on all three factors – the document was disclosed voluntarily and intentionally; Defendants did not take reasonable steps to protect the privilege; and Defendants failed to promptly take reasonable steps to rectify any error.

1.  **Defendants failed to take reasonable steps to protect their privilege as they voluntarily and intentionally disclosed the 10/04 document.**

"The attorney-client privilege is 'the oldest of the privileges for confidential communications known to the common law.'" *In re Qwest*, *Communications Intern. Inc.*, 450

F.3d 1179, 1185 (10th Cir. 2006) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)). "The privilege is narrowly construed, however, 'because it inhibits the truth finding process.'" *Sedillos v. Bd. of Educ. of School Dist. No. 1 in City & County of Denver*, 313 F.Supp.2d 1091, 1093 (D. Colo. 2004) (quoting *In re M & L Bus. Machine Co.,* 161 B.R. 689, 695 (D. Colo. 1993)); *see also Prince Lionheart*, 2007 WL 2728343, at *2.

As confidentiality is central aspect of the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged document to a third party." *New Jersey*, 258 F.R.D. at 426 (quoting *United States v. Ryan*, 903 F.2d 731, 741 n.13 (10th Cir. 1990)). Accordingly, "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *Id.* (quoting *United States v. Ryan*, 903 F.2d 731, 741 n.13 (10th Cir. 1990)). Thus, the Tenth Circuit has consistently concluded that "[a]ny voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege." *In re Qwest*, 450 F.3d at 1185 (quoting *United States v. Berand*, 877 F.2d 1463, 1465 (10th Cir. 1989)).

Here, there is no question that the disclosure of the disputed document was voluntary and intentional. Defense counsel, concerned that the document was privileged, specifically contacted the client to discuss the 10/04 document. (*See* Ex. D at ¶ 8.) An agent of the client—a lawyer who understood the ramifications of such a disclosure—appears to have specifically concluded that the 10/04 document was disclosable. (*See id.*) While the client and counsel may both now regret that decision, this regret does not make the disclosure inadvertent.

Further, any suggestion by counsel that this disclosure was inadvertent, or the accidental result of "over-production" on the part of Defendants is plainly inaccurate. (*See* Ex. M at 1.) Defendants specifically considered the production of this document and, rather than taking reasonable measures to prevent its disclosure, strategically determined it should be produced. If there was ever any possibility of "clawing back" this document, it has long past. Defendants have had multiple opportunities, over a number of months, to either re-assert the privilege or request the document be returned. (*See generally* Exs. F, I, J.) Instead, they failed to promptly make any such suggestion or request.

In sum, the record demonstrates that Defendants voluntarily and knowingly disclosed the 10/04 document.

### 2. Defendants failed to promptly take reasonable steps to correct their error.

"Identification of protected material must occur in a timely fashion. Where the party seeking protection fails to pursue all reasonable means of preserving the confidentiality of the privileged matter the protection is waived." *United States v. Ary*, 518 F.3d 775, 784 (10th Cir. 2008) (internal quotation omitted); *Prince Lionheart*, 2007 WL 2728343, at *5. "Requiring assertions of privilege and work product to be made expeditiously serves the goals underlying the attorney-client privilege and work-product doctrine. *Ary*, 518 F.3d at 784. Timely assertion of privilege minimizes the damage caused by a breach of confidentiality. *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992).

Here, Defendants failed to promptly take reasonable steps to correct the disclosure of a privileged document. Following knowing disclosure of the document, Defendants did not make

any assertions that the document was protected under the attorney-client or work-product doctrines for nearly eleven months.

Any assertion by Defendants that the document's privileged status could not have been known until the conversation with Mr. Layer, the day before the deposition, and six days before the scheduled close of discovery is false and unreasonable. (*See generally* Ex. L at 1.) Defense counsel necessarily, in order to designate Mr. Layer, had conversed with him regarding the exact issue that apparently led to the discovery of the privilege – specifically who had created the document and who had received the document. Thus, Defendants incontrovertibly knew about how the document was created, and its potential to be privileged, at the time Mr. Layer was designated. If defense counsel did not know this information previously, Plaintiff is perplexed as to how Defendants could have concluded that Mr. Layer was the correct designee.

Thus, the factual record demonstrates that the disclosure was voluntary and knowing, that Defendants did not act reasonably to protect any privilege, and that Defendants failed to timely assert any privilege or request the return of the document. Thus, any privilege[4] related to the 10/04 document is waived.

---

[4] To the extent that Defendants now seek to claim that the 10/04 document is protected under the deliberative process privilege, this argument also fails. While Rule 502 does not govern the determination of the deliberative process privilege specifically, the test for consideration uses similar factors: "(1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *In re McKesson Governmental Entities Average Wholesale Price Litigation*, C-09-80170 MISC MHP, 2009 WL 3706898, *5 (N.D. Cal. Nov. 4, 2009) (attached hereto as Ex. AA). Accordingly, Defendants also waived any possible deliberative process privilege by the voluntary disclosure of the document, and the failure to timely object to its use.

>    **B.   Waiver is also required because Defendants' testifying experts received and considered the 10/04 Document.**

Though the voluntary nature of the disclosure is more than sufficient to demonstrate that no privilege remains regarding the 10/04 document, waiver is further required as a result of Defendants' repeated disclosure of this document to their testifying experts. "The 1993 Amendments to Rule 26 make clear that any type of work product or other privilege is lost when the material is disclosed to and considered by a testifying expert." *Oklahoma v. Tyson Foods Inc.*, 05-CV-329-GKF-PJC, 2009 WL 1578937, *2 (D. Okla. June 2, 2009) (attached hereto as Ex. Z); *see also Regional Airport Auth. of Louisville v. LFG, LLC,* 460 F.3d 697, 714 (6th Cir. 2006) (majority view is that Rule 26 requires disclosure of all information provided to testifying experts). Any type of privileged material–including attorney-client, work-product, and deliberative process–is destroyed by the disclosure to a testifying expert. *Johnson v. Gmeinder*, 191 F.R.D. 638, 647 (D. Kan. 2000).

Here, Defendants voluntarily sent the 10/04 document to all of their testifying experts and allowed Plaintiff to send the document to his experts. One of Plaintiff's experts, Mr. Martin, specifically relied upon the 10/04 document in formulating his opinions. (*See* Ex. R at 15.) Though this reliance was specifically cited in Mr. Martin's report, Defendants did not object to his consideration or use of this document. Two of Defendants' rebuttal experts were offered to rebut Mr. Martin's testimony. (Ex. S at 1.) Since all of these experts read and analyzed Mr. Martin's report, they necessarily reviewed information from the 10/04 document. Thus, Defendants' voluntary disclosure of the 10/04 document to their testifying experts, and the experts' specific consideration of the 10/04 document, destroyed any privilege the document possessed.

## CONCLUSION

For the foregoing reasons, this Court should find that all privileges asserted regarding the 10/04 document are waived.

DATED:   November 23, 2009

                                            Respectfully submitted,

                                            STUDENT LAW OFFICE

                                            s/ Brittany Glidden
                                            Brittany Glidden, Esq.
                                            Laura L. Rovner, Esq.
                                            University of Denver Sturm College of Law
                                            2255 E. Evans Ave., Suite 335
                                            Denver CO 80208
                                            Phone: (303) 871-6140
                                            Fax: (303) 871-6847
                                            E-mail: bglidden@law.du.edu

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of November, 2009, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

**Marcy Elizabeth Cook**
Marcy.Cook@usdoj.gov

**Chris Synsvoll**
Chris.Synsvoll@usdoj.gov

                                      s/ Brittany Glidden
                                      Brittany Glidden