IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02471-PAB-KMT

THOMAS SILVERSTEIN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS, sued in its official capacity;
JOHN VANYUR, former Assistant Director, Correctional Programs Division, Federal
Bureau of Prisons, sued in his individual capacity;
JOYCE CONLEY, Assistant Director, Correctional Programs Division, Federal Bureau
of Prisons, sued in her official and individual capacities;
MICHAEL NALLEY, Regional Director, North Central Region, Federal Bureau of
Prisons, sued in his official and individual capacities;
DONALD DENNEY, Regional Psychology Administrator, North Central Region, Federal
Bureau of Prisons, sued in his official and individual capacities;
RONNIE WILEY, Warden, United States Penitentiary Administrative Maximum, sued in
his official and individual capacities;
MARIE BAILEY, Staff Psychologist, United States Penitentiary Administrative
Maximum, sued in her official and individual capacities; and
PAUL ZOHN, Staff Psychologist, United States Penitentiary Administrative Maximum,
sued in his official and individual capacities,

      Defendants.
_____

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS
_____

      Plaintiff Thomas Silverstein filed this action challenging the constitutionality of

the conditions of his confinement in the federal prison system. This case is presently

before the Court on various motions to dismiss filed by the defendants. The Court's

subject-matter jurisdiction is proper under 28 U.S.C. § 1331.

## I.  BACKGROUND

### A.  Factual Background

The Court derives the following facts from plaintiff's second amended complaint [Docket No. 158] and presumes them to be true for the sake of this motion.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).  Following a conviction for armed bank robbery, Mr. Silverstein began his incarceration in the federal prison system in 1978 at the United States Penitentiary ("USP") in Leavenworth, Kansas.  Second Am. Compl. for Declaratory & Injunctive Relief & Damages & Jury Demand [Docket No. 158] ("Second Am. Compl.") ¶¶ 14-15.  In 1980, Mr. Silverstein was convicted in the United States District Court for the District of Kansas of murdering a fellow inmate at USP Leavenworth.  *See* Second Am. Compl. ¶ 16.  On appeal, the Tenth Circuit concluded that the District Court committed material errors regarding evidentiary issues and explained that "although the properly admissible evidence was sufficient to support the defendant's conviction, we cannot conclude confidently that the errors did not substantially influence the jury's verdict."  *United States v. Silverstein*, 737 F.2d 864, 868 (10th Cir. 1984).  Consequently, the Tenth Circuit reversed the conviction and remanded the case for retrial, which never occurred.  *See* Second Am. Compl. ¶ 16.  In November 1980, while his first murder case was pending, Mr. Silverstein was transferred from USP Leavenworth to the USP in Marion, Illinois, where he was housed in the facility's Control Unit.  Second Am. Compl. ¶ 17.  While confined at USP Marion, Mr. Silverstein murdered two inmates, crimes for which he was later convicted.  *See*

2

Second Am. Compl. ¶¶ 18-23.  Then, in October of 1983, Mr. Silverstein murdered a correctional officer at USP Marion.  Second Am. Compl. ¶ 24.

Immediately following this last murder, the BOP placed Mr. Silverstein into solitary confinement.  Second Am. Compl. ¶ 25.  Within weeks, the BOP transferred Mr. Silverstein to the USP in Atlanta, Georgia.  Second Am. Compl. ¶ 26.  In August 1984, the director of the BOP issued a memorandum which detailed "special security procedures" for Mr. Silverstein.  Second Am. Compl. ¶ 27.  This memorandum apparently ordered BOP staff to isolate Mr. Silverstein from any and all contact with fellow inmates and prison staff for an indefinite period of time.  *See* Second Am. Compl. ¶¶ 27-28.  The BOP confined Mr. Silverstein to three, linked 42-square-foot, windowless cells that were set apart from the rest of the prison population in USP Atlanta and were designed to minimize his contact with prison staff.  Second Am. Compl. ¶¶ 29-30, 32-34.  During the time Mr. Silverstein was confined to these cells, he exercised and ate his meals alone and was subject to bright lights and camera surveillance for twenty-four hours a day.  Second Am. Compl. ¶¶ 37-39.  Mr. Silverstein also alleges that he was exposed to extreme heat during this confinement, had very limited recreation time, and was not permitted to have a watch or clock.  Second Am. Compl. ¶¶ 31, 40, 41-42.  During the first year of his isolation at USP Atlanta, the BOP permitted Mr. Silverstein to wear only underwear and prohibited him from having social visits or using a telephone, and the BOP denied him all privileges, including access to reading materials, art supplies, a radio, or a television.  Second Am. Compl. ¶¶ 44-45.  According to Mr. Silverstein, these conditions of confinement subjected him "to extreme sensory deprivation that led to physical and psychological harm."  Second Am. Compl. ¶ 47.

In 1987, after a prison riot in which other inmates released Mr. Silverstein from his cell, the BOP relocated Mr. Silverstein to the basement of USP Leavenworth, the facility where he began his incarceration in 1978. Second Am. Compl. ¶¶ 48, 50. The conditions in the basement unit were substantially similar to those in Mr. Silverstein's previous location at USP Atlanta. Second Am. Compl. ¶¶ 52, 55-61. However, while in the basement cell, Mr. Silverstein could hear no sounds of human activity in the prison. Instead, he was exposed to the constant buzzing sound of fluorescent lights. The BOP did not provide Mr. Silverstein any access to fresh air or sunlight through recreation or otherwise. Second Am. Compl. ¶¶ 62-63, 65. Furthermore, according to Mr. Silverstein, the basement cell, to which he was confined for twenty-four hours a day for an entire year, was infested with rats. Second Am. Compl. ¶ 66. The second amended complaint alleges that "[t]he conditions in the basement cell were such that Mr. Silverstein was subjected to extreme sensory deprivation that led to physical and psychological harm." Second Am. Compl. ¶ 67.

Following the year that Mr. Silverstein spent in the basement cell, the BOP transferred him to another area of USP Leavenworth that was previously known as "the hole." Second Am. Compl. ¶ 68. This unit was separate from the rest of the facility, and Mr. Silverstein was the only prisoner housed there. Second Am. Compl. ¶ 68. Mr. Silverstein asserts that the conditions of his incarceration in this unit at USP Leavenworth were substantially similar to the conditions he experienced in the basement unit and at USP Atlanta: he was isolated from other inmates and staff, was subjected to continuous lighting and camera surveillance, and exercised and ate alone. Second Am. Compl. ¶¶ 70-74, 81-83. Mr. Silverstein's housing area had a 144-square-

foot cell with a bed, shower, desk, television, and toilet and a separate cell used as an indoor recreation area and a visitation booth. Second Am. Compl. ¶¶ 75, 78-79. Mr. Silverstein's phone privileges grew from one call per month, when he first arrived, to 300 minutes per month by the time he left USP Leavenworth. Second Am. Compl. ¶ 86. While at USP Leavenworth, the BOP provided Mr. Silverstein with one hour of outdoor recreation in a confined, secure space on five days of each week. Second Am. Compl. ¶¶ 77, 84, 86. Mr. Silverstein claims that BOP staff would sometimes leave him in this outdoor recreation area for extended periods of time in the snow and bitter cold. Second Am. Compl. ¶ 85.

While housed at USP Leavenworth, Mr. Silverstein received monthly psychological reviews from the facility's psychology staff. Second Am. Compl. ¶ 87. Defendant Donald Denney conducted Mr. Silverstein's monthly psychological reviews between March 1989 and June 2003. Second Am. Compl. ¶¶ 88-89. As part of the psychological assessments, the reviewer would rate the threat Mr. Silverstein posed to others. Second Am. Compl. ¶ 92. Between 1987 and 1999, the reviewers determined Mr. Silverstein's threat to others to be "high." Second Am. Compl. ¶ 92. Between 1999 and 2004, however, the perceived threat dropped and fluctuated between "moderate" and "low." Second Am. Compl. ¶ 92. During his time in isolation, Mr. Silverstein purportedly used art as a way to ameliorate what he characterizes in his second amended complaint as "extreme sensory deprivation and social isolation that led to physical and psychological harm." Second Am. Compl. ¶¶ 94-96.

Except for a period of time during December 2002 and January 2003, in which he was temporarily housed in the basement cell, Mr. Silverstein remained at USP

Leavenworth under the conditions of confinement described above until 2005.  *See* Second Am. Compl. ¶¶ 97-99.  On July 12, 2005, based upon the decision of defendants Michael Nalley and John Vanyur, the BOP transferred Mr. Silverstein from USP Leavenworth to the USP Administrative Maximum facility, also known as "ADX," in Florence, Colorado.  *See* Second Am. Compl. ¶ 99, 106.  The BOP "never provided any meaningful information regarding the reason for his transfer to the ADX," nor did they offer Mr. Silverstein prior notice, a hearing, or any opportunity to contest his transfer to ADX.  Second Am. Compl. ¶¶ 104-05.

Upon Mr. Silverstein's transfer to ADX, defendants Nalley and Vanyur decided to place him in an area known as "Range 13."  Second Am. Compl. ¶¶ 100-01.  ADX is the most restrictive institution in the BOP system and Range 13 is the most restrictive housing area in ADX.  *See* Second Am. Compl. ¶ 108-09.  In Range 13, the BOP replicated the isolation and other conditions of confinement Mr. Silverstein had continuously experienced since his 1983 transfer to USP Atlanta.  Second Am. Compl. ¶¶ 101, 111, 125-28.  Mr. Silverstein's contact with fellow inmates and prison staff remained very limited.  Second Am. Compl. ¶¶ 113-14.  While housed on Range 13, Mr. Silverstein's cells had a concrete bed and desk, a sink, a toilet, a shower, and, at times, had a mirror and a window through which he had a partial view of the outdoors.  Second Am. Compl. ¶¶ 118-120.  Mr. Silverstein had access to an indoor and an outdoor recreation area that he was allowed to use alone for one hour a day, five days of each week.  Second Am. Compl. ¶¶ 121-25.  Upon transfer to ADX, Mr. Silverstein lost some of the privileges he had been given previously at USP Leavenworth; his

telephone usage and social visits were reduced and he was given less access to the art supplies he used as a coping mechanism. Second Am. Compl. ¶ 130-31, 141.

Mr. Silverstein's psychological examinations continued at ADX. Second Am. Compl. ¶ 134. Defendant Marie Bailey conducted Mr. Silverstein's psychological intake screening and one of his monthly psychological reviews. Second Am. Compl. ¶¶ 137-38. Although defendant Bailey knew that Mr. Silverstein had been in continuous solitary confinement since 1983, knew that Mr. Silverstein was exhibiting adverse physical and psychological reactions to that confinement, and characterized Mr. Silverstein's risk to others as "low," defendant Bailey did not recommend any change to those conditions or "take steps to meaningfully ameliorate Mr. Silverstein's conditions of confinement." *See* Second Am. Compl. ¶¶ 137-38, 194, 196, 199.

Between August 2005 and March 2008, defendant Paul Zohn conducted all but one of Mr. Silverstein's monthly psychological evaluations. Although defendant Zohn knew that Mr. Silverstein was exhibiting adverse physical and psychological reactions to his conditions of confinement and characterized Mr. Silverstein's risk to others as "low," defendant Zohn did not recommend any change in those conditions or "take steps to meaningfully ameliorate Mr. Silverstein's conditions of confinement." *See* Second Am. Compl. ¶¶ 139, 194, 196, 200.

On at least one occasion at ADX, defendant Denney – who had conducted Mr. Silverstein's monthly psychological reviews between March 1989 and June 2003 at USP Leavenworth – discussed with Mr. Silverstein his conditions of confinement. *See* Second Am. Compl. ¶ 140. Defendant Denney, therefore, had long-term knowledge of Mr. Silverstein's situation and the adverse effects of Mr. Silverstein's solitary

7

confinement. *See* Second Am. Compl. ¶ 196. Like the other psychological reviewers, defendant Denney assessed Mr. Silverstein's risk to others as "low." *See* Second Am. Compl. ¶ 194. Despite these facts, defendant Denney "failed to take steps to meaningfully ameliorate Mr. Silverstein's conditions of confinement." *See* Second Am. Compl. ¶ 198.

While housed on Range 13, Mr. Silverstein was removed from his cell only for semi-annual reviews and infrequent haircuts. *See* Second Am. Compl. ¶ 143. When he was removed from his cell, he was subject to "invasive" strip searches both upon exiting and returning to his cell. *See* Second Am. Compl. ¶ 144. According to the second amended complaint, "[t]he conditions on Range 13 were such that Mr. Silverstein was subjected to extreme sensory deprivation and social isolation that led to physical and psychological harm." *See* Second Am. Compl. ¶ 147.

Mr. Silverstein remained on Range 13 until April 7, 2008, when he was moved to ADX's "general population" unit, known as "D-Unit." *See* Second Am. Compl. ¶¶ 148-49. Although D-Unit is a "general population" unit, its inmates are still held in solitary confinement. *See* Second Am. Compl. ¶ 150. D-Unit is configured to minimize contact between inmates and between inmates and BOP staff. Second Am. Compl. ¶¶ 152-53. Similar to Mr. Silverstein's experience in other housing units, inmates on D-Unit eat and exercise alone. *See* Second Am. Compl. ¶¶ 154, 159. All inmates on D-Unit are confined to their cells for twenty-two hours of each weekday and twenty-four hours of each weekend day. Second Am. Compl. ¶ 155. It is ADX policy to provide inmates in D-Unit with two hours of out-of-cell, indoor or outdoor exercise each weekday. Second

Am. Compl. ¶¶ 156-59.  Mr. Silverstein alleges, however, that during his time on D-Unit, the BOP often has cancelled his scheduled recreation time; for example, in September 2008, the BOP allowed him an average of only three total hours of out-of-cell exercise a week.  Second Am. Compl. ¶¶ 156-58.

Upon transfer to D-Unit, defendant Wiley initially placed special conditions on Mr. Silverstein that were more restrictive than those placed on other inmates in the unit. *See* Second Am. Compl. ¶¶ 162-64.  For example, for several months following his transfer to D-Unit, Mr. Silverstein was housed and allowed recreation only in areas where no other inmates were nearby.  *See* Second Am. Compl. ¶¶ 164, 167, 168. Furthermore, while most D-Unit inmates are escorted by two correctional officers when they are removed from their cells, Mr. Silverstein was regularly accompanied by three, including a lieutenant.  Second Am. Compl. ¶¶ 160, 169.  Finally, while other inmates on D-Unit may receive social and legal visits on Thursdays, Fridays, Saturdays, and Sundays and may do so in the presence of other inmates, Mr. Silverstein's visits were restricted to Mondays, Tuesdays, and Wednesdays and were conducted outside the presence of other inmates.  Second Am. Compl. ¶¶ 161, 170.

According to the second amended complaint, many of these restrictions were subsequently lifted.  Mr. Silverstein no longer resides in a secluded portion of the unit and is permitted to exercise in areas adjacent to other inmates. Second Am. Compl. ¶¶ 164, 166-68.  Mr. Silverstein is now escorted by two, rather than three, correctional officers when outside of his cell, but at times is still escorted by a lieutenant.  Second Am. Compl. ¶ 169.  It appears, however, that the restrictions on visitation practices remain in place.  *See* Second Am. Compl. ¶ 170.

In 1991, while Mr. Silverstein was housed at USP Leavenworth, the BOP director ordered the BOP's entire executive staff to conduct annual reviews of Mr. Silverstein. Second Am. Compl. ¶ 206. Defendant Vanyur was a member of this executive staff between June 2004 and May 2007. Second Am. Compl. ¶ 207. Defendant Nalley has been a member of the executive staff since October 2004 and remains one to this day. Second Am. Compl. ¶ 208. According to Mr. Silverstein, the executive staff conducted hearings about him until November 2005. Second Am. Compl. ¶ 212. Mr. Silverstein alleges that he was not notified of these reviews, nor was he permitted to respond to the executive staff's assessment. Second Am. Compl. ¶ 211.

In November 2005, the BOP began conducting semiannual reviews of Mr. Silverstein by an "Executive Panel" consisting of two BOP officials. Second Am. Compl. ¶¶ 212-13. Mr. Silverstein's second amended complaint suggests that he participated in some way in these reviews. *See* Second Am. Compl. ¶ 143 ("While confined on Range 13, Mr. Silverstein was removed from his cell only *for semi-annual reviews* and infrequent haircuts." (emphasis added)). However, the complaint suggests that he was not given advance notice, an opportunity to present argument or evidence, or a chance to challenge the result. *See, e.g.*, Second Am. Compl. ¶¶ 219, 221-22, 228. Mr. Silverstein claims that defendants Vanyur, Nalley, and Conley are or have been members of the Executive Panel responsible for reviewing and perpetuating Mr. Silverstein's conditions of confinement both prior to and during his incarceration at ADX. *See* Second Am. Compl. ¶¶ 214-16. Mr. Silverstein also claims that defendant Wiley has substantial influence over the determinations of these decision-making bodies and has final say as to who may enter the Step-Down Unit Program. *See* Second Am.

Compl. ¶¶ 176, 218.  The BOP's Step-Down Unit Program is the means by which inmates who demonstrate good behavior and an ability to reintegrate into an open prison population may transfer out of ADX.  *See* Second Am. Compl. ¶ 172.  According to BOP policy, certain criteria must be met in order to qualify for the Step-Down Program.  Second Am. Compl. ¶¶ 173, 175.  Mr. Silverstein alleges, however, that inmates are not made aware of all of the criteria and often are not informed of the reasons why admittance is denied.  Second Am. Compl. ¶¶ 175.

After the BOP decided to transfer Mr. Silverstein to ADX's D-Unit in December 2007, the BOP discontinued the Executive Panel's semiannual review of his conditions of confinement.  *See* Second Am. Compl. ¶ 223-24.  Between December 2007 and the filing of the second amended complaint in May 2009, the BOP did review Mr. Silverstein's case at least once.  Second Am. Compl. ¶ 225.

Mr. Silverstein asserts that all of his reviews dating back to his initial placement in solitary confinement have been nothing more than mere formality, without any meaningful examination of his situation.  Second Am. Compl. ¶¶ 205, 228. Furthermore, the only explanation that Mr. Silverstein has been given for his continued solitary confinement is that his "'institutional history' required extreme security controls." Second Am. Compl. ¶ 221.  Mr. Silverstein claims that because he has not been told the reasons for his segregated confinement, he is prevented from meeting any required criteria or mitigating the causes.  *See* Second Am. Compl. ¶¶ 184-85, 222.  Mr. Silverstein further complains that because he has been confined to "no human contact status," he has been prevented from earning "good behavior" credits toward his sentence, which other inmates acquire for "performing exceptionally meritorious

service, or for performing duties of outstanding importance or for employment in an industry or camp."  Second Am. Compl. ¶¶ 226-27.

### B.  Procedural Background

Mr. Silverstein, through counsel, first filed a complaint in this case on November 11, 2007 [Docket No. 1].  He filed the operative pleading in this action, the second amended complaint [Docket No. 158], on May 14, 2009.  The second amended complaint names as defendants the BOP and seven individuals.  Mr. Silverstein named the BOP "in its official capacity," and defendant John Vanyur, former Assistant Director of the Correctional Programs Division of the BOP, in his individual capacity.  *See* Second Am. Compl. at 1.  All of the remaining defendants – Joyce Conley, current Assistant Director of the Correctional Programs Division of the BOP; Michael Nalley, Regional Director of the North Central Region of the BOP; Donald Denney, Regional Psychology Administrator for the North Central Region of the BOP; Ron Wiley, Warden of ADX; Marie Bailey, Staff Psychologist at ADX; and Paul Zohn, Staff Psychologist at ADX – are named in their "official and individual capacities."  Second Am. Compl. at 1.

The second amended complaint asserts four claims for relief.  The first alleges a "Deprivation of Liberty Interest Without Due Process of Law" in violation of the Fifth Amendment of the United States Constitution against defendants BOP, Vanyur, Conley, Nalley, and Wiley.  *See* Second Am. Compl. at 34.  This claim relates to "[d]efendants' placement of Mr. Silverstein in extreme and indefinite solitary confinement" and challenges the named defendants' "purported reviews of [p]laintiff's conditions of confinement" and "continuation of [p]laintiff's solitary confinement."  Second Am. Compl. ¶¶ 231, 233-34.  Mr. Silverstein's second claim alleges a "Deprivation of Liberty

Interest Without Due Process of Law" in violation of the Fifth Amendment against defendants BOP, Vanyur, and Nalley. Second Am. Compl. at 35. This claim is based upon Mr. Silverstein's transfer to ADX in July of 2005. Second Am. Compl. ¶ 236. Mr. Silverstein's third claim alleges a "Deprivation of Liberty Interest Without Due Process of Law" in violation of the Fifth Amendment against defendants BOP, Vanyur, Conley, Nalley, and Wiley. Second Am. Compl. at 35. The third claim relates to "[d]efendants' continued confinement of [p]laintiff at the ADX" which "prevented him from being considered for participation in the ADX Step-Down Unit Program." Second Am. Compl. ¶¶ 241, 243-44. Finally, the fourth claim in the second amended complaint alleges that all of the defendants have violated Mr. Silverstein's Eighth Amendment right to be free of cruel and unusual punishment. Second Am. Compl. at 36.

On July 13, 2009, all of the defendants whom Mr. Silverstein is suing in their individual capacity filed separate motions to dismiss. *See generally* Def. Vanyur's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 177] ("Vanyur Mot."); Def. Nalley's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 178] ("Nalley Mot."); Def. Conley's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 179] ("Conley Mot."); Def. Wiley's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 180] ("Wiley Mot.") ; Def. Denney's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 181] ("Denney Mot."); Def. Bailey's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 182] ("Bailey Mot."); Def. Zohn's Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 183] ("Zohn Mot."). Additionally, all of the defendants that Mr. Silverstein is suing in their official capacity, including the BOP, filed a single motion to dismiss. *See generally* Official-

Capacity Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 184] ("BOP Mot."). Each of the motions identified above is fully briefed and ripe for review.

## II. ANALYSIS

### A. Preliminary Matter – Official-Capacity Claims

Defendants request that the Court dismiss the official-capacity claims against the individual defendants as unnecessary, inefficient, and potentially confusing. Defendants argue that the presence of the United States, by way of the BOP, sufficiently covers plaintiff's desired relief. Plaintiff objects, but it is not clear what he believes is to be gained by the presence of the official-capacity claims against the individual actors.

"An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Furthermore, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166. Where, as here, the entity is also named, there is no need for an official-capacity claim. As a result, Mr. Silverstein's official-capacity claims against Joyce Conley, Michael Nalley, Donald Denney, Ron Wiley, Marie Bailey, and Paul Zohn are redundant, unnecessary, and potentially confusing.

Courts that have faced similar scenarios – complaints that allege identical claims against both an entity and agents of that entity in their official capacities – have taken

two tacks. Some dismiss the claims under federal courts' inherent authority to manage the cases before them. *See, e.g.*, *Saleh v. Federal Bureau of Prisons*, No. 05-cv-02467-PAB-KLM, 2008 WL 6893366, at *5 (D. Colo. July 29, 2008), *recommendation accepted in part and rejected in part on other grounds*, 2009 WL 3158120 (D. Colo. Sept. 29, 2009) (listing cases). Others rely on Federal Rule of Civil Procedure 12(f) – "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" – to eliminate redundant official-capacity claims. *See, e.g.*, *Brown v. City of Mounds, Ill.*, No. 08-861-DRH, 2009 WL 3055490, at *4 (S.D. Ill. Sept. 22, 2009); *McCleskey v. City of Dothan*, No. 08cv-634-MEF, 2009 WL 1258290, at *1-2 (M.D. Ala. May 5, 2009).

In the present case, while either approach would be justified, I believe that the proper mechanism for removing the official-capacity claims is Rule 12(f). Therefore, Mr. Silverstein's official-capacity claims against defendants Joyce Conley, Michael Nalley, Donald Denney, Ron Wiley, Marie Bailey, and Paul Zohn are stricken as redundant, unnecessary, and potentially confusing pursuant to Federal Rule of Civil Procedure 12(f).

## B.  Legal Standard – Motion to Dismiss

Dismissal of a claim under Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). For a complaint to state a claim it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual

matter that, taken as true, makes his "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). At the same time, however, a court need not accept conclusory allegations in the complaint. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erikson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (omission marks omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson*, 534 F.3d at 1286.

However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted). Thus, even

though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alteration marks omitted).

### C.  Plaintiff's First Claim for Relief

#### 1.  Division of Plaintiff's Claims for Relief

Before addressing the substance of Mr. Silverstein's claims, I turn to the parties' disagreement about what each claim covers.  According to the plaintiff's first claim for relief, defendants BOP, Vanyur, Conley, Nalley, and Wiley's "placement of Mr. Silverstein in extreme and indefinite solitary confinement created a liberty interest in that the conditions of his confinement were atypical and significant as compared to the ordinary incidents of prison life."  Second Am. Compl. ¶ 231.  Defendants contend that this claim must be read to cover only Mr. Silverstein's conditions of confinement prior to his transfer to ADX.  Defendants arrive at this conclusion because plaintiff's third claim for relief references the conditions of Mr. Silverstein's continued confinement at the ADX.  Second Am. Compl. ¶ 241.  Mr. Silverstein, on the other hand, argues that the claim is intended to cover his conditions of confinement for the full duration of his segregation, both prior to and following his transfer to ADX.  I agree with plaintiff.

Claim one covers the conditions of Mr. Silverstein's confinement both before and after his July 12, 2005 transfer to ADX.  The paragraphs describing claim one do not expressly create the temporal division that the defendants infer.  Instead, they speak broadly of "[d]efendants' purported reviews" and "[d]efendants' continuation of

[p]laintiff's solitary confinement." Second Am. Compl. ¶¶ 233-34. Furthermore, claim one names defendants Conley and Wiley, both of whom had no contact with Mr. Silverstein until after he was transferred to ADX. That being said, this interpretation creates a certain degree of overlap between claim one and claim three, overlap which I address in the discussion of claim three below. Therefore, going forward, I read plaintiff's first claim to challenge the constitutionality of his conditions of confinement beginning in 1983 and the process which he has received relative to the continuation of such conditions between that point and today.

### 2. Official-Capacity Claim Against the BOP

In its motion to dismiss, the BOP argues that there are two reasons why Mr. Silverstein's first claim for relief should be dismissed. First, the BOP alleges that the claim is moot because Mr. Silverstein's only recourse against the BOP would be injunctive relief, relief that can be afforded prospectively, not retrospectively. *See* Official-Capacity Defs.' Mot. to Dismiss Pl.'s Second Am. Compl. [Docket No. 184] ("BOP's Mot. to Dismiss") at 4-6. Second, the BOP claims that the statute of limitations bars Mr. Silverstein's claim. *See* BOP's Mot. to Dismiss at 6-7. The Court's interpretation of Mr. Silverstein's first claim nullifies both of the BOP's arguments. Because the alleged injuries continue, the claim for injunctive relief is prospective and the subject matter persists. Therefore, claim one is neither moot nor time-barred with respect to the BOP. With no other objections raised, Mr. Silverstein's first claim for relief against defendant BOP survives dismissal at this point.

### 3. *Individual-Capacity Claims*

Plaintiff's first claim asserts *Bivens* liability against four BOP administrators – defendants Vanyur, Conley, Nalley, and Wiley – in their individual capacities for their roles in maintaining Mr. Silverstein's conditions of confinement. Each of the four defendants argues that this claim is barred by the two-year statute of limitations on *Bivens* claims in Colorado. *See Turner v. Schultz*, 130 F. Supp. 2d 1216, 1221 (Colo. 2001). Because, as discussed above, the Court interprets the first claim to encompass activities after plaintiff's transfer to ADX, the statute of limitations does not bar plaintiff's *Bivens* claims.[1] Therefore, defendants' statute-of-limitations argument fails.

The other ground on which all defendants seek dismissal of plaintiff's first claim is qualified immunity.[2] Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.

---

[1] On the present record, however, the Court refrains from deciding the applicability of the "continuing violation" doctrine and its potential impact on Mr. Silverstein's ability to collect damages for actions that precede the two-year period. The exact details of the relevant facts and the applicability of defenses to the statute of limitations prevent the Court from deciding this issue at this point with any degree of reliability. *See Whalen v. Wiley*, No. 06-cv-00809-WDM-CBS, 2007 WL 2154184, at *4 (D. Colo. July 16, 2007) ("Because the statute of limitations defense is not patently clear from the face of the Complaint or based on adequately developed facts, the court is unable to determine on a motion to dismiss that [plaintiff's] claims are barred by the statute of limitations.").

[2] Defendant Conley also argues that she is entitled to dismissal of plaintiff's first claim as it relates to her based on defendants' previously rejected theory that claim one pertains only to events prior to Mr. Silverstein's transfer to ADX. For the reasons already discussed, this theory fails.

800, 818 (1982). Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008). Until recently, the plaintiff was required to "first establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003). After establishing that threshold question, the plaintiff had to establish that the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court recently altered the qualified immunity analysis by holding that the "mandatory, two-step rule for resolving all qualified immunity claims should not be retained." *Pearson v. Callahan*, 129 S. Ct. 808, 817 (2009). Instead, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on substantive law regarding that right. *See*, *e.g.*, *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007). On the other hand, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Casey*, 509 F.3d at 1283-84 (quoting *Saucier*, 533 U.S. at 202); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to

20

cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted). However, "contrary authority from other circuits does not preclude a finding that the law in this circuit was clearly established, if the contrary authority can be distinguished." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).

That being said, factual novelty alone will not automatically provide a state official with the protections of qualified immunity. *See Casey*, 509 F.3d at 1284; *Blake*, 469 F.3d at 914 ("[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." (internal quotation marks and alteration marks omitted)). The Tenth Circuit employs a "sliding scale" in identifying clearly established law: "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey*, 509 F.3d at 1284 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 129 S. Ct. at 815. Qualified immunity provides a defense to trial and the other burdens of litigation such as discovery, rather than just liability. *See Saucier*, 533 U.S. at 200, *overruled on other grounds by Pearson*, 129 S. Ct. 808.

Therefore, a court is to resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson*, 483 U.S. at 646 n.6.

Mr. Silverstein's first claim for relief alleges a violation of his Fifth Amendment right to due process. Defendants argue that "as set forth above, [p]laintiff does not state a plausible claim that his Fifth Amendment rights have been violated" in his due process claims. Vanyur Mot. at 10; Nalley Mot. at 10; Conley Mot. at 10; Wiley Mot. at 10. However, the only basis for dismissal that is "set forth above" by these defendants with respect to claim one is their statute of limitations argument. They did, however, in addressing claim three, raise procedural due process arguments.[3] *See* Vanyur Mot. at 7-9; Nalley Mot. at 7-9; Conley Mot. at 7-9; Wiley Mot. at 8-9. In his responses to defendants' motions to dismiss, plaintiff discussed the qualified immunity issue as it relates to the procedural due process questions surrounding claim one. *See* Pl.'s Resp. in Opp'n to Defs.' Mots. to Dismiss Pl.'s Second Am. Compl. [Docket No. 189] at 8-15; Pl.'s Resp. in Opp'n to Defs.' Mots. to Dismiss Pl.'s Second Am. Compl. [Docket No. 190] at 8-15. Therefore, I address the qualified immunity question with respect to claim one here.

The Court's broad reading of defendants' motions does not result in dismissal, however, because Mr. Silverstein has stated a plausible procedural due process claim. "We examine procedural due process questions in two steps: the first asks whether

---

[3] The parties do not address whether Mr. Silverstein's assertion within his first claim that "[d]efendants' continuation of [p]laintiff's solitary confinement was done in an arbitrary and capricious manner without legitimate penological justification," Second Am. Compl. ¶ 234, invokes some other legal doctrine. As a result, neither does the Court at this time.

there exists a liberty or property interest which has been interfered with by the [government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citations omitted).

With respect to the first step – the existence of a liberty interest – "prison conditions that 'impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' may create a liberty interest protected by the Due Process Clause." *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)) (internal alteration marks omitted). The Supreme Court in *Wilkinson v. Austin*, 545 U.S. 209 (2005), set the baseline for what constitutes an atypical and significant hardship in relation to the ordinary incidents of prison life. *Wilkinson* determined that the specific combination in that case of certain severe limitations in solitary confinement, indefinite placement, and an impact on the inmates' eligibility for parole constituted an atypical and significant hardship in relation to the ordinary incidents of prison life, and thus created a liberty interest in those conditions of confinement. Based on *Wilkinson*, the Tenth Circuit has identified four factors that courts "might" consider in determining whether a liberty interest exists in an inmate's conditions of confinement:

> (1) [whether] the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) [whether] the conditions of placement are extreme; (3) [whether] the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) [whether] the placement is indeterminate.

*Estate of DiMarco v. Wyoming Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007).

With respect to the first *DiMarco* factor – the purpose of the segregation and whether it relates to and furthers a legitimate penological interest, such as safety or rehabilitation – the record thus far is undeveloped and somewhat mixed. On the one hand, Mr. Silverstein has murdered at least three people while incarcerated, including a correctional officer. The BOP unquestionably has a legitimate penological interest in preventing Mr. Silverstein from murdering or injuring other inmates and prison staff in the future. On the other hand, Mr. Silverstein asserts that his psychological reviews, particularly as of late, have indicated that he represents a "low" risk to others and asserts that he is being kept in solitary confinement solely as punishment for murdering the correctional officer, not because he poses an ongoing risk. On a Rule 12(b)(6) motion where the Court must accept the plaintiff's well-pled facts as true, the Court can only speculate as to the penological interests behind the defendants' confinement decisions and whether those penological interests have changed in the nearly three decades since Mr. Silverstein first entered solitary confinement. For instance, it is unclear whether the psychological reviews evaluate what his risk to others would be in less restrictive settings, which bears directly on the penological interests in the conditions of plaintiff's confinement. Therefore, the Court is not in the position to make a determination on motions to dismiss regarding the extent to which Mr. Silverstein's segregation relates to and furthers a legitimate penological interest.

As for the second *DiMarco* factor – whether the conditions of placement are extreme – Mr. Silverstein has alleged conditions of confinement that are more severe than those before the Supreme Court in *Wilkinson*. The plaintiff inmates in *Wilkinson* were subject to the following physical conditions of confinement: "almost all human

contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Wilkinson*, 545 U.S. at 223-24. These conditions are similar to those alleged in Mr. Silverstein's second amended complaint. However, in addition to limitations on human contact and exercise time, long periods of lock-down, and continuous lighting, Mr. Silverstein also claims that he has, at times, been isolated from all indications of human activity, has had limited phone and visitation rights, is under constant camera surveillance, has been exposed to extremes of heat and cold, and has had no access to fresh air or sunlight. Furthermore, as of the date he filed his second amended complaint, Mr. Silverstein had been subjected to some combination of these conditions continuously for nearly twenty-seven years.

Relevant to the third *DiMarco* factor – whether the placement increases the duration of confinement – Mr. Silverstein alleges that as a result of his segregated confinement he has been precluded from earning "good behavior" credits which could potentially impact the length of his sentence. Whether Mr. Silverstein, who is serving three life sentences, actually qualifies for such credits and whether his parole eligibility would be affected by such credits under the law at the time he was sentenced is not currently before the Court. For the sake of the present motions, the Court accepts this averment as true. Finally, with respect to the fourth *DiMarco* factor, and similar to the inmates in *Wilkinson*, all indications are that Mr. Silverstein's placement in solitary confinement is for an indefinite period of time.

Whether plaintiff can establish these averred facts under the more rigorous standards of summary judgment remains to be seen. However, for purposes of the

present motion, the facts alleged in the second amended complaint sufficiently demonstrate that, like the inmates in *Wilkinson* and pursuant to the factors in *DiMarco*, Mr. Silverstein has been subjected to an atypical and significant hardship in relation to the ordinary incidents of prison life. As a result, Mr. Silverstein has a liberty interest in the alleged conditions of his confinement, a liberty interest that may be deprived only through due process of law.

I turn now to the second step in the procedural due process analysis – whether Mr. Silverstein received the process he was due in light of the circumstances. *Cf. Wilkinson*, 545 U.S. at 224 ("[T]he requirements of due process are flexible and call for such procedural protections as the particular situation demands." (internal quotation marks and alteration marks omitted)). In assessing the sufficiency of process in prison conditions cases, courts apply the three factors from *Mathews v. Eldridge*, 424 U.S. 319 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-25.

A prison inmate's liberty interest in the conditions of his confinement, "while more than minimal, must be evaluated, nonetheless, within the context of the prison system and its attendant curtailment of liberties." *Wilkinson*, 545 U.S. at 224-25. Therefore, because prison inmates already have their liberty limited in significant ways by the mere fact of being incarcerated, the private interest involved and the required process in

connection with the deprivation of that interest are not as robust as they would be for individuals who are not incarcerated in the first place. *See Sandin*, 515 U.S. at 485. With this in mind, due process in a prison conditions case is satisfied where the government allows: "(1) a sufficient initial level of process, i.e., a reasoned examination of the assignment; (2) the opportunity for the inmate to receive notice and respond to the decision; and (3) safety and security concerns to be weighed as part of the placement decision." *Estate of DiMarco*, 473 F.3d at 1344 (citing *Wilkinson*, 545 U.S. at 226-27).

Mr. Silverstein makes several assertions relevant to *DiMarco*'s three criteria for establishing the minimal level of process in prison conditions cases. For example, he claims that he "has never received a meaningful review of his conditions of confinement." Second Am. Compl. ¶ 205. He also claims that he "was never notified of the Executive Staff reviews [which occurred between 1991 and November 2005], nor was he provided the opportunity to respond to the Executive Staff's assessment of his conditions of confinement." Second Am. Compl. ¶ 211. He further alleges that the Executive Panel, which reviewed his case beginning in November 2005, also failed to conduct meaningful reviews. According to the allegations in the second amended complaint, instead of making an independent judgment, the panel simply followed the recommendation of defendant Wiley. Second Am. Compl. ¶¶ 218-19. He also complains that "[d]efendants never gave Mr. Silverstein any criteria for release from his extreme and indefinite solitary confinement" and "the only justification offered by [d]efendants for maintaining Mr. Silverstein in these conditions was that his 'institutional history' required extreme security controls." Second Am. Compl. ¶¶ 221-22.

Mr. Silverstein summarizes the process he has received in connection with his solitary confinement between 1983 and 2007 as follows:

> the reviews by both the Executive Staff and the Executive Panel were sham proceedings, totally devoid of any meaning or substance. No review actually occurred. The entire process at both types of reviews would take no longer than several minutes. Defendants automatically extended Mr. Silverstein's extreme and indefinite solitary confinement at each review. Defendants continued Mr. Silverstein's extreme and solitary confinement to punish him for killing a correctional officer in 1983. Defendants never meaningfully attempted to determine if Mr. Silverstein still required the security controls imposed by his conditions of confinement.

Second Am. Compl. ¶ 228.

Applying plaintiff's allegations to the criteria from *DiMarco*, it is at least plausible that he is entitled to relief for defendants' failure to provide sufficient process.[4] Contrary to the assertions of defendants, Mr. Silverstein has made sufficient, non-conclusory allegations to sustain such a determination. Mr. Silverstein claims that there has been no reasoned examination of his assignment or the safety and security concerns relative to his confinement. Instead, he avers that the reviews were perfunctory, lasting only "several minutes," and concluded with the automatic continuation of his conditions. Mr. Silverstein further alleges that the decisions were a sham because the panel deferred to defendant Wiley rather than attempting to make independent determinations. Mr. Silverstein also claims that between 1991 and November 2005 he was not provided with notice or the opportunity to respond to the Executive Staff's assessment of his

---

[4] Although Mr. Silverstein does not specifically state that defendants Vanyur, Conley, and Nalley through their roles on the review bodies each controlled the minute details of his confinement, the averments demonstrate that they reviewed his conditions and a reasonable inference provides that they were to approve or disapprove either broadly or specifically the nature of that confinement.

conditions of confinement.  Second Am. Compl. ¶ 211.  The Court infers from plaintiff's

allegations that this approach persisted under the Executive Panel reviews.  *See, e.g.*,

Second Am. Compl. ¶¶ 219, 221, 222, 228.  For example, I read plaintiff's assertion

that "[d]efendants never gave Mr. Silverstein any criteria for release from his extreme

and indefinite solitary confinement" and "the only justification offered by [d]efendants for

maintaining Mr. Silverstein in these conditions was that his 'institutional history' required

extreme security controls," Second Am. Compl. ¶¶ 221-22, to indicate that he has not

been informed of the specific reasons for his continued confinement and, therefore,

was not given the opportunity to rebut those reasons.

The Supreme Court has noted that notice of the factual basis underlying one's

segregated confinement and a fair opportunity for rebuttal "are among the most

important procedural mechanisms for purposes of avoiding erroneous deprivations" of

liberty interests.  *Wilkinson*, 545 U.S. at 225-26.  Therefore, to the extent that each of

the defendants is individually implicated in this process, a constitutional violation by

them is plausibly pled.  Based upon Mr. Silverstein's second amended complaint, I

conclude that he has pled facts that sufficiently demonstrate a liberty interest which was

not afforded the proper process in connection with its deprivation.  Therefore, the Court

finds that plaintiff's claim of a Fifth Amendment violation by defendants Vanyur, Nalley,

Conley, and Wiley is at least plausible.  Plaintiff has met his burden under the first

prong of the qualified immunity analysis and dismissal under Federal Rule of Civil

Procedure 12(b)(6) is not appropriate.

While Mr. Silverstein's first claim survives defendants' motions to dismiss, one

point deserves stating.  Mr. Silverstein may have a liberty interest in the conditions of

his confinement as alleged in this case.  However, no case has held that prisoners have an absolute entitlement to the eventual release from solitary confinement.  As the Supreme Court in *Wilkinson* noted, such "harsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners."  *Wilkinson*, 545 U.S. at 224.  Rather, there may be infractions or threats which are so serious that this confinement may last indefinitely, as long as accompanied by sufficient process.  *See, e.g.*, *Wilkinson*, 545 U.S. 209.  On issues of prison management and placement of inmates, courts owe prison officials considerable deference.  *See Estate of DiMarco*, 473 F.3d at 1342; *see also Wilkinson*, 545 U.S. at 228 ("[C]ourts must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior.").

I now turn to the second qualified-immunity prong, namely, whether the law at issue here was clearly established at the time defendants allegedly violated it.  With respect to the creation of a liberty interest in an inmate's conditions of confinement, both the Supreme Court and the Tenth Circuit have noted the difficulty in drawing a definitive line regarding what constitutes an atypical and significant hardship in relation to the ordinary incidents of prison life.  The Supreme Court framed this issue in terms of determining a comparative baseline from which to measure an allegedly atypical hardship.  *See Wilkinson*, 545 U.S. at 224; *see also Estate of DiMarco*, 473 F.3d at 1342.  The Tenth Circuit noted in a recent unpublished case that "confusion and divergence" about what constitutes an atypical and significant hardship in relation to the

ordinary incidents of prison life "evidences that *Sandin*'s rule continues to evolve, even after *Wilkinson*." *Ajaj v. United States*, 293 F. App'x 575, 586 (10th Cir. 2008). As a result, the Court in *Ajaj* stated that it had "no qualm in concluding that the law was not clearly established as to whether Plaintiff had a protected liberty interest in avoiding transfer to ADX in 2002." 293 F. App'x at 586.

Defendants rely upon the latter statement in *Ajaj*. However, in the present case, the complained-of conditions not only parallel those which the Supreme Court found created a liberty interest in *Wilkinson*, they impose greater restrictions. Therefore, as of June 13, 2005 – the date the Supreme Court issued *Wilkinson* – it was clearly established that the conditions of Mr. Silverstein's confinement created a liberty interest. It was also clearly established by that date, that in order to deprive an individual of such a liberty interest, a government actor had to provide him with some process which *Wilkinson* suggests was, at a minimum, notice and an opportunity to be heard. *See Wilkinson*, 545 U.S. at 229. As a result, the law which defendants Vanyur, Nalley, Conley, and Wiley allegedly violated according to Mr. Silverstein's second amended complaint was clearly established as of June 13, 2005. I conclude that Mr. Silverstein has met his burden under the second prong of the qualified immunity analysis and has stated a claim that is plausible on its face. Therefore, plaintiff's first claim against defendants Vanyur, Nalley, Conley, and Wiley will not be dismissed under Rule 12(b)(6).

### D.  Plaintiff's Second Claim for Relief

In his second claim, plaintiff asserts that "[d]efendants' transfer of Mr. Silverstein to the ADX created a liberty interest in that the conditions of his confinement at the ADX are atypical and significant as compared to the ordinary incidents of prison life." Second Am. Compl. ¶ 236.  The complaint goes on to allege that Mr. Silverstein received insufficient process in connection with this transfer.  Second Am. Compl. ¶ 239.  For purposes of the motion to dismiss, the BOP stated its willingness to assume that Mr. Silverstein did, in fact, have a liberty interest in his transfer.  Because the existence of a liberty interest is a question of law, *see Estate of DiMarco*, 473 F.3d at 1339 n.3, the Court is not bound by this concession.

Plaintiff's second claim is not viable.  While transfer to an administrative segregation facility can create a liberty interest, *see, e.g.*, *Wilkinson*, 545 U.S. 209, it does not do so in the present case.  The reason for the distinction is that, in cases like *Wilkinson*, transfer to the administrative segregation unit represented the initiation of highly restrictive conditions of confinement.  In the present case, however, Mr. Silverstein alleges he was transferred to ADX because the defendants "considered it necessary to continue to confine Mr. Silverstein in substantially the same conditions that he had been confined in for the previous 21 years."  Second Am. Compl. ¶ 101. Mr. Silverstein's description of his conditions of confinement both prior to and at ADX supports his assertion that the BOP maintained substantially similar conditions.  *See* Second Am. Compl. ¶ 101, 137; *see also* Second Am. Compl. ¶ 190.  As a result, unlike the inmates in *Wilkinson*, Mr. Silverstein's transfer to an administrative

segregation facility did not represent a substantial alteration of the conditions of his confinement. The law is well established that inmates generally do not have a liberty interest in the location of their imprisonment. *Frazier v. Dubois*, 922 F.2d 560, 561 (10th Cir. 1990) ("[T]he due process clause of the Fourteenth Amendment does not entitle a prisoner to a hearing whenever he is transferred from one prison to another because a prisoner does not have a '*liberty interest*' in assignment to any particular prison." (citing *Meachum v. Fano*, 427 U.S. 215 (1976)) (emphasis in original)). Therefore, because no liberty interest is implicated in Mr. Silverstein's transfer to ADX, he has failed to state a claim on which relief is plausibly available and dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate.

### E. Plaintiff's Third Claim for Relief

Claim three asserts that "[d]efendants' confinement of Mr. Silverstein's [sic] on Range 13, the most restrictive unit at the ADX, prevented him from being considered for participation in the ADX Step-Down Unit Program," Second Am. Compl. ¶ 243, and that "[t]he special restrictions [d]efendants BOP and [Wiley] have placed on Mr. Silverstein during his confinement on D-Unit bar Mr. Silverstein from meaningful consideration for participation in the ADX Step-Down Unit Program." Second Am. Compl. ¶¶ 244 (capitalization in original). The final paragraph of claim three makes the subject matter of that claim most clear: "Defendants' purported reviews of [p]laintiff's conditions of confinement failed to provide due process to protect [p]laintiff's liberty interest in entering the ADX Step-Down Unit Program." Second Am. Compl. ¶ 245.

Entry into the Step-Down Unit Program at ADX is a process by which an inmate moves toward less restrictive conditions and, perhaps, to transfer out of ADX. Plaintiff's ability to enter the Step-Down Unit Program runs hand-in-hand with any liberty interest he has in his conditions of confinement. In other words, if his conditions of confinement fail to rise to the level of a liberty interest, there would be no process due under the Fifth Amendment either in initially subjecting him to those conditions or perpetuating them, for example, by excluding him from the Step-Down Unit Program. On the other hand, if his conditions of confinement are sufficient to create a liberty interest, then plaintiff is entitled to process for both the initiation and the perpetuation of those conditions. Either way, because the Step-Down Unit Program is merely a means to address the conditions that may or may not create a liberty interest, the Court is unable to find that Mr. Silverstein has a liberty interest in eligibility for the Step-Down Unit Program that is separate and independent from the liberty interest created by the conditions of confinement themselves. Indeed, the Court is unaware of a case that takes such a position. Therefore, claim three is redundant of claim one.[5] However, unlike plaintiff's official-capacity claims, which the Court struck as duplicative, claim three's shortcomings also implicate their substance. As a result, the Court exercises its discretion in managing this case and dismisses claim three. *See Saleh v. Federal*

_____

[5] Furthermore, with respect to plaintiff's individual capacity claims, although it is his duty to do so, *see Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008), plaintiff has not demonstrated that a clearly-established independent liberty interest exists in the Step-Down Unit Program itself. *Cf. Ajaj v. United States*, 293 F. App'x 575, 587 n.9 (10th Cir. 2008) ("Assuming arguendo Plaintiff had any protected liberty interest in admittance to the step down program, such a right was not clearly established at the time of [the defendant's] allegedly wrongful conduct.").

*Bureau of Prisons*, No. 05-cv-02467-PAB-KLM, 2008 WL 6893366, at *5 (D. Colo. July 29, 2008), *recommendation accepted in part and rejected in part on other grounds*, 2009 WL 3158120 (D. Colo. Sept. 29, 2009).  Going forward, plaintiff has a single due process claim – claim one – regarding his conditions of confinement while in BOP custody.

### F.  Plaintiff's Fourth Claim for Relief

As noted at the outset, Mr. Silverstein's fourth claim for relief alleges a violation of the Eighth Amendment's prohibition on cruel and unusual punishment.  *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").  "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm."  *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).  "An Eighth Amendment claim has both an objective component – whether the deprivation is sufficiently serious – and a subjective component – whether the official acted with a sufficiently culpable state of mind."  *Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 809 (10th Cir. 1999).

Courts "consider the conditions of confinement as a whole because several deprivations in combination may constitute a constitutional violation when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise . . . ."  *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996) (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotation

marks omitted).  However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."  *Wilson*, 501 U.S. at 305.

"[F]or a condition of confinement to be considered cruel and unusual it must be either: (a) grossly disproportionate to the severity of the crime warranting punishment, (b) involve . . . the wanton and unnecessary infliction of pain or (c) deprive inmates of the minimal civilized measure of life's necessities."  *Mitchell*, 80 F.3d at 1441-42 (citing *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981)) (internal quotation marks omitted). Courts are to use these factors in distinguishing between cruel and unusual – thus unconstitutional – prison conditions and restrictive, even harsh, conditions that are merely a "part of the penalty that criminal offenders pay for their offenses against society."  *Mitchell*, 80 F.3d at 1441 (citing *Rhodes*, 452 U.S. at 347).  As for the subjective component of plaintiff's Eighth Amendment claim, "[i]n cases challenging the conditions of a prisoner's confinement, the subjective standard is one of deliberate indifference to inmate health or safety."  *Perkins,* 165 F.3d at 809.

### 1.  *Official-Capacity Claim Against the BOP*

A noteworthy characteristic of Mr. Silverstein's confinement is its duration.  While the Court is unaware of a circuit court decision discussing the Eighth Amendment implications of decades-long segregated confinement, the Tenth Circuit has noted that "[a]n inquiry into conditions of confinement by necessity relies on the particular facts of each situation; the circumstances, nature, and *duration* of the challenged conditions must be carefully considered."  *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)

(internal quotation marks omitted) (emphasis added).  Moreover, "[w]hile no single factor controls the outcome of these cases, the length of exposure to the conditions is often of prime importance."  *DeSpain*, 264 F.3d at 974.  "In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while 'substantial deprivations of shelter, food, drinking water, and sanitation' may meet the standard despite a shorter duration."  *DeSpain*, 264 F.3d at 974 (quoting *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000)).

In the present case, Mr. Silverstein's segregated confinement has continued for a sufficient length of time that relief on his Eighth Amendment claim is plausible and dismissal is not appropriate against defendant BOP.  Therefore, defendant BOP's motion to dismiss plaintiff's fourth claim for relief is denied.

## 2. *Individual-Capacity Claims*

The evolving nature of Eighth Amendment jurisprudence, *see DeSpain*, 264 F.3d at 973-74, which in part allows plaintiff's claim against the BOP to proceed in this case, has the opposite effect on his individual capacity claims.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson v. Callahan*, --- U.S. ----, 129 S. Ct. 808 (2009).  "Qualified immunity operates . . . to protect officers from the sometimes hazy border between [unconstitutional and lawful conduct] and to ensure that before they are subjected to suit, officers are on notice their

conduct is unlawful." *Saucier*, 533 U.S. at 206 (internal citation and quotation marks omitted). Although there are some district court cases that address the issue of lengthy confinement in segregated status, *see Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 685 (M.D. La. 2007); *McClary v. Kelly*, 4 F. Supp. 2d 195, 208-09 (W.D.N.Y. 1998), no circuit courts have addressed the issue. Therefore, there is no clearly established law on the subject. *See Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008) ("A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." (internal quotation marks omitted)). As a result, it would not have been clear to a reasonable prison official that keeping plaintiff in solitary confinement for twenty-seven years was unlawful, especially given plaintiff's history of prison murders.

Mr. Silverstein has failed to meet his burden in demonstrating that the individual defendants violated a clearly established statutory or constitutional right of which a reasonable person would have known, *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, all of the individual defendants are entitled to qualified immunity on Mr. Silverstein's fourth claim for relief and, as a consequence, the claim as it pertains to these defendants is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## III. CONCLUSION

In accordance with the discussion above, it is

**ORDERED** that defendants' motions to dismiss [Docket Nos. 177, 178, 179, 180, 181, 182, 183, 184] are GRANTED in part and DENIED in part as follows. Plaintiff Thomas Silverstein's official-capacity claims against defendants Joyce Conley, Michael

Nalley, Donald Denney, Ron Wiley, Marie Bailey, and Paul Zohn are STRICKEN as redundant, unnecessary, and potentially confusing pursuant to Federal Rule of Civil Procedure 12(f). Plaintiff Thomas Silverstein's second and third claims for relief are DISMISSED as to all named defendants. Plaintiff Thomas Silverstein's fourth claim for relief is DISMISSED as it relates to defendants John Vanyur, Joyce Conley, Michael Nalley, Donald Denney, Ron Wiley, Marie Bailey, and Paul Zohn. Plaintiff Thomas Silverstein's first claim for relief against defendants the BOP, "in its official capacity," and John Vanyur, Joyce Conley, Michael Nalley, and Ron Wiley, in their individual capacities, will proceed. Plaintiff Thomas Silverstein's fourth claim for relief, as it relates to defendant the BOP, also will proceed. It is further

**ORDERED** that any Final Judgment entered upon resolution of all claims against all parties shall reflect the rulings in this order.

DATED March 23, 2010.

BY THE COURT:

s/ Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge