**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 07-cv-02471-PAB-KMT

THOMAS SILVERSTEIN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS, *et al.*,

      Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

The Federal Bureau of Prisons ("BOP") and Joyce Conley, Michael Nalley, John Vanyur and Ron Wiley (collectively "Defendants"), through counsel, move for summary judgment to dismiss Plaintiff's two remaining claims in his second amended complaint. Fed. R. Civ. P. 56.

Plaintiff, a former leader of the Aryan Brotherhood ("A.B.") prison gang, is an inmate in BOP custody at the United States Penitentiary, Administrative Maximum ("ADX"). Between 1981 and 1983, while housed in the then-most secure unit within the most secure federal penitentiary, Plaintiff did what no other BOP inmate has accomplished: he murdered two inmates, one correctional officer, and triggered a gang race war within the BOP with repercussions that resonate even today. As a result of this and other institutional misconduct by Plaintiff, in November 1983 the BOP imposed specific, individualized security measures that restricted his conditions of confinement. These measures, which were discontinued in April 2008, were imposed given the unprecedented danger Plaintiff posed to BOP officials, other inmates and the public.

Twenty-four years after the conditions were initially imposed, Plaintiff filed a complaint, asserting four claims for relief related to such conditions. Doc. 1, 158. Two claims remain. Doc.

261 at 39.  In Claim 1, Plaintiff challenges his conditions of confinement that were initially imposed in November 1983, alleging he was deprived of a liberty interest without sufficient due process.  Doc. 158 ¶¶ 231-34.  In Claim 4, Plaintiff asserts that his conditions of confinement violate his Eighth Amendment right to be free of cruel and unusual punishment.  *Id.* ¶¶ 246-51.  He seeks damages under *Bivens* for Claim 1, a declaratory judgment (for Claims 1 and 4) that the BOP's actions violated his constitutional rights, and to be transferred to a different institution.  *Id.* at 38.

The complaint should be dismissed for multiple reasons.  First, Claims 1 and 4 are time-barred by the applicable statutes of limitations.  Plaintiff filed his complaint in 2007, more than 24 years after his claims accrued in 1983 when the BOP imposed restrictive conditions of confinement.

Even if the claims were not time-barred, they are nevertheless without merit.  The BOP has not violated Plaintiff's procedural due process rights.  His confinement in administrative segregation and at the ADX does not go so far as to deprive him of a constitutionally protected liberty interest.  The conditions further legitimate penological interests, are not "extreme," do not lengthen his sentence or disqualify him for parole eligibility, and it is not indeterminate.  Even if Plaintiff had a liberty interest, Defendants have provided him with adequate process to challenge his confinement.  The BOP reviews his confinement periodically (every six months at least) in several ways, through which he may participate and raise concerns about his conditions of confinement.  Plus, he recently received a retroactive ADX hearing to address whether his confinement there was warranted.

Further, Plaintiff's conditions of confinement in segregation and at the ADX do not violate the Eighth Amendment.  First, the BOP has provided him with the minimal civilized measure of life's necessities.  He has been housed in humane conditions of confinement with adequate food, clothing, shelter, sanitation, medical care, mental health care and reasonable safety from serious bodily harm.  Second, he cannot show that the BOP acted with culpable intent.  He does not suffer from any discernible physical or mental harm caused by the restrictive conditions of confinement,

nor can he show that the BOP acted with deliberate indifference to a significant risk of serious harm.  Therefore, Plaintiff's claims fail.

## I.      STATEMENT OF UNDISPUTED MATERIAL FACTS ("Facts").

### A.  Plaintiff's Criminal History & Membership in the A.B. Shows a Capacity for Great Violence.

**1.**   Plaintiff is a validated member of the A.B.**\***,[1] a prison gang that is one of the most violent and dangerous "disruptive groups" in the BOP.  Ex. A, Plaintiff Depo. at 65, 353; Ex. B, Smith Decl. ¶ 15; Ex. C, Vanyur Depo. at 18, 19; Ex. D, Collins Decl. ¶ 6.

**2.**   Given the threat posed by A.B. members to the safety, security, and orderly running of the institution and public is severe, such inmates cannot be managed by routine measures. Ex. D ¶ 7.

**3.**   The A.B. is a structured, self-disciplined disruptive group that uses violence to keep members in compliance with its rules.  If a member or suspect is instructed to perform an act, he must carry it out, or face discipline – either by a beating or by death.  Ex. B ¶ 17; Ex. D ¶¶ 8-9.

**4.**   To qualify for A.B. membership, an inmate has to "make his bones" by committing murder.  Ex. B ¶ 16.  Retirement from the A.B. does not exist, only death severs membership.  *Id.* ¶ 19.

**5.**   Plaintiff "made his bones" by murdering Danny Atwell, an inmate, and then became a "commissioner" or "shot caller" (leader) of the A.B.**\*** Ex. A at 97, 111.

---

[1] At his deposition, when posed with certain questions, Plaintiff repeatedly invoked his Fifth Amendment privilege against self-incrimination.   Defendants ask that the Court make negative inferences as to Plaintiff's refusal to answer such questions (they will be marked by an asterisk in bold-face, "**\***").   *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *Mid-America's Process Serv. v. Ellison*, 767 F.2d 684, 686 (10th Cir. 1985) (stating that a party may assert the Fifth Amendment in civil litigation but "may have to accept certain bad consequences that flow from that action").

**6.** He has ordered "hits" (assassinations) on correctional officers and inmates, and retains the authority to do so.* *Id.* 106-07, 110, 353.  He has used attorneys, girlfriends and visitors to transmit messages about hits.* *Id.* 109.

**7.** On February 28, 1978, Plaintiff came into BOP custody at the United States Penitentiary ("USP"), Leavenworth, Kansas, to serve a 15-year term for armed bank robbery.  Ex. D ¶ 5.

**8.** Upon arrival to USP Leavenworth in 1978, Plaintiff initially received favorable work and unit reports, but he soon became a management problem and incurred several incident reports.  *Id.* ¶ 11.

**9.** The BOP believes that in February 1979, Plaintiff stabbed inmate Danny Atwell to death at USP Leavenworth.  *Id.* ¶ 12.  The conviction was reversed, but "the properly admissible evidence was sufficient to support [his] conviction."  *United States v. Silverstein*, 737 F.2d 864, 869 (10th Cir. 1984).

**10.** The BOP conducted an internal investigation, which found that Plaintiff was guilty of Atwell's murder; as a result, Plaintiff forfeited 394 days of s statutory good time, was placed in disciplinary segregation for 60 days, and was transferred to Control Unit at USP Marion, Illinois ("Marion Control Unit").  Ex. D ¶ 12.  In the early 1980s, the Marion Control Unit was the most secure unit within the most secure BOP prison.  *Id.* ¶ 16.

**11.** In November 1981, while confined in the Marion Control Unit, Plaintiff and Clayton Fountain, an accomplice, murdered Robert Chappelle, a black inmate, as a favor to the Mexican Mafia.  *United States v. Silverstein*, 732 F.2d 1338, 1342 (7th Cir. 1984).  They strangled Chappelle with a cord "as he lay on his bed with his head leaning against the bars of the cell."  *Id.*

**12.** At the time, Plaintiff was "a member of the three-man commission that governs the Aryan Brotherhood."  *Id.* at 1341.  He was sentenced to life in prison, and the conviction was affirmed.  *Id.*

**13.** In September 1982, Plaintiff and Fountain murdered inmate Raymond "Cadillac" Smith, the leader of the D.C. Blacks gang, in the Marion Control Unit.  Plaintiff and Fountain, who were in a

recreation enclosure while inmate Smith was showering, escaped from a hole in the enclosure which they had previously cut, and stabbed inmate Smith 67 times with homemade knives.  Ex. D ¶ 14.

**14.**  Plaintiff, who then was an A.B. "shot caller," had the authority to delegate this hit but chose to commit the murder himself.  Ex. B ¶ 34.  The BOP believes that Smith's murder was intended to a message to the D.C. Blacks that they were not immune from the A.B.'s reach.  *Id.* ¶ 35.

**15.**  In October 1983, while confined at the Marion Control Unit, Plaintiff murdered BOP Officer Merle Clutts, stabbing him 29 times with a shank.  *United States v. Fountain*, 768 F.2d 790, 793 (7th Cir. 1985).  As Plaintiff, who was handcuffed, was escorted to his cell by three officers, an accomplice handed him keys and a weapon.  *Id.*  Plaintiff unlocked the cuffs and murdered the officer.  *Id.*  The court called Plaintiff and Fountain the "masters of prison murder."  *Id.* at 790.

**16.**  In the aggregate, Plaintiff is serving three consecutive life sentences, plus 45 years.  Ex. R, Carson Decl. ¶ 8.  Plaintiff's "two-thirds date," which is when the U.S. Parole Commission must review his parole eligibility, is Nov. 2, 2095.  *Id.* ¶¶ 9-10 (citing 18 U.S.C. § 4106(d) (repealed)).

**17.**  Plaintiff has been eligible for parole since August 25, 1982, and it is his burden to apply for parole.  *Id.* ¶ 11 (citing 18 U.S.C. § 4205(a) (repealed)).  His restrictive conditions of confinement conditions do not affect his parole eligibility.  *Id.* ¶ 12.

**18.**  Since 1982, Plaintiff "has neither earned nor been entitled to the deduction of statutory good time."  *Id.* ¶ 14 (citing 18 U.S.C. § 4161 (repealed)).

**19.**  Plaintiff's disciplinary record also shows assaults of at least three staff members, a threat to a staff member, an attempt to escape by posing as a U.S. Marshal, and the discovery in his rectum of weapons, handcuff keys and lock picks.  Ex. D. ¶¶ 17-19.

### B.  Plaintiff Still Has a Significant Status as an A.B. Member.

**20.** Plaintiff's murder of Cadillac Smith, the leader of the D.C. Blacks gang, ignited a war between the A.B. and the D.C. Blacks (or D.C. Crews) within the BOP with continuing consequences and serious management concerns related to Plaintiff.   Ex. B ¶¶ 43-56.

**21.** These groups' rivalry is still a correctional concern to the BOP, and currently there are no influential A.B. or D.C. Crew members who are allowed to interact in an open population prison within the BOP.  *Id.* ¶¶ 45-46.

**22.** Plaintiff's status in the A.B. is legendary and the BOP expects him to fill the current leadership vacuum in the A.B.'s ranks as a result of its leaders' recent racketeering convictions.  *Id.* ¶¶ 24, 53-55.

**23.** As recently as December 2010, a likely A.B. sympathizer reached out to Plaintiff, asking, in code language, for permission to perform an act.  *Id.* ¶¶ 57-65.

### C.  Between 1983 and 2008, Plaintiff was Subject to Special Security Measures.

**24.** On November 2, 1983, the BOP transferred Plaintiff from the Marion Control Unit to USP Atlanta, housing him in a secure living area.  Ex. D ¶ 20; Ex. H, Lloyd Decl. ¶ 10.

**25.** In August 1984, then-BOP Director Norman A. Carlson issued a memorandum ("Carlson Memo") directing that Plaintiff be removed from Control Unit status and housed in a secure living area to meet the specific, individualized security issues presented by him.[2]  Ex. D ¶ 20.

**26.** In the Carlson Memo, the Director determined that while Plaintiff was considered highly assaultive and dangerous before his murder of Officer Clutts, his actions in Clutts' murder required "individualized control not available in the Marion Control Unit," and the Director imposed "specific, individualized measures to meet the security requirements presented by" Plaintiff, which included non-contact, limited visiting and restrictions of recreation and programming.  *Id.* ¶¶ 22-23.

---

[2] While the BOP has been unable to locate the actual Carlson Memo for Plaintiff because it – and his central file – was likely destroyed during the 1987 riots at USP Atlanta, it presumes one was issued for him for several reasons set forth in the declaration.  Ex. D ¶ 21.

**27.** The Carlson Memo also directed numerous periodic reviews for Plaintiff: a daily visit by unit staff/physician assistant; a psychological review every 30 days; advice Regional Director ("RD") of the security precautions in effect, a case review every 30 days; and a report by the Warden to the Director every 90 days. *Id.* ¶ 24.

**28.** In 1986, Plaintiff also began receiving, every six-months, in-person reviews with his unit team, Executive Staff at USP Atlanta (warden, associate warden and captain) and the RD's staff. *Id.* ¶ 25. At the six-month reviews, he had the opportunity to raise any concerns about his conditions of confinement. *Id.*

**29.** On April 29, 1991, BOP Director Quinlan modified the Carlson Memo's directives, adding an additional annual review by the BOP's Executive Staff, which consists of 16 individuals. *Id.* ¶ 31.

**30.** In November 2004, the Executive Staff replaced its annual reviews of Plaintiff with six-month, in-person reviews of Plaintiff's confinement with the BOP's North Central RD, the Assistant Director of Correctional Programs ("ADCP") and the prison's Executive Staff (Warden, Associate Warden(s) and Captain). All other Carlson Memo requirements (monthly/quarterly reports to RD and Director) remained unchanged. *Id.* ¶¶ 32-33. At the six-month reviews, he had the opportunity to raise any concerns about his conditions of confinement. *Id.* ¶ 33.

**31.** Plaintiff remained at USP Leavenworth until July 11, 2005, when he was transferred to the ADX's Special Housing Unit ("SHU"), in an area called Range 13. *Id.* ¶ 36.

**32.** In July 2005, RD Michael K. Nalley and ADCP John Vanyur decided to transfer Plaintiff from USP Leavenworth to the ADX. Ex. G, Nalley Depo. at 8, 118; Ex. C at 8, 55-56.

**33.** The BOP transferred Plaintiff to ADX because USP Leavenworth's mission changed to a medium security facility and it no longer provided the conditions of confinement required for a maximum security inmate like Plaintiff. Ex. C at 56. The ADX was the only facility that had the type of conditions of confinement that Plaintiff required. Ex. G at 30; Ex. C at 57.

**34.** By placing Plaintiff at the ADX, the BOP had the option to later move him from Range 13 to the general population of that institution.  Ex. C at 59.

**35.** Shortly after his arrival at the ADX, the BOP replaced Plaintiff's monthly reviews and reports, quarterly reports to the Director, and in-person reviews every six months with the RD.  Ex. D ¶ 37. In their place, the BOP conducted in-person, six month reviews with members of the BOP's Executive Panel (RD and ADCP), ADX Warden, Associate ADX Warden and members of Plaintiff's unit team.  *Id.*  At the six-month reviews, he had the opportunity to raise any concerns about his conditions of confinement.  *Id.*

**36.** On April 3, 2008, RD Nalley directed then-ADX Warden Wiley to place Plaintiff in the ADX's general population.  Ex. D ¶ 43; Ex. P, Bates 16319.

**37.** Warden Wiley was not involved in making this decision.  Ex. Q, Wiley Depo. at 33.

**38.** Dr. Joyce Conley was the ADCP from May 2007 until July 2009.  Ex. D ¶ 39.  Dr. Conley, as a member of the Executive Panel, participated in two six-month reviews, and was one of the deciding officials who decided to transfer Plaintiff from Range 13 to the general population.  *Id.* ¶ 41-42.

**39.** In April 2008, with Plaintiff's transfer to the ADX's general population, the BOP discontinued the special security measures imposed by the Carlson Memo.  *Id.* ¶ 45.

**40.** Between April 4, 2008, and August 10, 2009, in addition to the standard ADX general population procedures, Warden Wiley approved additional daily management procedures for Plaintiff.  Ex. P, Bates 16320-21, 19159.  He did so because Plaintiff "was moving from a restricted area to a less-restricted area.  And it's sound correctional judgment to do an assessment and see how [inmates] adjust to less restrictions and then lessen the restrictions based on that."  Ex. Q at 187-88.

**41.** On July 29, 2009, ADX Warden Davis discontinued Plaintiff's additional daily management procedures, and since August 10, 2009, Plaintiff has been managed under the existing procedures applicable to all other ADX general population inmates.  Ex. P, Bates 19159.

**D. Plaintiff Has Known About His Conditions of Confinement Since 1983 and Has Been Dissatisfied with Them Since at Least 1989.**

42. In Plaintiff's view, every BOP administrator since 1983 kept him "in the same conditions and never changed anything" related to "his living conditions." Ex. A at 46.

43. Sometime in early 1985, while at USP Atlanta, Plaintiff "received attorney visits from the Public Defender's Office and the Atlanta Legal Aid Society." Ex. O, Bates 2127.

44. Plaintiff raised the issue of his conditions of confinement during the following monthly screening evaluations with Dr. Donald Denney, a BOP psychologist who reviewed him for many years, or at the periodic SHU reviews: 10/13/89; 11/2/89; 7/9/91; 10/29/91; 1/31/92; 7/15/92; 1/22/93; 9/22/95; 1/7/97; 3/3/97. *Id.* Bates 3190, 3198, 3231, 3302, 3313, 3325, 3334, 3340, 3377.

45. In an October 1991 report, Plaintiff asked Dr. Denney to execute an "affidavit regarding his 'cruel and harsh' conditions that he was being exposed to in his cell." *Id.* Bates 3334.

46. In a January 1992 SHU review, Plaintiff "inquired if he was going to be kept in solitary confinement indefinitely." *Id.* Bates 3326.

47. In December 1992 and August 1996, Plaintiff filed requests for administrative remedies (#29530, #39514, #114976) with the BOP, requesting release from his SHU cell and challenging the BOP's review process of his confinement. Ex. D ¶ 66 & Attach. 7.

**E. Plaintiff's Conditions of Confinement at USP Leavenworth and ADX, and the BOP's Periodic Reviews of Plaintiff's Confinement.**

48. On December 1, 1987, Plaintiff was transferred to USP Leavenworth from USP Atlanta. From July 1998 until July 2005, Plaintiff was principally housed in a secure living area in the SHU at USP Leavenworth. Ex. H ¶ 11-12.

49. Cynthia Ashman, Plaintiff's case manager at USP Leavenworth from 1994 until 2005, prepared monthly progress reports for him. Ex. E, Ashman Depo. at 6, 19, 40, 56. She would see him at least four times per month and generate her progress report based on her visits. *Id.* 56.

**50.** She also attended his six-month reviews along with the warden, captain regional representative and psychologist.  *Id.* 32.  The purpose of the six-month reviews was to discuss with Plaintiff any changes in his sentence, educational status, medical concerns, program goals, among others.  *Id.* 29.

**51.** Plaintiff's special security measures between 2001 and 2006 at USP Leavenworth were as follows: only staff directly responsible for his custody, care and treatment were allowed in his housing area; when he had to leave his cell, a lieutenant and four officers were present; he had handcuffs, a Martin chain, a black box and leg irons; he had no contact with other inmates; the captain was his unit manager; and video monitoring.  Ex. F, Allen Depo. at 40, 42-48.

**52.** At USP Leavenworth (1998-2005), Plaintiff lived in a secure living area consisting of a main living area (136 ft.$^2$) with a bed, toilet, shower, sink, 10" TV, writing area and duress button; an indoor recreation/visitation area (150 ft.$^2$); and an outdoor recreation area (250 ft.$^2$).  Ex. H ¶¶ 12-16. The indoor temperature was 68º F (cold months) and 78º F (warm months); and there was hot water (105º F) for the sink and shower.  *Id.* ¶ 13-14.  The secure living area had continuous audio/video surveillance.  *Id.* ¶ 18.  His main living area had a light, which he could turn off completely.  *Id.* ¶ 22.

**53.** The BOP provided him three meals daily, which Plaintiff ate in his cell; BOP offered him a no-flesh protein diet option, and would heat liquids for him upon request.  *Id.* ¶ 20.

**54.** Plaintiff had commissary privileges; he also could have many personal items (for art supplies or personal hygiene) and the BOP issued him several articles of clothing for all seasons.  *Id.* ¶¶ 26-27.

**55.** The outdoor recreation area provided sunlight and fresh air.  *Id.* ¶ 19.  His main living area had a window that provided with natural light.  *Id.* ¶ 17.  The indoor recreation area had a stationary bike, stool, and intercom.  Generally, Plaintiff recreated for 1.5 to 2 hours, five days per week.  *Id.* ¶15, 17.

**56.** He also had access to media/reading materials, to the law library and could correspond with an appropriate clerk of the court to receive forms to file lawsuits and manage his cases.  *Id.* ¶¶ 23-24.

**57.** At ADX, Range 13 cells are 95 ft.[2]; general population cells are 87 ft.[2]  Ex. H ¶ 34.  The ADX's indoor temperature is 68º F (cold months) and 78º F (warm months); and there is hot water for the sink (120-125º F) and shower (105º F).  *Id.* ¶¶ 36, 38.

**58.** Cells have black-and-white TVs with 60 available channels and closed circuit programs.  *Id.* ¶ 42.

**59.** Each ADX cell has a shower stall, sink, toilet, concrete stool, desk and shelf.  Inmates, who may choose a no-flesh diet, eat meals in their cells, receive a minimum of two, 15-minute social calls per month, up to 5 social visits monthly, and may talk to each other while in their cells.  *Id.* ¶ 34, 35.

**60.** Inmates have access to indoor and outdoor recreation, which provides sunlight and fresh air.  Id. ¶ 39.  On Range 13, Plaintiff recreated for an average of 1.5-2 hours, five days per week.  *Id.* ¶ 40. In the general population, he receives 10 hours of out-of-cell recreation per week.  *Id.* ¶ 34b.

**61.** ADX cells have a light with four settings (off, dim, medium, bright), which the inmate may turn on/off from his cell.  *Id.* ¶ 41.

**62.** The BOP reviews the status of all inmates three ways: classification, program reviews, and progress reports. Ex. D ¶ 46.

**63.** "Classification" and "program review" (also known as "team meetings") are the procedures by which an inmate's status is formally reviewed by the unit team.  *Id.* ¶ 47.

**64.** Inmates are expected to be present at team meetings, which give staff and inmates the opportunity to discuss issues in an open format and provide inmates an opportunity to get individual attention and to ask questions and discuss concerns.  *Id.*  At ADX team meetings, inmates can raise questions and concerns about their confinement.  *Id.*

**65.** Classification, which generally occurs within four weeks of an inmate's arrival to his designated prison, is the initial team meeting in which an inmate's case and history are carefully reviewed and relevant programs are recommended.  *Id.* ¶ 48.

**66.** Plaintiff received initial classifications upon arrival to USP Leavenworth and ADX.  *Id.* ¶ 52-53.

**67.** Later team meetings, referred to as "program reviews," ordinarily occur at least once every six months, and are memorialized in writing and signed by the inmate. Their purpose is to monitor and evaluate the inmate's progress in all program areas. *Id.* ¶ 50-51.

**68.** Inmates receive 48 hours' notice of scheduled program reviews; they are expected to attend and can personally raise questions and concerns about anything relating to their confinement. *Id.* ¶ 50.

**69.** From July 1992 to September 2010, Plaintiff has had 46 program reviews. *Id.* ¶ 54.

**70.** A third way the BOP reviews the status of inmates is through the "progress report," a document that the unit team employs to evaluate an inmate's behavior and activities. A progress report, which the inmate receives, is ordinarily prepared every three years and is a comprehensive account of the inmate's history, including past and current status. *Id.* ¶¶ 55-57.

**71.** Plaintiff has received a progress report, at a minimum, every three years. In addition, his monthly reports generated by the Warden at USP Leavenworth, and for a brief time at the ADX, were the equivalent of progress reports. *Id.* ¶¶ 29, 32-33, 58.

**72.** The ADX has a step-down unit program ("step-down program") that consists of a stratified system of housing. *Id.* ¶ 76. As inmates demonstrate periods of clear conduct and positive institution adjustment, they can become eligible to progress from the general population units to the step-down units (J-Unit, K-Unit and D/B Unit). *Id.*

**73.** ADX Institution Supplement FLM 5321.06I(1), Change Notice 01 ("2009 I.S.") currently governs how an inmate is placed in and advances through the program. *Id.* ¶¶ 80-81. Under the review procedure established by the 2009 I.S., an inmate's placement in and advancement through, the program is a classification decision. *Id.* ¶ 88.

**74.** Every six months, at Plaintiff's program review, his unit team reviews their placement in and advancement through the program. *Id.* ¶ 82.

**75.** Under the 2009 I.S., Plaintiff is eligible to advance into and through the program if he meets four factors. Inmates meeting the eligibility requirements are referred to a step-down screening committee ("Committee") for consideration. *Id.* ¶¶ 83-84.

**76.** Eligibility for placement into or advancement through the program does not equate with appropriateness for placement into or advancement to the next phase of the program, and the Committee exercises its judgment on a case-by-case basis. *Id.* ¶ 89.

**77.** The Committee considers 13 factors in making a program admission decision. *Id.* ¶ 86.

**78.** The ADX Warden makes all final decisions regarding a program admission and the inmate receives a written notification of the decision, which he can administratively appeal. *Id.* ¶ 87, 92.

**79.** On May 18, 2009, then ADX Warden Wiley denied Plaintiff's admission to J-Unit based on his judgment that the factors which led to his placement at the ADX had not yet been sufficiently mitigated. *Id.* ¶ 79. Plaintiff was considered under a previous Institution Supplement that is no longer in effect. *Id.* ¶ 78.

**80.** Plaintiff challenged this decision through the administrative remedy program. *Id.* Attach. 8.

**81.** On October 28, 2009, the Committee denied Plaintiff admission into J-Unit for several reasons, including his membership in the A.B. and the fact that "recent removal of the daily management procedures required additional time to assess [his] compliant behavior." *Id.* ¶ 95.

**82.** Plaintiff challenged this decision through the administrative remedy program. *Id.* Attach. 9.

**83.** On July 6 and October 20, 2010, the Committee denied Plaintiff admission into J-Unit based on several reasons, including his continued "commitment to [A.B.] gang activities and association with members of that gang." *Id.* ¶ 96, 97. Plaintiff challenged the July 6 decision through the administrative remedy program. *Id.* Attach. 10.

### F. The BOP Recently Gave Plaintiff a Hearing to Address his ADX Placement.

**84.** When an inmate will be placed in the ADX's general population is governed by a 2009 Memorandum from RD Nalley ("Nalley Memorandum"), under which inmates must meet either of the following criteria: (1) the inmate's placement in other correctional facilities creates a risk to institution security and good order, or poses a risk to the safety of any individual; and/or (2) as a result of the inmate's status, either before or after incarceration, the inmate could not be safely housed in the general population of another institution.  Ex. I, Alexander Decl. ¶¶ 4-5.

**85.** The Nalley Memorandum identifies several factors to be used to determine whether inmates meet the two basic criteria, which must be established by reliable evidence by findings by a BOP discipline hearing officer.  *Id.* ¶ 6.

**86.** The Nalley Memorandum also sets forth procedures to be followed when an inmate meets ADX designation criteria.   The procedures require giving the inmate written notice of hearing that provides the reason for designation, a hearing, and appeal rights to the BOP's general counsel of an adverse decision by RD, among others.  *Id.* 13-15.

**87.** E. Alexander, a hearing administrator, followed the Nalley Memorandum procedures (notice, hearing, recommendation) in conducting procedure Plaintiff's hearing.  *Id.* ¶ 7-9.

**88.** On September 9, 2009, the BOP gave Plaintiff written notice of a hearing to address his placement to the ADX, which explained his rights and procedures for the hearing and provided the facts for placement at the institution.  *Id.* ¶¶ 22-26.

**89.** On September 15, 2009, Alexander conducted Plaintiff's hearing, in which he made an oral and written statement and offered supporting documents.   After the hearing, Alexander prepared a report, which Plaintiff received, recommending that Plaintiff should remain at the ADX because of his killing of three inmates, a correctional officer and his attempted escape from a BOP institution. *Id.* ¶¶ 27-31; *see also id.* 20-23.

**90.** On October 2, 2009, RD Nalley accepted the recommendation and Plaintiff received a copy. *Id.* ¶ 32.

### G. The BOP Has Provided Plaintiff with Extensive and Continuous Medical and Psychological Care.

**91.** Since Plaintiff's arrival to the ADX in July 2005, BOP and non-BOP medical staff have evaluated him about 35 times. Ex. J, Allred Decl. ¶ 18a-ii. Previously, at USP Leavenworth, BOP medical staff examined him approximately 34 times for various medical conditions, including heart murmur, hemorrhoids, skin irritation, Hepatitis C ("HCV"), and tooth pain, among others. *Id.* ¶ 19.

**92.** Plaintiff has been diagnosed with the following medical conditions: heart murmur, rectal bleeding/hemorrhoids, and HCV. *Id.* ¶ 10. The BOP has provided specific courses of treatment and medical tests for these medical diagnoses. *Id.* ¶¶ 11-17. His current overall medical condition is stable and any foreseeable treatment required is available at the ADX. *Id.* ¶ 20.

**93.** From 2001 to June 2005, while Plaintiff was at USP Leavenworth, a staff psychologist/psychiatrist evaluated him about 47 times. Ex. K, Zohn Decl. ¶ 23.

**94.** Dr. Donald Denney, the chief of psychology at USP Leavenworth from 1989 to 2004, was mainly responsible for Plaintiff's monthly evaluations during that time period. Ex. L, Denney Depo. at 11, 45. Dr. Denney found that he "didn't see that [Plaintiff's] housing status was having a negative impact on his mental health." *Id.* 103. And he found that the "conditions of [Plaintiff's] confinement had not eroded his self-competence or his resolve." *Id.*; *see also id.* 135-36.

**95.** Dr. Denney found that Plaintiff has a resilient character given his mindset and daily routines. *Id.* 101-02, 137. He holds this psychological opinion when he last saw Plaintiff at the ADX. *Id.* 197-98.

**96.** When Plaintiff arrived at the ADX on July 13, 2005, a staff psychologist performed an initial psychological screening interview, finding him well-oriented and with a favorable psychological stability. Ex. K ¶ 24. From July 2005 to March 2008, when Plaintiff was confined on Range 13 at

the ADX, he received 39 psychological evaluations, which found that his "mental status, emotional expression and behavior do not suggest significant mental health problems." *Id.* ¶ 25.

97. Two days after his deposition, Plaintiff reported "untreated anxiety" to BOP staff, who prescribed Zoloft, a medication used to treat anxiety symptoms. *Id.* Since that time, Plaintiff has been diagnosed with anxiety disorder NOS, and BOP staff have discussed this condition with Plaintiff and have changed his medications to address it. *Id.* ¶¶ 29-38.

98. Dr. Spencer Friedman, Plaintiff's expert who evaluated his mental health status, concluded that Plaintiff "did not demonstrate or exhibit any evidence of … a major mental illness…." Ex. M, Friedman Depo. at 13, 15, 19, 32-33. Dr. Friedman also found that the BOP's clinical findings were consistent with Plaintiff's self-reports. *Id.* 29.

99. Dr. Harold J. Bursztajn, Defendants' expert, concluded that he shows "no significant indication of having been harmed by the restrictions placed on him at USP Leavenworth and the ADX." Ex. N, Bursztajn Decl. ¶ 6.

## II.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

In Claims 1 and 4, Plaintiff contends that his conditions of confinement, which were initially imposed in 1983, deprive him of a liberty interest and violate the Eighth Amendment. Defendants timely raised the statute of limitations defense in their answer. Doc. 262 at 35. While the Court declined to dismiss the claims as time-barred at the motion to dismiss stage, Doc. 261 at 18, that order is subject to revision, Fed. R. Civ. P. 54(b), and with the benefit of a fuller factual record, the Court should find that these claims are time barred under the applicable statutes of limitations.

"Statutes of limitations promote policies of repose." *Arnold v. Duchesne County*, 26 F.3d 982, 987 (10th Cir. 1994). As the Supreme Court has noted, statutes of limitations "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to

slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Order of R.R. Tel. v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944).

A claim accrues when the plaintiff is "first harmed." *Bergman v. United States*, 751 F.2d 314, 317 (10th Cir. 1984). For declaratory and injunctive relief claims related to Plaintiff's conditions of confinement, a six-year statute of limitations applies. 28 U.S.C. § 2401(a). "A claim against [the] United States first accrues on the date when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Ute Distrib. Corp. v. Sec'y of Interior of U.S.*, 584 F.3d 1275, 1282 (10th Cir. 2009). The Court construed Claims 1 and 4 as encompassing "his conditions of confinement for the full duration of his segregation," which based on the allegations in the complaint began in October 1983. Doc. 261 at 17, 18, 37.

*Bivens* actions are "subject to the statute of limitations of the general personal injury statute in the state where the action arose." *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 968 (10th Cir. 1994). In Colorado, there is a two-year statute of limitations on suits for personal injuries. Colo. Rev. Stat. § 13-80-102. "[T]he statute of limitations on a *Bivens* claim begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." *Van Tu v. Koster*, 364 F.3d 1196, 1199 (10th Cir. 2004).

Here, Claims 1 and 4 are barred by the two- and six-year statutes of limitations. These claims *accrued* in November 1983, when the BOP made the discrete decision to place Plaintiff under individualized specific safety measures.[3] Doc. 261 at 18. That is the time when Plaintiff was "first harmed." *Bergman*, 751 F.2d at 317. The statute of limitations expired in November 1985 (for *Bivens*) and November 1989 (for official capacity) – two and six years from the date when Plaintiff

---

[3] Previously, the Court declined to dismiss Claim 1 on the ground that it "encompass[ed] activities after plaintiff's transfer to the ADX." Doc. 261 at 19. The Court, however, did not determine when the claim accrued. Under *Koster* and *Ute*, the Court must first determine the claim's *accrual date*; then, based on that date, it must ascertain whether the plaintiff timely filed his action. 364 F.3d at 1199.

was initially placed under such conditions, respectively.  Plaintiff *knew* about his conditions, and the process leading to the same, in 1983.  Facts **42**.  As early as 1989, he repeatedly indicated his dissatisfaction with those conditions and process raised his conditions of confinement prison administrators during his monthly and bi-annual periodic reviews.  *Id.* **44-47**.  In 1991, 1992 and 1996, he filed administrative remedies challenging his conditions of confinement.  *Id.*  However, he did not file this action until November 11, 2007 (Doc. 1), 24 years after the imposition of the restrictions and process he now challenges.  *Saleh v. BOP*, 2009 WL 3158120, *3 (D. Colo. Sept. 29, 2009) (dismissing as time barred procedural due process claims because "plaintiffs were aware of the reasons for their transfer [but] … did not file their claim until after the limitations period had run").

Since the claims accrued in the '80s, they only could be timely if treated as a continuing violation.  But the continuing violation doctrine is inapplicable to toll the limitations periods.  The Tenth Circuit has held that the doctrine "is simply not applicable" to civil rights actions brought pursuant to Title 42, *Bivens'* analogue. *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1514 (10th Cir. 1997).  Even if it were applicable, the doctrine "cannot be employed where the plaintiff's injury is definite and discoverable and nothing prevented plaintiff from coming forward to seek redress." *Ute*, 584 F.3d at 1283.  Here, Plaintiff has himself recognized the definitiveness of his injury, admitting that he has known about it since 1983 when the restrictive conditions of confinement were initially imposed.  Facts **42**.  And nothing prevented him from *timely* filing a suit to challenge the restrictions or the process.  At USP Leavenworth, he had access to a law library, and could correspond with an appropriate court clerk to receive forms to file lawsuits, file them and manage them.  *Id.* **56**.  In 1985, he also consulted with several attorneys while at USP Atlanta.  *Id.* **43-47**.

Moreover, for the doctrine to apply, there must be "continual unlawful acts, not continual ill effects from the original violation." *Bergman*, 751 F.2d at 317; *see also Eidson v. Tenn. Dep't of Childrens' Servs.*, 510 F.3d 631, 635 (6th Cir. 2007).  Plaintiff has challenged a discrete decision, made in

November 1983, to place him under specific individualized security measures. His contention that the objectionable conditions are still in effect today is simply an "ill effect" that arose from the original alleged violation. The continuing violation doctrine is thus inapplicable. *Cf. Parkhurst v. Lampert*, 264 F. App'x 748, 749 (10th Cir. 2008) (affirming dismissal of claim as time-barred and rejecting continuing violation doctrine because the plaintiff "alleged the same ill effect from the day the alleged overcrowding first existed"); *Sims v. New*, No. 08-0794, 2009 WL 3234225, *7 (D. Colo. Sept. 30, 2009) (same in *Bivens* claim because "subsequent events described by Plaintiff … were not new illegal acts that would allow Plaintiffs to rope the [original act] into the applicable limitations period. Rather, the subsequent acts merely sustained the injury caused by the original act.").

In sum, because Plaintiff failed to challenge within the limitations periods the imposition of the restrictions or the process he received, those decisions are covered by statutes of repose. His view that the imposition of restrictions should be construed as a continuing violation would give such claims "an indefinite lifespan," *Lang v. Aetna Life Ins. Co.*, 196 F.3d 1102, 1105 (10th Cir. 1999), which would violate *Ute*'s rule limiting the applicability of the continuing violation doctrine. It would also violate statutes of limitations' policies, which give parties a definite period of time to bring a claim. *Bergman*, 751 F.2d at 317. Accordingly, his claims are time-barred.

## III.   PLAINTIFF LACKS A *BIVENS* REMEDY FOR CLAIM 1.

Even if the claims were not time-barred, because Plaintiff seeks damages for his claim against individual federal officers under the Fifth Amendment, Doc. 158 at 38, he must first establish that he has a *Bivens* remedy. Since *Bivens*, which allowed an action for damages for a Fourth Amendment violation, the Supreme Court has recognized this damages remedy in only two types of cases: for violations of the Cruel and Unusual Punishment Clause, *Carlson v. Green*, 446 U.S. 14 (1980); and violations of the equal protection component of the Fifth Amendment's Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979). "Since *Carlson* [the Court has] consistently refused to

extend *Bivens* liability to any new context or new category of defendants." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). *Accord Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

In fact, the Supreme Court has declined to create *Bivens* remedies for a variety of other claims. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2008) (collecting cases/claims). Similarly, it has declined to extend *Bivens* to claims against federal agencies, *FDIC v. Meyer*, 510 U.S. 471 (1994), or to claims against private prisons. *Malesko*, 534 U.S. at 68. In the context of procedural due process, the Supreme Court noted that such claims are not appropriate for *Bivens* because the relief that provides the proper remedy against this type of constitutional violation by a government agency is *injunctive*. *Malesko*, 534 U.S. at 74 ("unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

To determine whether a *Bivens* remedy should be created, the Court must conduct a two-pronged analysis. First, it should ask "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Second, the Court weighs the "reasons for and against the creation of a new cause of action, the way common law judges have always done," considering, for instance, the "inadequacy of discrete … remedies…." *Id.* at 554.

Here, neither factor favors creating a *Bivens* remedy for procedural due process challenges. First, there are alternative, existing processes for protecting an inmate's procedural due process rights. A prisoner may file suit seeking injunctive relief against the BOP (which Plaintiff has done), *Malesko*, 534 U.S. at 74; *see also Simmat v. BOP*, 413 F.3d 1225, 1233, 1234 (10th Cir. 2005). As the court noted, "there is no reason to rely on a court-created remedy, like *Bivens*, when Congress has created an adequate means for obtaining legal redress." *Simmat*, 413 F.3d at 1231.

Second, requests for administrative remedies and actions for injunctive relief can provide adequate remedies for a deprivation of procedural due process. Had Plaintiff timely sued the BOP, he could have addressed the merits of his contentions. Here, the appropriate remedy is not damages, but "procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In sum, the Court should not recognize a *Bivens* remedy for the procedural due process claim.

## IV.   THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE CLAIMS.

### A.   Defendants Have Not Violated Plaintiff's Procedural Due Process Rights.

An inmate has a "heavy burden" to establish that a prison restriction violates his constitutional rights. *Shaw v. Murphy*, 532 U.S. 223, 226 (2001). "A person alleging that he has been deprived of his right to procedural due process must prove two elements: that he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and that he was not afforded an appropriate level of process." *Zwygart v. Bd. of County Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007) (internal quotations omitted). The undisputed evidence show now violation of Plaintiff's due process rights. First, the facts do not support a finding that he had a constitutional liberty interest in avoiding either his confinement under specific individualized safety measures (in administrative segregation), or his confinement at the ADX. Further, even if he had a liberty interest, the BOP gave him – through its periodic reviews of his confinement, his recent ADX transfer hearing and the administrative remedy program – adequate process to challenge his confinement.

### 1.   Plaintiff's Confinement Does Not Deprive Him of a Liberty Interest.

The BOP's classification of Plaintiff "into segregation does not involve deprivation of a liberty interest independently protected by the Due Process Clause." *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006). Rather, a liberty interest exists only where an interference with that

right would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Id.* at 480 (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)).

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court held that assignment to the Ohio State Penitentiary ("OSP") prison imposed an atypical and significant hardship in relation to the ordinary incidents of prison life. *Id.* at 223. The Court held that a liberty interest was implicated in avoiding placement to the OSP because of the conditions of solitary confinement plus two critical additional factors: (1) the placement was for an indefinite duration, which was reviewed only annually; and (2) the placement disqualified an otherwise eligible inmate from parole consideration. *Id.* at 224. Absent these additional factors, the inmate may not have a liberty interest: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.*

After *Wilkinson*, the Tenth Circuit set forth four specific factors that courts must apply to determine whether a liberty interest is implicated. *See Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007). *DiMarco* considered the confinement of a hermaphrodite and found that no liberty interest was implicated. The Tenth Circuit held that four non-dispositive factors should be used to determine the baseline comparison required by *Wilkinson*. 473 F.3d at 1342. It also noted that "any assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *Id.* Applying these standards, the court held that these factors – the purpose in segregating the prisoner, a transgendered male; the prisoner's conditions of confinement in administrative segregation; the duration of her confinement; and the regular reevaluations of her confinement – "do not weigh in favor of finding … an enforceable liberty interest." *Id.* at 1344.

Since *DiMarco*, this Court has repeatedly held that an inmate's confinement at the ADX does not deprive him of a liberty interest. *Saleh v. BOP*, No. 05-2467, 2010 WL 5464294, *3-*5 (D. Colo. Dec. 29, 2010); *Rezaq v. Nalley*, No. 07-cv-02483, 2010 WL 5157317, *6-*13 (D. Colo. Aug. 17, 2010), *recommendation adopted by* 2010 WL 5157313 (Dec. 14, 2010); *Georgacarakos v. Wiley*, No. 07-cv-01712, 2010 WL 1291833, *12-*13 (D. Colo. March 30, 2010) (citing *Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 652 (10th Cir. 2006)). In *Georgacarakos*, the Court reasoned that the ADX's conditions of confinement by themselves were not atypical and significant, and that the step-down program made the plaintiff's ADX confinement not indefinite. 2010 WL 1291833 at *13. And in *Rezaq*, this Court agreed with the Seventh Circuit's holding in *Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008), that conditions of "extreme isolation" *by themselves* are insufficient to be atypical and significant for purposes of procedural due process. 2010 WL 5157317, at *14.

Here, Plaintiff lacks a liberty interest in avoiding confinement in segregation and at the ADX because the conditions are not atypical and significant. Under the first *DiMarco* factor, the confinement of Plaintiff in segregation and at the ADX has been, and is, related to the legitimate penological interests in safety and security. Plaintiff is a unique inmate in the BOP's history. As a member and leader of the A.B., one of the most dangerous disruptive groups in the BOP, he murdered three inmates and a correctional officer in the Marion Control Unit, which was the most secure unit within the most secure BOP prison. Facts **1-23**. The murder of one of those inmates, Cadillac Smith, the leader of the D.C. Blacks, triggered a race gang war in the BOP, with consequences reverberating today. *Id.* **13-14, 20-23**. And the undisputed evidence shows that the BOP continues to have concerns with Plaintiff's membership in the A.B.[4] *Id.* **81, 83**. These unique circumstances show that the BOP had legitimate penological reasons for imposing specific

---

[4] And, as recently as December 2010, a likely A.B. sympathizer tried to reach out to Plaintiff, asking for permission to perform an act. Facts **23**.

individualized security measures beginning in 1983, which is a decision that is entitled to deference. *Sandin*, 515 U.S. at 483 ("federal courts ought to afford appropriate deference and flexibility to [federal] officials trying to manage a volatile environment."); *DiMarco*, 473 F.3d at 1342.  Plaintiff's confinement at the ADX since 2008 also furthers legitimate penological interests.  Given Plaintiff's murders of three inmates and a correctional officer at the Marion Control Unit, and his attempted escape from a BOP facility, Plaintiff met the Nalley Memorandum general criteria and guidelines for designation to the ADX.  Facts **84, 89**.  In sum, this factor weighs against Plaintiff.

Under the second *DiMarco* factor, Plaintiff's conditions of confinement while under the individualized special security measures were not extreme given his unique institutional history of misconduct.  Facts **24-39**.  His conditions of confinement at USP Leavenworth and the ADX are described in detail.  *Id.* **48-61**.  While Plaintiff did not have opportunities for interaction with other inmates under the special restrictions, he received a great deal of care from BOP providers, received far more frequent reviews than other inmates, and suffered no apparent ill health effects from his restrictions.  Under *Wilkinson*, if a prisoner confined under OSP-type conditions and does not have the plus-factors (parole disqualification, or indefinite placement), he will not be subjected to an atypical and significant hardship.  *Wilkinson*, 545 U.S. at 224; *Townsend*, 522 F.3d at 772.

Nor are Plaintiff's current conditions of confinement at the ADX "extreme."  *Rezaq*, 2010 WL 5157313, at *10-*11; *Georgacarakos*, 2010 WL 1291833, at *12.  As this Court has held, the conditions of confinement at the general population of the ADX are materially less restrictive than those at OSP in several critical respects.  *Saleh*, 2010 WL 5464294, at *5; *Rezaq*, 2010 WL 5157313, at *10.  Again, this factor weighs against Plaintiff.

As for the third *DiMarco* factor (whether the placements will increase the duration of Plaintiff's total confinement), neither confinement – in segregation, before, or at the ADX, now – has lengthened his sentence or disqualified him from parole eligibility.  His incarceration under

restrictive conditions of confinement conditions does not affect his parole eligibility.  Facts **17**.  He has been eligible for parole since August 25, 1982.  *Id.* (citing 18 U.S.C. § 4205(a)).  Further, Plaintiff "has neither earned nor been entitled to the deduction of statutory good time."  *Id.* **18** (citing 18 U.S.C. § 4161).  This factor is particularly significant because it is one of the "plus" considerations that led the Supreme Court to conclude that a prisoner had a liberty interest in avoiding assignment to the OSP.  *Wilkinson*, 545 U.S. at 224.  On this factor, neither the specific individualized security measures nor his confinement at the ADX present the special factor in *Wilkinson*, where placement at the OSP automatically rendered an inmate *ineligible* for parole.  Thus, as in *Rezaq*, 2010 WL 5157317, at *11-*12, this factor also weighs against finding a liberty interest.

The fourth *DiMarco* factor, whether the placement is indeterminate, also weighs against finding a liberty interest.  *Saleh*, 2010 WL 5464294, at *5 (confinement not indefinite when periodic reviews occur and prisoner may present his views during them).  When Plaintiff was under the Carlson Memo measures, the BOP frequently and regularly reviewed his placement (first as directed by the Carlson Memo, and later as modified by other officials), and allowed Plaintiff the opportunity to raise any concerns about his conditions of confinement for most reviews.  These reviews consisted of the following:  daily unit team, physician's assistant visits; monthly psychology reviews and progress reports; and six-month reviews with RD/ADCP/institution's Executive Staff/Executive Panel.  Facts **27-30, 35, 49-51**.  In addition, the Director was apprised of Plaintiff's status every 90 days, and between April 1991 and Nov. 2004 the BOP's Executive Staff reviewed his confinement annually.  *Id.* **29-30**.

Lastly, Plaintiff's confinement at the ADX is not indefinite.  As in *Saleh*, *Rezaq* and *Georgacarakos*, the BOP reviews his confinement periodically through his initial classification meeting, his program reviews (since 1992 he has received 46), plus his step-down program consideration (every six months), and his progress reports (every three years).  Facts **62-83**.  And he may challenge

adverse step-down program decisions, as he has done, through the administrative remedy program. *Id.* **78-83**. These periodic reviews contrast sharply with the OSP, where as the Supreme Court noted in *Wilkinson*'s that, once at OSP, inmates were not entitled to a full complement of due process procedures. 545 U.S. at 228-29. In sum, the *DiMarco* factors weigh against finding a liberty interest.

> **2.      Even if Plaintiff Had a Liberty Interest, the BOP Provided Him with Constitutionally Sufficient Process.**

Even if Plaintiff had a liberty interest, the BOP has provided him with adequate process to challenge his confinement. "The essence of procedural due process is the provision to the affected party of '*some* kind of notice and … *some* kind of hearing.'" *Moore v. Bd. of County Comm'rs of County of Leavenworth*, 507 F.3d 1257, 1259 (10th Cir. 2007) (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)). Procedural due process is a process-focused inquiry – i.e., "the right to procedural due process … does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). If a liberty or property interest is implicated, the "requirements of due process are flexible and call for such procedural protections as the particular situation demands." *Wilkinson*, 545 U.S. at 224 (citing *Morrissey*, 408 U.S. at 481). Courts consider the three factors established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine the level of process that is due. *Wilkinson*, 545 U.S. at 224. The three *Mathews* factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335.

The Supreme Court made clear in *Wilkinson* that inmates assigned to OSP were not entitled to a full complement of due process procedures, such as an adversary hearing or the right to present witnesses. 545 U.S. at 228-29 (citing *Hewitt*). When the prison administrator's decision draws upon

his experience, the inmate only is entitled to informal, non-adversarial procedures under the Due Process Clause. *Id.* Such procedures include some notice, an opportunity to be heard by the decision-maker, and some chance for periodic review of the confinement, but they do not include a hearing or submission of additional evidence: "Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Hewitt*, 459 U.S. at 477 n.9. This Court recently concluded that the BOP's prescribed periodic review of prisoners described *supra* provides inmates with adequate due process protections for ADX inmates in the general population. *Matthews v. Wiley*, _ F. Supp. 2d _, 2010 WL 3703357, *11 (D. Colo. 2010).

Applying the three *Mathews* factors to the undisputed evidence shows that the process used here – the BOP's periodic reviews of Plaintiff's confinement, its administrative remedy program and the ADX placement hearing it gave him (Facts **25-30, 35, 63-90**) – provided adequate measures to safeguard his interest to challenge his confinement in segregation and at the ADX. As to the first *Mathews* factor, Plaintiff's private interest is not that significant for several reasons. As a convicted inmate sentenced to imprisonment, his liberty has been curtailed "by definition," and "the procedural protections to which [he is] entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. And his private interest is also diminished because Congress has expressly given the BOP's exclusive authority to designate inmates at any available facility. 18 U.S.C. § 3621(b). Plus, his A.B. membership and severe institutional misconduct, which was unprecedented in the BOP's history (Facts **1-23**), also further weakens any private interest he may have had in less restrictive conditions.

Second, the risk of erroneous deprivation of Plaintiff's private interest is low. There is no dispute that Plaintiff was an extremely violent and dangerous gang leader even under tight restrictions. Under the standards set forth in *Wilkinson* (and in *Greenholtz* and *Hewitt*), the procedures

afforded to Plaintiff after the restrictions were imposed exceed the constitutional minimum. The BOP has given him periodic reviews that provide notice, an opportunity to be heard, and an opportunity to appeal. The BOP has provided more process than the minimal procedures discussed with approval in *Wilkinson*. 545 U.S. at 228-29.

These procedures have been extensive as set forth in the Carlson Memo, the Nalley Memorandum (ADX transfer hearing), the BOP's Program Statements (classification, program reviews, progress reports), the 2009 I.S. (step-down program) and the administrative remedy program. Facts **25-30, 35, 63-90**. As this Court has found, ADX prisoners receive "a review of their placement at least every six months via program reviews, the process governing admission to the Step-Down program." *Saleh*, 2010 WL 5464294, at *5. During them, Plaintiff may present his views. *Id.* And under the 2009 I.S., Plaintiff does not have to mitigate the reasons for his ADX placement. *Id.* It is undisputed that Plaintiff has had 46 program reviews and that he has been considered for placement in the step-down program three times. Facts **69, 79-83**. However, he has been denied admission, in part, because of his A.B. membership and continued association with members of the gang. *Id.* As required by the 2009 I.S., Plaintiff has received written notification of the decisions denying him placement in the step-down program, which has included the reasons for such denials. *Id.* He has appealed the denials through the administrative remedy program. *Id.*

These procedures comply with the *Greenholtz/Hewitt* framework approved by *Wilkinson* because they allow Plaintiff to present his views to the Warden of the ADX, the final decision-maker. 545 U.S. at 228-29. Plaintiff may submit an administrative remedy request to the ADX Warden within 20 calendar days of the event giving rise to the grievance. 28 C.F.R. § 542.14. If Plaintiff does not obtain the resolution he desires, he has two more levels of review with the BOP's regional office and the general counsel. *Id.* § 542.15(a).

Further, the BOP recently gave Plaintiff a hearing to address his designation to the ADX. This hearing provided him with additional process and review of the decision under the Nalley Memorandum procedures.  Plaintiff received advance written notice and a retroactive ADX hearing to address whether his confinement there was warranted.  Facts **84-88**.  He also participated in the hearing, received the hearing officer's written report and RD Nalley's  decision.  *Id.* **89-90**.

Third, the government's interests are of paramount consideration.  As *Wilkinson* aptly noted, the government has a strong interest in furthering prison security given the "brutal reality of prison gangs," and in efficiently managing its scarce resources.  545 U.S. at 227-28.  The government's interests in the restrictions are especially strong here given Plaintiff's unique history and his status as an A.B. member and leader.

Therefore, in balance, considering the undisputed evidence, the *Mathews* factors here yield the conclusion that the multi-level process available to Plaintiff has sufficient procedural safeguards. Even if Plaintiff had a liberty interest to avoid confinement in administrative segregation and in the ADX, the BOP's procedures available to him throughout his confinement have afforded him sufficient procedural safeguards.  Accordingly, Petitioner's Fifth Amendment claim fails.

## B.    Defendants Are Entitled to Qualified Immunity for Claim 1.

Even if Plaintiff had a *Bivens* remedy for Claim 1, the individual Defendants are entitled to qualified immunity.   Plaintiff has failed to set forth facts showing that any of them violated his rights, let alone any rights that were clearly established.   Government officials performing discretionary functions generally are granted qualified immunity and are shielded from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The primary purpose of qualified immunity is "to protect [public officials] from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510 U.S. 510,

514 (1994).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  Qualified immunity is immunity from suit, not merely from liability.  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

When the defense of qualified immunity is raised, "the Plaintiff initially bears a heavy two-part burden."  *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).  Until recently, the Court first had to determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  "[T]he next, sequential step [was] to ask whether the right was clearly established."  *Id.  See also Maestas v. Lujan*, 351 F.3d 1001, 1006-07 (10th Cir. 2003).  The Supreme Court urged that a court evaluating qualified immunity must consider the "threat reasonably perceived by the responsible officials."  *Hudson v. McMillian,* 503 U.S. 1, 8 (1992).  The Supreme Court recently modified the *Saucier* sequence, stating that it is no longer mandatory, and gave discretion on which prong to address first.  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

*Bivens* liability "must be based on personal involvement in the alleged constitutional violation."  *Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997).  To establish liability of supervisors, plaintiff also must show that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  It is unclear what the "culpable" state of mind required to establish individual *Bivens* liability for a procedural due process violation because, as noted, the Supreme Court has not approved a *Bivens* remedy in this context.  *See supra* § III.  At a minimum, the Court should adopt *Iqbal*'s formulation, requiring proof

that defendants acted with a "discriminatory purpose" to deprive plaintiff of procedural due process rights.  129 S. Ct. at 1948.

Here, the Individual Defendants, all of whom have (or had) supervisory positions with the BOP, are entitled to qualified immunity on both prongs.  First, as shown *supra* § IV.A., they have not violated Plaintiff's procedural due process rights.  Second, Plaintiff cannot establish the Individual Defendants' supervisory liability.  Neither Warden Wiley nor Dr. Conley made the decision to transfer Plaintiff to transfer him to Range 13.  Facts **32**.  RD Nalley and ACPD Vanyur made that decision because USP Leavenworth's mission changed to a medium security prison and could not house Plaintiff, given the security measures he required.  *Id.* **33**.  And the move to the ADX allowed Defendants the option to move Plaintiff to the general population, where he could be stepped-down.  *Id.* **34**.

Further, none of the Defendants acted with a "discriminatory purpose" to deprive Plaintiff of his procedural due process rights.  The undisputed evidence shows that Defendants never took away Plaintiff's periodic reviews offered under BOP program statements or the Carlson Memo. And even when the BOP discontinued some reviews (like the Executive Staff annual review in November 2004), it replaced them with other types of review (six-month, Executive Panel reviews). Plus, Plaintiff always has had the right to employ the administrative remedy program.

Third, there is not a clearly established right that his confinement in segregation and at the ADX implicates a liberty interest.  A clearly established constitutional right must be based upon either a Supreme Court or Tenth Circuit decision on point, or the clear weight of authority from other circuits must establish the constitutional right.  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  ACPD Conley, RD Nalley, ACPD Vanyur and Warden Wiley did not violate a clearly established right.  Plaintiff cannot show that a reasonable prison official would have known that his confinement in administrative segregation on Range 13, even after *Wilkinson*, posed

an atypical and significant hardship such that it deprived him of a liberty interest.[5] His confinement on Range 13 lacks the two critical "plus" factors that are necessary to trigger procedural safeguards. It is undisputed that Plaintiff's incarceration under restrictive conditions of confinement does *not* affect his parole eligibility, or his ability to earn statutory good time because, by law, he is precluded from earning such time. Facts **17, 19** (18 U.S.C. § 4161). Further, the conditions of "extreme isolation" *by themselves* are insufficient to be atypical and significant so as to deprive an inmate of a liberty interest. *Rezaq*, 2010 WL 5157317, at *14 (citing *Townsend*, 522 F.3d at 772). In light of these undisputed facts, Defendants are entitled to qualified immunity.

To the extent that Plaintiff contends that his placement in the ADX's general population violates the Fifth Amendment, it is well established that after *Wilkinson*, neither the Tenth Circuit nor this Court has held that such confinement implicates a liberty interest. *See Ajaj*, 293 F. App'x at 585; *Jordan*, 191 F. App'x at 650-51 & nn.9-10; *Matthews*, 2010 WL 3703357, at *8-*10; *Georgacarakos*, 2010 WL 1291833, at *11-*12. Accordingly, given that there is not a clearly established right under the Fifth Amendment that a prisoner's confinement at the ADX poses an atypical and significant hardship, Defendants are entitled to qualified immunity.

### C.   Defendants Have Not Violated Plaintiff's Eighth Amendment Rights.

In Claim 4, Plaintiff alleges that his confinement violates the Eighth Amendment. "The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d

---

[5] The Court previously ruled that based on the allegations in the complaint, "the complained-of conditions not only parallel those which the Supreme Court found created a liberty interest in *Wilkinson*, they impose greater restrictions." Doc. 261 at 31. As shown in the body, the record evidence shows that the conditions of confinement do not implicate a liberty interest because they do not affect Plaintiff's parole eligibility and his confinement is not indeterminate. § IV.A.

912, 916 (10th Cir. 2008) (citations omitted).  However, the Eighth Amendment "does not mandate comfortable prisons." *Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998).

To state an Eighth Amendment claim on conditions of confinement, a plaintiff must establish two elements. *Mauchlin v. Bier*, 2010 WL 3733891, *2 (10th Cir. Sept. 27, 2010).  First, he must establish the objective component, and show that "he [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298, (1991).  Second, he must meet the subjective prong, and "establish that the prison official had a 'sufficiently culpable state of mind.'" *Mauchlin*, 2010 WL 3733891 at *2 (quoting *Farmer*).  That is, the official must act with "deliberate indifference to inmate health or safety," *Farmer*, 511 U.S. at 834, meaning that he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

On the first prong, even severe restrictions do not satisfy the objective component if the inmate is not deprived of a basic human need.  In *Ajaj v. United States*, 293 F. App'x 575, 583 (10th Cir. 2008), the court held that the restrictive conditions of confinement at the ADX do not constitute cruel and unusual punishment, reasoning that "the conditions of confinement he avers do not, even taken together, constitute the sort of 'significant departure from the healthy habilitative environment the state is required to provide its inmates.'"  And this Court rejected an Eighth Amendment claim brought by a prisoner confined in the general population of the ADX. *Georgacarakos*, 2010 WL 1291833, at *12 (while the "conditions at ADX are undoubtedly extremely restrictive," "they are not so extreme or inhumane that they could be deemed a significant departure from contemporary standards of decency").

Here, the undisputed evidence shows that Plaintiff cannot establish an Eighth Amendment violation under either factor. First, he cannot meet the objective component because his conditions of confinement (either under the Carlson Memo's security measures between 1983 and 2008, or now at the ADX) do not deprive him "of the minimal measure of life's necessities." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). At USP Leavenworth and the ADX, he has been housed in humane conditions of confinement and the BOP has provided him with adequate food, clothing, shelter, sanitation, and reasonable safety from serious bodily harm. Facts **48-61**. The BOP also has provided him appropriate medical and mental health care. *Id.* **91-99**. *Fleming v. Neb. Dep't of Correctional Servs.*, 2006 WL 2990355, *13 (D. Neb. Oct. 18, 2006) (holding there was "no evidence that the basic conditions that the plaintiff experienced in administrative confinement [for 12 years], alone or in combination, 'produce[d] the deprivation of a single, identifiable human need …'"). Further, the BOP has continually and periodically has reviewed Plaintiff's confinement, with officials from the institution (unit team, warden, associate warden, captain, psychologist), respective regions (RDs), and the Director being involved in the reviews. *Id.* **26-31, 55-73**. Plaintiff was present at many of these reviews and had the opportunity to participate.

To the extent Plaintiff's claim challenges his *current* conditions of confinement at the ADX (Range 13 or general population), it fails. The conditions at the ADX do not deprive inmates of basic human needs. *Compare* Facts **57-62** *with Georgacarakos*, 2010 WL 1291833, at *11, *and Ajaj*, 293 F. App'x at 583; *see also Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003). Plaintiff's complaints that he "has only limited access to education, employment, religious programming, housing assignment, recreation time and equipment," *Trujillo*, 465 F.3d at 1225 n.17, do not establish that prison officials deprived him "of the minimal measure of life's necessities." *Id.*

Nor can Plaintiff meet the subjective component. The undisputed evidence shows that the restrictions imposed upon Plaintiff reflect his dangerous status, not a culpable state of mind.

Indeed, Plaintiff has not suffered any such discernible physical or mental harm from his restrictions. Plaintiff's long-time BOP psychologist, Dr. Denney, found that his housing status did not have a negative impact on his mental health and that the conditions "had not eroded his self-competence or his resolve." Facts **94**. He also noted Plaintiff's resilient character. *Id.* **95**. Dr. Friedman, Plaintiff's expert, also concluded that Plaintiff did not have a "major mental health illness." *Id.* **98**. And he agreed that the BOP's clinical diagnosis of Plaintiff was consistent with his self-reports during his monthly evaluations with BOP psychologists. *Id.* Dr. Bursztajn, Defendants' expert, reached similar conclusions. *Id.* **99**. And the evidence also shows that he has been diagnosed and treated for his medical ailments, such as HCV and heart murmur. *Id.* **91-92**. At USP Leavenworth, a psychologist or psychiatrist evaluated him 47 times. *Id.* **93**. Plaintiff thus cannot show any significant harm from his conditions of confinement, let alone that the BOP knew such harm and acted with deliberate indifference to cause it. Accordingly, Plaintiff's Eighth Amendment claim fails.[6]

## V.    CONCLUSION.

For the reasons set forth above, Defendants' motion for summary judgment should be granted and the claims should be dismissed with prejudice.

<div style="margin-left:40%">

Respectfully submitted,
JOHN F. WALSH
United States Attorney

s/Juan G. Villaseñor
Juan G. Villaseñor & Marcy E. Cook
Assistant United States Attorneys
1225 Seventeenth Street, Suite 700
Denver, CO 80202   Tel: (303) 454-0100
E-mail: juan.villasenor@usdoj.gov

</div>

---

[6] To the extent that Plaintiff seeks monetary damages against Defendants in their official capacities, the Court lacks subject matter jurisdiction and summary judgment is appropriate. *Meyer*, 510 U.S. at 475; *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002).

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on January 26, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

bglidden@law.du.edu
lrovner@law.du.edu
marcy.cook@usdoj.gov
rraghunath@law.du.edu
susan.prose@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand- delivery, etc.) indicated above the nonparticipant's name:

None.

s/Juan G. Villaseñor
United States Attorney's Office