IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02471-PAB-KMT

THOMAS SILVERSTEIN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
JOHN VANYUR,
JOYCE CONLEY,
MICHAEL NALLEY, and
RONNIE WILEY,

      Defendants.
_____

### ORDER GRANTING SUMMARY JUDGMENT
_____

Plaintiff Thomas Silverstein filed this action challenging the constitutionality of the conditions of his confinement in the federal prison system.  This case is presently before the Court on defendants' motion for summary judgment [Docket No. 296]; plaintiff's motion for leave to file sur-reply [Docket No. 365]; and plaintiff's motion for oral argument [Docket No. 354].  As threshold matters, the Court grants plaintiff's motion for leave to file a sur-reply and accepts plaintiff's sur-reply for filing.  The Court denies plaintiff's motion for oral argument.

## I. BACKGROUND[1]

### A.  History of Plaintiff's Incarceration and Conditions with the BOP

Plaintiff has been in the custody of the Federal Bureau of Prisons ("BOP") since 1978, when he started serving a fifteen year sentence for bank robbery.  Plaintiff began his sentence at the United States Penitentiary ("USP") in Leavenworth, Kansas.  As a result of the BOP believing that plaintiff stabbed fellow inmate Danny Atwell to death at USP Leavenworth in February 1979, the BOP transferred plaintiff to the Control Unit at USP Marion, Illinois.  While plaintiff was housed at the Marion Control Unit, he was accused of the 1981 murder of inmate Robert Chappelle.  A jury convicted him of conspiracy to commit murder.  The Seventh Circuit upheld his conviction.  *See United States v. Silverstein*, 732 F.2d 1338, 1342 (7th Cir. 1984).  The opinion states that plaintiff was a member of the three-man commission governing the Aryan Brotherhood and had killed Chappelle, a black inmate, as a favor to the Mexican Mafia.  *See id.* Plaintiff maintains his innocence for this crime.

In September 1982, plaintiff and Clayton Fountain murdered another inmate, Raymond "Cadillac" Smith, a leader of the D.C. Blacks gang, in the Marion Control Unit. Plaintiff and Fountain cut a hole in the recreation enclosure in the Control Unit and then escaped through the hole to an area where Smith was showering.  They stabbed Smith sixty-seven times with homemade knives.  The BOP believes that the murder of Smith was intended to send a message from the Aryan Brotherhood to the D.C. Blacks, while

---

[1] The following facts, unless otherwise indicated, are not in dispute.

plaintiff denies that he knew Smith was a leader of the gang until 10 years after Smith's murder.

In October 1983, plaintiff murdered BOP Officer Merle Clutts in the Marion Control Unit.  Plaintiff was being escorted to his cell by three officers when an accomplice handed plaintiff handcuff keys and a shank.  Plaintiff unlocked his handcuffs and stabbed Officer Clutts twenty-nine times.  Plaintiff also admits this murder.

As a result of these murders, plaintiff is serving three consecutive life sentences plus forty-five years.

On November 2, 1983, the BOP transferred plaintiff from the Marion Control Unit to USP Atlanta.  Plaintiff was initially housed in a secure living area, but in August 1984, BOP director Norman A. Carlson issued a memorandum ("Carlson Memo") directing that plaintiff be removed from Control Unit status and housed in a special unit designed to meet his particular needs.  The Carlson Memo also set several specific restrictions on plaintiff, including placing him on "non-contact" status, limiting his visits, and restricting his recreation and programming.

Plaintiff remained under these individualized conditions at USP Atlanta until December 1, 1987, when he was transferred to USP Leavenworth.  For the first eighteen months at USP Leavenworth, plaintiff was housed in the basement cell where he did not have access to hot water or outdoor recreation and often did not receive three meals a day.  After this period, plaintiff was transferred to a secure area in the Special Housing Unit ("SHU") at USP Leavenworth.  Plaintiff's cell in the SHU included a 136 square foot living area with a bed, toilet, shower, sink, ten inch television, writing area, a duress button, an indoor and outdoor recreation area, as well as a visitation

3

space.  Plaintiff's sink and shower had hot water.  Plaintiff generally was allowed to

recreate for one and a half to two hours, five days a week.  Plaintiff had access to

media, to reading materials, and to the law library.  Plaintiff was under constant audio

and visual surveillance in his cell.  Defendants admit that for all but the one to two years

of his seventeen year incarceration at USP Leavenworth, plaintiff did not have control

over the light in his cell, which was on twenty-four hours a day.  Between 2001 and

2005, only staff directly responsible for plaintiff's custody, care, and treatment were

allowed in plaintiff's housing area and four officers were present any time plaintiff had to

leave his cell.  He was transported in handcuffs, a Martin chain, a black box, and leg

irons.  Plaintiff had no contact with other inmates.

On July 12, 2005, BOP transferred plaintiff from USP Leavenworth to the USP

Administrative Maximum facility, known as "ADX," in Florence, Colorado.  According to

BOP, plaintiff required transfer because USP Leavenworth changed to a medium

security facility and plaintiff required more secure confinement.  The BOP maintains

that only ADX provided sufficiently secure conditions to house plaintiff.  The parties

agree that ADX is the most restrictive BOP facility in the nation.

Plaintiff was initially housed in Range 13 at ADX, but on April 3, 2008, Regional

Director Nalley directed then-ADX Warden Ron Wiley to move him to a general

population cell in the D-Unit at ADX, where he remains housed today.  As part of this

transfer, the BOP discontinued the special security measures imposed by the Carlson

Memo.  Plaintiff was prohibited from communicating with other inmates in Range 13.

However, in the D-Unit, plaintiff can communicate with other inmates by yelling from cell

to cell.  Inmates receive a minimum of two 15-minute social calls and five social visits

per month.  Cells at ADX have black-and-white TVs with sixty channels and closed circuit programs.  Each cell has a shower stall, sink, toilet, concrete stool, desk, and shelf.  Cells have lights with four brightness settings which inmates may control.  However, plaintiff's cell remains lit by hall lights twenty-four hours a day.  Inmates may choose a "no-flesh" diet; they eat meals in their cells.  Inmates have access to indoor and outdoor recreation.  On Range 13, plaintiff exercised for an average of one and a half to two hours daily, five days a week; on the D-Unit, plaintiff receives ten hours of recreation time per week.

Between April 4, 2008 and August 10, 2009, ADX Warden Wiley approved daily management procedures for plaintiff in addition to the procedures for other ADX general population inmates.  On July 29, 2009, current ADX Warden Davis discontinued plaintiff's additional procedures.  Since August 10, 2009, plaintiff has been subject to the same procedures as all other ADX general population inmates.

Plaintiff has been eligible for parole since August 25, 1982, but the restrictive conditions of his confinement do not affect his parole eligibility.  Due to his life sentences, plaintiff has not be entitled to statutory good time under 18 U.S.C. § 4161 since 1982.  Plaintiff's disciplinary record, in addition to the aforementioned murders, shows assaults of three staff members, a threat to a staff member, an attempt to escape by posing as a United States Marshal, and the discovery of weapons, handcuff keys, and lock picks in plaintiff's rectum.  All of these offenses occurred in the 1980s.  Plaintiff has not received a citation for a disciplinary infraction since 1988.

### B.  Review of Plaintiff's Conditions of Confinement

The BOP has modified the procedure for reviewing the conditions of plaintiff's
confinement over the years of his incarceration.  The Carlson Memo, issued in 1984,
directed a series of period reviews of plaintiff while he was housed at USP Atlanta,
including a daily visit from unit staff or a physician assistant, a psychological review
every 30 days, a case review every 30 days, and a report by the Warden to the Director
every 90 days.  In 1986, the BOP maintains that plaintiff began receiving in-person
reviews every six months with his unit team, during which he could raise concerns
about his conditions of confinement.  Plaintiff disputes that any unit team in-person
reviews took place while he was housed in Atlanta.  Between 1989 and 2003, plaintiff
received monthly screening evaluations from Dr. Donald Denny, a BOP psychologist.
Plaintiff often raised the issue of the conditions of his confinement with Dr. Denny or at
periodic SHU reviews.

On April 29, 1991, BOP Director Quinlan modified the Carlson Memo's directives
to add an additional annual review by the BOP's Executive Staff, consisting of 16
individuals.  In November 2004, the Executive Staff replaced its annual review of
plaintiff's conditions with six month in-person reviews with the BOP's North Central
Regional Director, the Assistant Director of Correctional Programs, and the prison's
Executive Staff (including the Warden, Associate Warden, and Captain).  The other
reviews required by the Carlson Memo remained unchanged.  Defendants maintain that
Cynthia Ashman, plaintiff's case manager at USP Leavenworth from 1994 to 2005,
prepared monthly progress reports for him and visited him at least four times per
month.  Plaintiff disputes that Ms. Ashman visited him that frequently.  Ms. Ashman also

6

attended six-month reviews with the warden, captain regional representative, and psychologist.  Defendants state that the purpose of these reviews was to discuss with plaintiff any changes in his sentence, educational status, medical concerns, and program goals, while plaintiff argues the purpose of these meetings was only to direct him as to which programming he should complete.

After plaintiff's transfer to ADX, the BOP modified these various reviews.  At ADX, plaintiff receives an in-person review every six months with members of the BOP's executive panel (Regional Director and Assistant Director of Correctional Programs), the ADX Warden, the Associate ADX Warden, and members of plaintiff's unit team.  Plaintiff can raise any concerns about the conditions of his confinement at these six-month reviews.

Currently, the BOP reviews the status of inmates through what it terms "classification," "program reviews," and "progress reports."  According to the BOP, classification generally occurs within four weeks of an inmate's arrival at his designated prison.  Plaintiff received initial classifications upon his arrival at both USP Leavenworth and ADX.

Subsequent team meetings are called "program reviews" and ordinarily occur at least once every six months.  Inmates are expected to attend program reviews.  Defendants maintain that these reviews are intended to monitor and evaluate an inmate's progress in all areas and provide inmates an opportunity to raise concerns about anything related to their confinement.  Plaintiff disputes that program reviews are meaningful and argues that these meetings are only intended to tell inmates what television programming to watch.  Plaintiff argues these meetings last only a minute or

two and often involve a case manager simply leaving a pre-filled form under plaintiff's door while he is recreating.  Defendants claim that inmates are given forty-eight hours notice before scheduled program reviews, while plaintiff disputes that he is given any prior notice.  Between July 1992 and September 2010, plaintiff received 46 program reviews.

The BOP also monitors plaintiff's incarceration through progress reports, which it prepares every three years.  These reports are a comprehensive account of an inmate's history, including past and current status.  Inmates are given a copy of their progress reports.  Plaintiff received progress reports every three years.  The monthly reports generated by the wardens at USP Leavenworth and briefly at ADX were the equivalent of progress reports.

ADX employs a step-down unit program ("Step-Down Program") which allows inmates housed there to progress through stratified levels of restrictive housing. Inmates in the program progress from general population to J-Unit, K-Unit and then D/B Unit.  The ADX Institution Supplement FLM 5321.06I(1), Change Notice 01 ("2009 Institution Supplement") currently governs the operation of the Step Down Program. Eligibility to be evaluated by the Step-Down Screening Committee ("Committee") for entry into the program is assessed at an inmate's program review every six months.  An inmate is eligible to enter the program if he meets four factors: (1) six or twelve months (depending on his current assignment) of clear conduct; (2) active participation in and completion of all programs recommended by his team; (3) positive behavior, including respectful and appropriate conduct toward staff and other inmates; and (4) positive overall institutional adjustment, including personal hygiene and cell sanitation.  Inmates

who meet these criteria are referred to a Step-Down Screening Committee

("Committee") for consideration.  Under the 2009 Institution Supplement, the Committee

considers thirteen factors in deciding whether to admit an inmate to the program.

However, plaintiff disputes that the Committee actually considers these factors,

contending that the main factor the Committee considers is whether an inmate has

mitigated the reasons for his placement at ADX.  This factor has been removed from

the 2009 Institution Supplement.  The ADX Warden makes the final decision whether to

admit an inmate into the program.

On May 18, 2009, Warden Wiley denied plaintiff admission into the Step-Down

Program and the J-Unit under a previous Institution Supplement.  Wiley stated that the

factors which led to plaintiff's placement at ADX had not been sufficiently mitigated.

Plaintiff challenged this decision through the administrative remedy program.  On

October 28, 2009, the Committee denied plaintiff admission to J-Unit, citing his

membership in the Aryan Brotherhood and the fact that the BOP only recently removed

his daily management procedures.  Plaintiff then administratively challenged this

decision.  On July 6 and October 20, 2010, the Committee again denied plaintiff

admission to J-Unit.  The Committee cited plaintiff's continued commitment to the Aryan

Brotherhood and association with its members.

### C.  Review of Plaintiff's Placement at ADX

Placement of inmates in ADX's general population is currently governed by a

2009 Memorandum from Regional Director Nalley ("Nalley Memo").  The Nalley Memo

allows placement of inmates at ADX who meet either of two criteria: (1) the inmate's

placement in other correctional facilities creates a risk to institution security and good

order, or poses a risk to the safety of any individual; and/or (2) as a result of the

inmate's status, either before or after incarceration, the inmate could not be safely

housed in the general population of another institution.  On September 9, 2009, the

BOP gave written notice of a hearing to retroactively address plaintiff's placement at

ADX, which notice explained plaintiff's rights and the procedures to be used in the

hearing.  On September 15, 2009, a hearing administrator conducted plaintiff's

placement hearing.  Plaintiff made an oral and written statement and offered supporting

documents.  After the hearing, the hearing officer issued a written report recommending

that plaintiff remain at ADX.  Plaintiff received a copy of this report.  The hearing officer

based her recommendation on plaintiff's killing of three inmates and a correctional

officer as well as his attempted escape from a BOP institution.  Plaintiff contends that,

despite the Nalley Memo's directive for hearing administrators to rely only on reliable

evidence, the hearing officer relied on unreliable evidence such as plaintiff's Wikipedia

page.  Plaintiff also argues that the hearing was meaningless because its outcome was

predetermined.  On October 2, 2009, Nalley accepted the recommendation and plaintiff

received a copy.

### D.  Plaintiff's Dangerousness

Plaintiff and defendants dispute the extent to which plaintiff's continued

confinement in extremely restrictive conditions is necessary.  For ten years, BOP

psychology staff has rated plaintiff as a "low" risk of violence.  Defendants maintain that

this low rating was tied to his continued confinement in isolated conditions and is not a

predictor of plaintiff's potential behavior in a less restrictive environment.  Defendants

do not dispute that the most predictive demographic of future dangerousness is a

criminal's age and that, at age 59, plaintiff is of advanced age.  Nor do defendants

dispute that plaintiff has been a model inmate for twenty-three years, has had no

infractions since 1988, and that there are many ways plaintiff could have acted out and

been given an incident report notwithstanding his restrictive conditions of confinement.

Plaintiff has publicly apologized to Officer Clutts' family.

Defendants maintain that plaintiff's membership in the Aryan Brotherhood

("A.B."), a violent prison gang, is a key factor requiring his continued incarceration in

restrictive conditions.  According to defendants, plaintiff is a validated member of the

A.B. who "made his bones" by murdering Danny Atwell.  After Atwell's murder, plaintiff

became a leader of the A.B.  Plaintiff claims he never murdered Atwell, but does not

dispute that he was at one point a leader of the A.B.  Plaintiff disputes that he continues

to be a member of any gang.

Defendants see plaintiff's membership in the A.B. as continuing and permanent

since A.B. members are not allowed to leave the gang.  Under defendants'

understanding of the A.B., plaintiff may be asked at any time to perform violent tasks for

the gang, even if he has been inactive and out of contact for years.  Defendants state

that A.B. members who are asked to perform a task and refuse to perform it are beaten

or killed.  Plaintiff counters with evidence that older or sick members of the A.B. are no

longer asked to perform tasks for the organization and that some A.B. members are

able to turn down assignments without violent retribution.

Plaintiff's earlier involvement with the A.B. and its current relevance is not the

BOP's only concern.  Defendants also believe that, as recently as December 2010, an

A.B. sympathizer reached out to plaintiff via his blog, asking in code for permission to

provide an act.  Plaintiff responds that this message was not a code at all, but rather a family friend asking for permission to start a Facebook page for plaintiff.

### E.  Plaintiff's Health

Plaintiff presents evidence both of the detrimental psychological effects of his isolated confinement and of allegedly inadequate medical care he has received while incarcerated.  Defendants respond with evidence that plaintiff's health has been adequately cared for throughout his incarceration at the BOP.

As for plaintiff's mental health, plaintiff presents expert evidence that individuals in solitary confinement experience similar symptoms, including appetite and sleep disturbances, anxiety, panic, paranoia, hallucinations, self-mutilations, hypersensitivity, cognitive dysfunction, hopelessness, suicidal ideation, and withdrawal.  Plaintiff has experienced disrupted sleep and insomnia since his incarceration in Atlanta and which continues to the present.  Defendants do not dispute that plaintiff, who had no prior mental health history, has now been diagnosed with Anxiety Disorder.  Plaintiff reported various symptoms of psychological distress to BOP officials over the years, including his hopelessness, troubles with concentration, memory loss, and depression.  BOP staff noted plaintiff's symptoms and attributed many of them to his isolation and other conditions of confinement.  Plaintiff tested positive for cognitive impairment on Mini Mental Status Exams conducted by two doctors.  In 1997, plaintiff requested an evaluation for cognitive impairments he was experiencing as a result of his isolation, but BOP has not conducted such an evaluation.

As for plaintiff's physical health, the parties agree that, since plaintiff's arrival at ADX in July 2005, BOP and non-BOP medical staff have evaluated him approximately

35 times.  Plaintiff has been diagnosed with a heart murmur, rectal bleeding/hemorrhoids, and Hepatitis C.  Plaintiff claims that, although the BOP knew plaintiff suffered a heart murmur in 1983, it did not examine him in regard to this condition until after he filed this lawsuit.  Defendants state that in February 2010 a specialist recommended no further treatment for this condition.  Plaintiff claims he has received inadequate treatment for his Hepatitis C; defendants respond that he is on a wait list to receive such treatment, which he does not need at this time.  Finally, the parties dispute whether plaintiff has been inappropriately denied surgery to alleviate the pain from his hemorrhoids.

### F.  Procedural Background

Plaintiff filed the complaint in this case on November 28, 2007 [Docket No. 1]. He filed the second amended complaint [Docket No. 158] on May 14, 2009.  On March 23, 2010, the Court issued an order on defendants' motions to dismiss [Docket No. 261].  As a result of this order, only two of plaintiff's claims remain.

Plaintiff's first claim is a Fifth Amendment due process claim challenging the constitutionality of the conditions of his confinement beginning in 1983 and the process he has received relative to the continuation of those conditions between that point and today.  Plaintiff's first claim is brought against the BOP and individual defendants Vanyur, Conley, Nalley, and Wiley.  Plaintiff's fourth claim is an Eighth Amendment Claim alleging cruel and unusual punishment and surviving only against the BOP.  As relief for these alleged violations, plaintiff seeks equitable relief, in the form of declarations and injunctions, and monetary relief, in the form of nominal, compensatory, and punitive damages.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

### A.  Statute of Limitations

Plaintiff seeks declaratory and injunctive relief in the form of an order altering the conditions of his confinement.  *See* Docket No. 158 (Second Amended Complaint) at 38.  This relief appears to be part of both of his remaining claims.  Defendants argue that a six year statute of limitations applies to this relief pursuant to 28 U.S.C. § 2401(a), which provides that: "Except as provided by chapter 71 of title 41, every civil

action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Defendant argues that plaintiff's Fifth and Eighth Amendment claims accrued in November 1983, when the BOP made the decision to place plaintiff in isolation and under special safety restrictions and, thus, more than six years has expired since his claims accrued.

In its order on the motions to dismiss, the Court found that a six-year statute of limitations did not bar plaintiff's claims for equitable relief because "the alleged injuries continue" and plaintiff's "claim for injunctive relief is prospective." *See* Docket No. 261 at 18. The Court sees no reason to reconsider this earlier order. *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1225 (10th Cir. 2007) ("district courts generally remain free to reconsider their earlier interlocutory orders"). Defendants are correct that the six-year limitations period in Section 2401(a) applies to claims for equitable relief against the United States. *See Urabazo v. United States*, 1991 WL 213406, at *2 (10th Cir. Oct. 21, 1991) (applying 2401(a) to claim for declaratory relief). However, plaintiff's claims for equitable relief are primarily tied to his current conditions and, therefore, accrued when those conditions were imposed. *See Urabazo*, 1991 WL 213406, at *2 ("A cause of action 'first accrues' for purposes of 28 U.S.C. § 2401(a) 'when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action.'"). Those conditions were imposed within six years of his filing suit, as plaintiff was only moved to ADX in July 2005 and then moved from ADX's Range 13 to general population in April 2008. Therefore, the Court finds that plaintiff's claims for equitable relief are not time-barred.

Plaintiff seeks nominal, compensatory, and punitive damages against the individual defendants in his first claim, which alleges a violation of his due process rights pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  This claim is subject to the two-year limitations period applicable to *Bivens* claims in Colorado.  *See Turner v. Schultz*, 130 F. Supp. 2d 1216, 1221 (D. Colo. 2001).  In its order on the defendants' motions to dismiss, the Court held that, because plaintiff's claim incorporated defendants' activities after his transfer to ADX, it was timely.  *See* Docket No. 261 at 19.  Plaintiff was transferred to ADX on July 12, 2005 and he filed his suit on November 18, 2007, over two years after his transfer.  Thus, only actions taken by defendants after November 18, 2005, that is between plaintiff's transfer to ADX and his placement in general population, fall within this period.

In its earlier order, the Court reserved ruling on the question of whether the continuing violation doctrine might allow plaintiff to recover damages for defendants' actions preceding the two-year period.  *See id.* at 19 n.1.  The continuing violation doctrine has its origin in discrimination law and allows a "Title VII plaintiff to challenge incidents that occurred outside the statutory time limitations of Title VII if such incidents are sufficiently related and thereby constitute a continuing pattern of discrimination." *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994).  This equitable doctrine "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated" and, therefore, fails "if the plaintiff knew, or through the exercise of reasonable diligence would have known, she was being discriminated against at the time the earlier events

16

occurred." *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003) (quotations omitted).

The Tenth Circuit has not extended the continuing violation doctrine to *Bivens* claims and it has explicitly reserved ruling on its applicability to § 1983 claims alleging constitutional violations by state actors.  *See Brock v. Herbert*, 2011 WL 3154230 at *3, (10th Cir. July 27, 2011); *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011).  The Tenth Circuit has held that the doctrine does not apply to § 1981 claims alleging racial discrimination, reasoning that the doctrine is tied to the relatively short time period in which Title VII plaintiffs must file administrative charges, a requirement not present for § 1981 claims. *See Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir. 1997).  At least one district court in the Tenth Circuit has extended this reasoning to find that the doctrine does not apply to § 1983 claims.  *See Barrett v. Philpot*, 2009 WL 211687 at *4 (E.D. Okla. Jan. 29, 2009), *rev'd on other grounds*, 356 F. App'x 193 (10th Cir. 2009).  On the other hand, this Court has applied the doctrine to a prisoner's *Bivens* claims that are highly analogous to the claims asserted by plaintiff here.  *See Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2008 WL 4216265, at *12-13 (D. Colo. Sept. 12, 2008) (applying continuing violation doctrine to plaintiff's claims that defendants conspired to hold him at a security classification more restrictive than the one for which he was eligible and that he was held in constitutionally insufficient conditions).

Here, even assuming that the continuing violation doctrine applies to *Bivens* claims, it would not apply to plaintiff's due process claim.  Plaintiff alleges that BOP officials provided him insufficient process in determining the appropriate conditions of his confinement over a period of nearly three decades.  During this time, plaintiff was

housed in four different correctional institutions in varying conditions.  Plaintiff's claim is

analogous to a claim recently considered by the Tenth Circuit in *Fogle v. Slack*, 419 F.

App'x (10th Cir. 2011).  There, the plaintiff brought a due process claim under § 1983,

alleging that he "was not given proper due process before being assigned to

administrative segregation."  *Id.* at 862.  Plaintiff had spent three years in administrative

segregation at three different state facilities.  *Id.*  The district court dismissed his claim

as untimely, holding that the continuing violation doctrine did not apply.  The Tenth

Circuit affirmed, reasoning that "each segregation decision was of a discrete nature and

that, in many instances, segregation decisions were made by different decision makers

across three different correctional facilities, thus making it inappropriate to aggregate all

such decisions into one continuing violation for limitations purposes."  *Id.* at 864-65.

Here, too, plaintiff alleges different review schemes operating during different periods of

his incarceration involving different protocols and decision makers at different

institutions.  Accordingly, the Court finds that the continuing violation is not applicable to

plaintiff's first claim, and he may only recover damages for due process violations

beginning two years before he filed his complaint.

### B.  Availability of a *Bivens* Remedy

In their motion for summary judgment, defendants argue that, even assuming

plaintiff's first claim is timely, a *Bivens* remedy is not available for the alleged violation of

plaintiff's due process rights.  "*Bivens* established that the victims of a constitutional

violation by a federal agent have a right to recover damages against the official in

federal court despite the absence of any statute conferring such a right."  *Carlson v.*

*Green*, 446 U.S. 14, 18 (1980).  However, the *Bivens* remedy has only been recognized

18

for a limited number of Constitutional violations.  *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (recognizing remedy for Fourth Amendment violations); *Carlson*, 446 U.S. 14 (recognizing *Bivens* remedy for Eighth Amendment violations); *Davis v. Passman*, 442 U.S. 228 (1979) (recognizing *Bivens* remedy for Fifth Amendment equal protection claim).  Thus, defendants argue that a *Bivens* remedy is not available for plaintiff's Fifth Amendment due process claim.  The Court finds plaintiff has failed to raise a genuine issue of material fact on his Fifth Amendment claim and that defendants are entitled to summary judgment, as discussed below.  The Court therefore does not address whether a *Bivens* remedy would be available should plaintiff prevail on his first claim.

### C.  First Claim: Due Process

Plaintiff's first claim challenges the adequacy of the BOP and individual defendants' review of the conditions of his confinement under the Fifth Amendment's due process clause.  As explained above, plaintiff's claim is limited to the review process applicable to his conditions after November 28, 2005, two years before he filed his complaint.  During this period, plaintiff has been held at ADX, first on Range 13 and then in the general population.  This period does not include plaintiff's initial transfer to ADX.  In order to prevail on his due process claim, plaintiff must demonstrate both that he has a protected liberty interest in the conditions of his confinement at ADX and that defendants afforded him inadequate process when determining those conditions.

### 1.  Liberty Interest

"A due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest in which the

state has interfered." *Stefley v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).  When a plaintiff asserts a liberty interest in avoiding more restrictive conditions of placement in the prison context, the plaintiff must show that these conditions are an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted).  *Sandin*'s requirement of "an atypical and significant hardship" was applied in *Wilkinson v. Austin*, 545 U.S. 209 (2005), where the Supreme Court held that inmates at a state Supermax facility possessed a liberty interest based on the extreme conditions of their confinement, the indefinite duration of their placement, and the fact that transfer to the facility automatically disqualified an otherwise eligible inmate for parole consideration.  *Id.* at 223-24.

Drawing on *Wilkinson* and *Sandin*, the Tenth Circuit has identified four factors that a court may consider in determining whether a liberty interest exists in an inmate's conditions of confinement: "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of confinement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate."  *Estate of DiMarco v. Wyo. Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007).

### a.  Legitimate Penological Interest

As to the first *DiMarco* factor, defendants argue that the placement of plaintiff at ADX serves the legitimate penological interest of safety.  In support, defendants cite plaintiff's history of extreme violence and his membership in the Aryan Brotherhood.  Plaintiff does not dispute that he murdered Officer Clutts and fellow inmate Smith while

housed at the extremely restrictive Marion Control Unit.  Plaintiff does, however, dispute that this violent history requires that he continue to be housed in extremely restrictive conditions.  In order to demonstrate that the BOP's beliefs about plaintiff's future dangerousness are unfounded, plaintiff presents evidence that he no longer poses a security threat.  First, plaintiff presents evidence that for ten years, BOP staff have rated plaintiff as a "low" risk of violence.  *See* Docket No. 321 (psychological screening records).  Defendants do not dispute this fact but add that this rating was premised on assessments of plaintiff's capacity to commit violence while housed in restrictive conditions and do not indicate that he would be a similarly low risk under different circumstances.  *See* Docket No. 321-1 at 28 (November 30, 2001 SHU Review from Dr. Donald Denney) ("If [plaintiff is] left in his current housing situation, there is a low risk of violence.  If he is moved to an open setting where he will be required to confront the challenges of interpersonal relations, his risk level goes up.").

Next, plaintiff presents evidence from psychologist Spencer Friedman, who opines that plaintiff "presents a low risk of future violence, even if he is moved to less isolated conditions."  *See* Docket No. 322-6 at 7, ¶ 34 (Friedman Decl.).  Dr. Friedman's conclusion is based on his interviews with plaintiff, plaintiff's age, plaintiff's record of 25 years of good behavior, and plaintiff's acceptance of responsibility for his actions.  *See id.* at 7-8, ¶¶ 35-45.  Plaintiff also presents the expert report of Dr. Craig Haney, who opines that plaintiff poses a low risk of violence for similar reasons.  *See* Docket No. 321-17 at 51-53.  Dr. Haney specifically opines that plaintiff's restrictive conditions are not the cause of his clean record, but that plaintiff's compliant behavior in the face of such psychologically stressful confinement conditions is evidence of his psychological

21

maturity and low risk of violence. *See* Docket No. 321-17 at 51-53. Finally, plaintiff presents the declaration of corrections expert Steve Martin, who opines that, based on plaintiff's record of clear conduct, his age, and current behavior, there is no penological justification for housing plaintiff in ADX general population. *See* Docket No. 320-6 at 11-12.

This evidence, at best, demonstrates that these experts might differ in their placement of plaintiff. However, the Court "must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *See DiMarco*, 473 F.3d at 1342. It is undisputed that plaintiff has an extraordinarily violent history, including murders he admits to committing while housed under highly restrictive conditions. One of these murders, that of Officer Clutts, occurred while plaintiff was being escorted by three correctional officers. The Court, therefore, finds that there is no genuine dispute of material fact as to defendants' legitimate penological interest in housing plaintiff in the general population at ADX.

### b. Conditions of Placement are Extreme

Plaintiff asserts that he endured extreme conditions during his incarceration on Range 13 because regulations restricted virtually all forms of communication with other inmates. Docket No. 321-17 at 13-14. Plaintiff argues that his conditions were atypical because he could only communicate with others through solid concrete walls and was restricted to non-contact visits. *Id*. Plaintiff maintains that the indefinite duration of this extreme segregation makes his case analogous to *Wilkinson*. Docket No. 319 at 29-30.

As a preliminary matter, no court in the Tenth Circuit has held that the conditions at ADX, regardless of the unit, are extreme. In fact, the courts that have addressed

ADX conditions on summary judgment have found that such conditions were not atypically extreme.  *See Jordan v. Federal Bureau of Prisons*, 191 F. App'x 639, 651-52 (10th Cir. 2006) (finding no liberty interest in conditions imposed during five-year administrative confinement in the ADX control unit); *Saleh v. Federal Bureau of Prisons*, Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM, 2010 WL 5464294 (D. Colo. Dec. 29, 2010) (no liberty interest in conditions imposed in the ADX general population unit); *Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2010 WL 1291833, at *11-13 (D. Colo. March 30, 2010) (finding no liberty interest in conditions imposed in the ADX general population unit); *Rezaq v. Nalley*, No. 07-cv-02483-LTB-KLM, 2010 WL 5157317 (D. Colo. Dec. 14, 2010) (conditions in the ADX general population unit do not implicate a liberty interest).  However, because plaintiff was housed on Range 13, the above cases are not completely on point.  Nevertheless, plaintiff's conditions of incarceration at Range 13 do not differ significantly from inmates in the general population.  Both sets of inmates have control over the lights in their cells; televisions, showers, and sinks in their cells; access to outdoor recreation; the ability to have non-contact social visits; contact with prison staff; and two fifteen-minute phone calls per month.  Docket No. 321-17 at 13-17.

Given these facts, plaintiff's sole contention rests on the assertion that, because he had no communication with other inmates while at Range 13, *see* Docket No. 321-17 at 14, he was subject to harsher conditions than inmates in ADX's general population.  Docket No. 296-8 at 10-11, ¶ 34.  In this regard, plaintiff relies on *Wilkinson*'s finding that the limitation on almost all human contact could be a liberty interest because it creates an atypical and significant hardship within the correctional

23

context. *Wilkinson,* 545 U.S. at 224. However, the Court finds plaintiff's contention that

he has a liberty interest from the thirty months he spent on Range 13 unavailing.

In *Wilkinson*, the inmates could not hold conversations from cell to cell, had

restricted visits, and were deprived of almost all human contact. *Wilkinson*, 545 U.S. at

214. In contrast, while on Range 13, plaintiff could communicate with prison staff, have

phone conversations, and have social visits. Docket No. 321-17 at 14. Additionally,

*Wilkinson* does not stand for the proposition that a limitation on almost all human

contact standing alone creates a liberty interest. *See id*. at 224. On the contrary, it was

the combination of solitary confinement, the rarity of social visits, the inability to control

the lights within a cell, and the lack of outdoor exercise for an indefinite period which

the Supreme Court found was an "atypical and significant hardship." *Id. Wilkinson*

acknowledged that "any of these conditions standing alone might not be sufficient to

create a liberty interest." *Id*. Moreover, *Wilkinson* recognized that most, if not all, of

these conditions would be present in the majority of solitary confinement facilities and

limited its holding to the two factors that made the Ohio facility an outlier – the indefinite

duration of segregation and the inmates' ineligibility for parole. *Id*. Thus, in *Wilkinson*,

the Court was not solely concerned with the inmates' lack of social contact, but rather

the inmates' complete deprivation for an indefinite period of any environmental or

sensory stimuli. *Id*.

In this case, unlike the inmates in *Wilkinson*, plaintiff cannot maintain that he is

completely deprived of all environmental or sensory stimuli because he can exercise

outdoors, communicate with prison staff, watch television, and control the lights within

his cell. Docket No. 321-17 at 15. Moreover, plaintiff's reliance on thirty months

24

without contact with other inmates is inapposite because other courts within the district have upheld similar inmate restrictions for comparable periods of time. *See Jordan*, 191 F. App'x at 652 (finding that five years in administrative detention not a liberty interest because he had contact with staff, length of sentence not affected, and his confinement was not indefinite); *Villarreal v. Harrison*, 1999 WL 1063830, at *2 (10th Cir. Nov. 23, 1999) (two-year duration of administrative detention, even with conditions involving restricted telephone privileges and eating alone in cell, did not establish a liberty interest); *Chappell v. McKune*, 1999 WL 1079618 (10th Cir. Nov. 30, 1999) (1000 days in administrative segregation does not give rise to a liberty interest). Thus, because plaintiff's prison conditions are not analogous to those in *Wilkinson,* plaintiff's claim that he endured extreme conditions during his thirty months in Range 13 is without merit. Apart from the ability to communicate with other inmates, plaintiff's conditions at Range 13 are in almost every respect identical to those in the D-Unit which have never been found to violate due process. *Saleh*, 2010 WL 5464294, at *4 (citing cases). For the reasons listed above, plaintiff's claim that his conditions of incarceration in ADX's general population unit are extreme is also denied.

Plaintiff's next claim is that the duration of his segregation gives rise to a liberty interest. Docket No. 319 at 29. Some Tenth Circuit cases have held that the duration of confinement in administrative segregation alone may create a liberty interest. *See Payne v. Friel*, 266 F. App'x 724, 728 (10th Cir. 2008) (finding duration of confinement by itself may be an "atypical and significant hardship"); *Jordan*, 191 F. App'x at 651-53 (finding that long periods spent in administrative segregation could be atypical if not justified by sufficient extenuating circumstances); *see also Wilkerson v. Stalder,* 329

25

F.3d 431, 436 (5th Cir. 2003) (30 years in lockdown – 23 hours a day in isolation – *might* give rise to a *Sandin* "atypical and significant" hardship); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (finding that an inmate in administrative custody for eight years, confined to his cell 23 hours a day, five days a week, and 24 hours a day, two days a week, with contact only with guards implicates a liberty interest); *Fogle v. Pierson*, 435 F.3d 1252, 1259 (10th Cir. 2006) (reversing district court's dismissal of complaint as frivolous where court concludes that there was no *arguable* basis that a three-year period of administrative segregation where prisoner was in his cell all but five hours a week and denied outdoor activities, was not "atypical")   However, in this case the duration of plaintiff's confinement does not sufficiently distinguish the length of his administrative segregation from *Jordan* (five years), *Georgacarakos* (seven), and *Rezaq* (thirteen years).[2]  As the court in *Rezaq* remarked, "while the length of time is instructive, it does not impact the fact that the conditions at issue here are simply not as restrictive as those in *Wilkinson*."  *Rezaq*, 2010 WL 5157313, at *11. Therefore, the Court finds that because the length of plaintiff's administrative segregation does not create an atypical and significant hardship, there is no genuine dispute of material fact and plaintiff's conditions of incarceration are not extreme.

---

[2] The duration of isolation may lead to a different result if it appears that the inmate is placed in segregation purely as a form of punishment.  *See Sandin*, 515 U.S. at 487.  However, where as here, given that plaintiff's segregation is not punishment for unacceptable behavior, but serves the penological goal of safety, the duration of confinement becomes less important.  *See Rezaq*, 2011 WL 5157313, at *11 n.13.

### c.  Placement Increases Duration

There is no evidence that placement at ADX increases the duration of plaintiff's sentence, a fact which was relevant to the Supreme Court's decision in *Wilkinson*.  *See* 545 U.S. at 224.  Plaintiff admits that his eligibility for parole is not affected by his placement in ADX.  Therefore, the Court finds that there is no genuine dispute of material fact regarding this factor, which weighs against finding a liberty interest.

### d.  Placement is Indefinite

Plaintiff asserts that there is a disputed issue of fact as to whether his placement at ADX is indefinite.  Docket No. 319 at 31.  Plaintiff insists that the various reviews he receives from the BOP are meaningless and perfunctory.  *Id*.  Plaintiff argues that, despite his ongoing eligibility for the Step-Down Program, defendants admitted that there is no timetable for his acceptance and it was uncertain if plaintiff would ever be allowed into the program.  Docket No. 320-18 at 2.

To evaluate this claim, plaintiff's assertion must be separated into two relevant time periods: (1) plaintiff's confinement at Range 13 from November 18, 2005 until April 6, 2008; and (2) plaintiff's current confinement in ADX's general population unit. Plaintiff's first claim is tantamount to an assertion that, when he was confined in Range 13, his confinement was indefinite because he did not know whether he would ever be transferred to a general population unit.  However, this argument is placing the cart before the horse because plaintiff must first establish whether confinement in Range 13 creates an atypical and significant hardship when compared to confinement in ADX's general population.  As already noted, the BOP had a valid penological interest for

plaintiff's confinement at Range 13, his incarceration in that unit did not increase his sentence, and the differences in conditions within Range 13 and the ADX general population (i.e. the general population is allotted 5 more hours of outdoor recreation and the inmates may communicate with one another) are not extreme.  Thus, plaintiff's sole basis for asserting a liberty interest is to show that his confinement within Range 13 was indefinite because the reviews at Range 13 were perfunctory and a "sham." Docket No. 319 at 33.   However, plaintiff does not contest that upon arrival at ADX he received a classification interview and while in Range 13 he received six program reviews.  Docket No. 296 at 12,  ¶¶ 69-71; Docket No. 319 at 7, ¶¶ 69-71.  Further, plaintiff does not challenge that he was transferred from Range 13 to the ADX general population based on the recommendation of Dr. Conley after a semi-annual review on December 18, 2007.  Docket No. 296-4 at 14, ¶¶ 40-45; Docket No. 296 at 8, ¶¶ 35-47; Docket No. 319 at 5, ¶¶ 35-47.  Consequently, the Court finds that plaintiff's claim that confinement in Range 13 was indefinite is without merit because he was given periodic reviews and these reviews eventually led to his transfer to a less restrictive unit.

The second time period relevant to plaintiff's claim that his placement at ADX is indefinite is his current detention in ADX's general population.  Other courts that have addressed this issue have found that incarceration in ADX's general population is not indeterminate because inmates receive periodic reviews.  *See Georgacarakos*, 2010 WL 1291833, at *13 (finding that the existence of the Step-Down Unit Program provides a definite benchmark for plaintiff's exit from ADX even if it took almost thirteen years to get accepted to the program); *Georgacarakos*, 2011 WL 940803, at *11; *Rezaq*, 2010 WL 5157313, at *13 (conditions of confinement at ADX general population units–those

imposed on inmates who are excluded from the step-down program–do not give rise to a liberty interest).

After reviewing the evidence, the Court finds that plaintiff was given adequate review and therefore his claim that confinement in ADX's general population is indefinite is without merit.  Plaintiff's reviews for admission into the step-down program were guided by the 2009 Institution Supplement (FLM 5321.06I(1)) and occurred at least once every six months.  Docket No. 296-4 at 24-26.  The 2009 Institution Supplement designates thirteen factors that prison officials must consider when making a determination of whether an inmate can enter the step-down program. The 2009 Institution Supplement requires that, if a prisoner is denied admission, he must be given: (1) the reasons for his denial in writing; and (2) a chance to appeal the warden's decision.  Docket No. 296-4 at 29.  Since his transfer to the general population, plaintiff has had four referrals to the step-down program: May 18, 2009; November 17, 2009; July 6, 2010, and October 20, 2010.  Docket No. 296-4 at 118-24.  In these reviews, plaintiff was provided with specific reasons why his admission into the step-down program was denied as well as the goals plaintiff had to achieve in order to receive admission into the program.  *Id*.  Moreover, although plaintiff's admission to the step down program was denied, his daily management restrictions were gradually removed and, since August 10, 2009, plaintiff is subject to the same procedures as all other ADX general population inmates.  Docket No. 296-16 at 4.

Additionally, even though plaintiff meets the qualifications to enter into the step-down program, defendant's failure to admit plaintiff does not give rise to an atypical and significant hardship.  Defendants have highlighted the need to proceed carefully given

plaintiff's history, but nevertheless have gradually loosened plaintiff's restrictions.  The Court does not believe that plaintiff's reviews are rendered meaningless simply because plaintiff has not been approved for the step down process during his first three years in the general population.  *See Rezaq*, 2010 WL 5157313, at *13 (finding that the existence of the step-down program provides a definite benchmark for plaintiff's exit from ADX even if plaintiff was only accepted after almost thirteen years).[3]

In this case,  the Court finds that there is no genuine material dispute that plaintiff's confinement is not indefinite because plaintiff is given regular reviews, the opportunity to present objections, and specific reasons for the denial of his applications. *See Saleh*, 2010 WL 5464294, at *5; *Rezaq*, 2010 WL 5157313, at *14 (to rise to a level of a liberty interest, "the circumstances of confinement must create a virtual dead end for the prisoner in order for due process guarantees to be operative.").

### 2.  *Adequacy of Process*

Given that the Court has found plaintiff failed to raise a genuine issue that his incarceration at ADX implicates a liberty interest, there is no need to consider whether

---

[3] The Court notes that the 2009 Institution Supplement meets the standard set forth in *Toevs v. Reid*, 646 F.3d 752 (10th Cir. 2011), where the Tenth Circuit set forth the requirements of a meaningful review for entrance into stratified prison programs.  In *Toevs*, the court found that the admission process into a stratified program provided inmates with a liberty interest.  *Id.* at 759.  The court held that a three-tiered level of review with notice to inmates and an ability to present evidence satisfied due process. *Id*.  However, the court found that the prisoners did not have a meaningful review because their feedback was couched in terms of stock language such as "circumstances have not changed."  *Id*.  Thus, the court found that the reviews needed to provide reasons for inmates failure to progress and recommend programs to guide the inmates future behavior.  *Id.*  Here, the 2009 Institution Supplement considers thirteen factors and provides the inmates with written reports for denials and a chance to appeal.  Docket No. 296-4 at 23-27.

plaintiff has been provided with sufficient due process protections.  *See Rezaq*, 2010 WL 5157313, at *14 (citing *Templeman v. Gunter*, 16 F.3d 367, 369 (10th Cir. 1994)).

### 3.  Qualified Immunity

Because the Court finds that plaintiff has failed to raise a material issue of fact on his Fifth Amendment claim and will dismiss that claim, it need not address the individual defendants' argument that they are entitled to qualified immunity on this claim.  *See Jordan*, 191 Fed. App'x at 652.

### D.  Fourth Claim: Cruel and Unusual Punishment

Plaintiff's fourth claim asserts a violation of the Eighth Amendment's prohibition on cruel and unusual punishment against the BOP.  In determining whether conditions are cruel and unusual, courts do not apply a "static test" but look to "the evolving standards of decency that mark the progress of a maturing society" to gauge whether conditions are unconstitutional or only "part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981) (quotation omitted).  To prevail on his claim that the current conditions of his confinement are cruel and unusual, plaintiff must satisfy a two-prong test.  First, he must establish an objective component by showing that "he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Second, he must establish a subjective component by showing that the defendants imposed or continued these conditions with a "sufficiently culpable state of mind," that is, with "deliberate indifference" to his health or safety.  *Id.*

Plaintiff's fourth claim survives only against the BOP and because the government has not waived its sovereign immunity, plaintiff's relief is limited to

injunctive relief.  *See Simmat v. United States Bureau of Prisons*, 413 F.3d 1225, 1233

(finding that prisoner's claim for injunctive relief–premised on violations of his Eight

Amendment rights–was not barred by sovereign immunity).  Moreover, although plaintiff

alleges that he has faced serious risk of harm based in part on his isolation for over

twenty-eight years, the Court will focus its Eighth Amendment inquiry on conditions

imposed after plaintiff's transfer to ADX in July 2005.  The Court finds that plaintiff's

confinement at USP Leavenworth is inconsequential to his ongoing Eighth Amendment

claim insofar as plaintiff seeks injunctive relief because nothing in plaintiff's supporting

documents suggests that he is likely to be subject to those conditions again.  *See Saleh*

*v. U.S.*, No. 09-cv-02563-PAB-KLM, 2011 WL 2682728, at *6 (D. Colo. July 8, 2011)

(dismissing First Amendment injunctive relief based on plaintiff's transfer to another

correctional facility); *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) ("Plaintiff

seeking prospective relief must show more than past harm or speculative future

harm.").

### 1. *Objective Component*

The objective component of an Eighth Amendment claim is satisfied by proof of

a deprivation that is "objectively, sufficiently serious."  *Farmer*, 511 U.S. at 834

(quotation omitted).  Plaintiff argues that a deprivation need not create a risk of serious

harm so long as it creates a risk of unnecessary harm.  *See* Docket No. 319 at 20.  The

Court disagrees.  None of the cases plaintiff cites in identifying this "strand of the Eighth

Amendment doctrine" obviate the need for proof of a sufficiently serious deprivation.

*See Estelle v. Gamble,* 429 U.S. 97, 104 (1976) ("deliberate indifference to *serious*

medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'")

(emphasis added) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *Rhodes v. Chapman,* 452 U.S. 337, 347-48 (1981) (finding that consequences of double-celling of inmates "did not inflict pain, much less necessary and wanton pain"); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (finding defendants subjected plaintiff to "a substantial risk of physical harm" by tying him to a hitching post for 7 hours); *Roper v. Simmons,* 543 U.S. 551 (2005) (addressing death penalty); *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996) (Eighth Amendment prohibits "wrongdoing [] objectively harmful enough to establish a constitutional violation") (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

Thus, the Court addresses whether plaintiff has introduced sufficient evidence of an objectively serious deprivation or risk of harm so as to survive summary judgment. Plaintiff alleges that his current confinement deprives him of the following basic needs: sleep, social interaction, environmental stimulation, and adequate medical care.  The Court will address each alleged deprivation in turn.

### a.  Sleep

Plaintiff states that because of his twenty-eight years in isolation he suffers from insomnia, which increases his risk of stroke, cardiac complications, morbidity, and mortality.  Docket No. 321-4 at 4, ¶¶ 16-21.  Plaintiff reports that, as a direct consequence of his insomnia, he sleeps 4-5 hours per night, and usually takes a 1-hour nap after lunch.  Docket No. 321-4 at 38.  Plaintiff further reports that he is unable to sleep because his cell is never completely dark as light seeps in from the hallway. Docket No. 1 at 36, ¶ 208.  He concedes that he does not allege that the conditions at ADX are *per se* unconstitutional; rather, he claims that the ADX conditions as applied to

plaintiff–based on his history--amount to an Eighth Amendment violation. Docket No. 319 at 23.

After analyzing the evidence, the Court finds that plaintiff does not face a serious risk of harm based on a claim of sleep deprivation. Plaintiff fails to prove a direct connection between his insomnia and his confinement at ADX since July 12, 2005. Plaintiff's expert alleges that "conditions of confinement *may* be the cause of his insomnia, as insomnia *can* be caused by isolation." Docket No. 321-4 at 5, ¶ 20 (emphasis added). Further, the expert's opinion that insomnia may be caused by plaintiff's isolation is not based on the expert's treatment of the plaintiff; rather, it relies on generalized studies. *Id.* Additionally, plaintiff's expert does not show that plaintiff's insomnia has led to plaintiff's heart murmur or other health issues, but again relies on a generalized study of non-incarcerated individuals to show that sleeplessness increases the risk of heart diseases by 48%. *Id.* at ¶ 18.

Second, plaintiff's claim that constant illumination leads to a serious deprivation of sleep is unavailing. The fact that light enters his cell from the hall does not constitute a serious risk of harm and is a typical incident of prison life. *See Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997) (finding that 24-hour lighting with low-watt fluorescent bulbs does not objectively constitute an "extreme deprivation."). Additionally, plaintiff admits that, despite this illumination, he is able to sleep 4-5 hours a night and take a nap after lunch. As a result, the Court finds that constant illumination does not objectively amount to a serious deprivation of the basic human need for sleep. *See Murray v. Edwards County Sheriff's Dept.*, 248 F. App'x 993, 998 (10th Cir. 2007) (upholding summary judgment for prison officials on grounds that the detainee failed to

establish that his sleep problems from continuous cell illumination were sufficiently sever to trigger the Eighth Amendment); *Hampton v. Ryan*, 288 F. App'x 404, 405 (9th Cir. 2008) (upholding district court's grant of summary judgment where plaintiff "failed to raise a triable issue as to whether the lighting level in his cell caused him to suffer psychological or physical harm").

Therefore, the Court finds that because plaintiff is able to sleep 4-5 hours a night, has control over the lights in his cell, makes only a tenuous correlation between insomnia and isolation, and is subject to the same restrictions at ADX that courts have found do not violate the Eighth Amendment, plaintiff does not face an objective risk of serious harm from sleep deprivation.

### b.  Social Interaction and Environmental Stimulation

Plaintiff asserts that thirty years in isolation has exposed him to a serious risk of harm because he is deprived of significant social interaction and environmental stimulation.  Docket No. 319 at 23.  Plaintiff alleges that, as a result of such deprivations, he suffers from anxiety, memory loss and cognitive impairments.  Docket No. 296-11 at 10, ¶ 30; Docket No. 321-4 at 5, ¶ 22.  Plaintiff's expert, Dr. Haney, supports these claims based on external studies that show that detainees held in isolation for extended periods of time often suffer from severe psychological pain and distress.  Docket No. 321-16 at 55.  Dr. Haney adds that these studies have shown that detainees subject to isolation often exhibit appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, and hallucinations.  Docket No. 321-16 at 59-60. Based on these studies, Dr. Haney opines that plaintiff's symptoms will likely worsen if his conditions of confinement do not improve.  Docket No. 321-16 at 56.

Plaintiff's assertion that he has been deprived of social interaction and environmental stimuli is inconsistent with the record.  The record shows that, since his arrival at ADX, plaintiff can make two fifteen-minute phone calls a month, have five non-contact visits, have five hours of indoor or outdoor recreation per week, and can communicate with the guards and other prison staff.  Docket No. 296-8 at 10, ¶ 34.  Furthermore, after plaintiff's transfer to the D-Unit, he can talk to other inmates and had an additional five hours of outdoor or indoor recreation.  *Id*.

Plaintiff argues that as a result of his isolation he now suffers from anxiety.  Docket No. 321-4 at ¶ 22.  Medical records show that, other then anxiety, plaintiff denied any other mental health concerns.  Docket No. 296-11at ¶ 30.  Moreover, the records show that plaintiff's psychological complaints are promptly handled and, since his arrival at ADX, plaintiff has had forty-nine different sessions with the psychology department as they continue to treat his symptoms with different medications.  *Id*. at ¶ 38.

In regard to plaintiff's cognitive impairments, the record shows that he has received two Mini-Mental State Exams (MMSE) that are designed to measure cognitive impairments.  Docket No. 322-6 at ¶ 18.  After Dr. Williams performed plaintiff's MMSE, he found that plaintiff had an abnormal result but was unable to attribute the memory impairment to plaintiff's conditions of confinement.  Docket No. 321-4 at 42.  Plaintiff's second MMSE, performed by Dr. Friedman, revealed that plaintiff had mild cognitive impairments, yet concluded that in combination with his anxiety it would not "necessarily interfere with Mr. Silverstein's functioning in a reality-oriented manner."  Docket No. 322-6 at 6, ¶ 22.

The record also contains an undisputed review of plaintiff's mental state by Dr. Bursztjan, who opined that "Mr. Silverstein shows no significant indications of having been harmed by the restrictions placed on him at Leavenworth and ADX Florence . . . I do not find evidence of damage to Mr. Silverstein's mental health resulting from the conditions of confinement."  Docket No. 296-14 at ¶ 7; Docket No. 296  at 16, ¶ 99; Docket No. 319 at 8, ¶ 99.  Dr. Bursztjan opinion goes on to state that the "safest and most reasonable course . . . is for Mr. Silverstein to continue to negotiate the conditions of his confinement with prison staff with whom he interacts on a daily basis" because this will "enhance his capacity for self-control and responsibility."  Docket No. 321-16 at 7, ¶ 20.  Thus, contrary to plaintiff's assertions, the record shows that confinement in isolation has had minimal impact on plaintiff's mental state.  It also highlights that the BOP's gradual loosening of restrictions is actually supported by undisputed expert opinion.

The Court notes that no other court in the Tenth Circuit has found that the deprivation of some "social interaction" or "environment stimulation" gives rise to a colorable violation of the Eighth Amendment.  *See Hill v. Pugh*, 75 F. App'x 715, 720-21(10th Cir. 2003) (holding that an inmate failed to state an Eighth Amendment claim when the inmate alleged that he incurred "sensory deprivation" because he was held in his cell 23 hours a day); *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (finding that lack of outdoor exercise or fresh air to breathe did not constitute a *per se* Eight Amendment violation, particularly where the prisoner gets at least an hour of exercise per week and some fresh air); *McMillan v. Wiley*, No. 09-cv-01709-WYD-KLM, 2011 WL 4102278, at *16 (D. Colo. Sept. 14, 2011) (plaintiff's claim that he is deprived of

environmental stimulation at ADX does not satisfy the objective component of an Eight

Amendment inquiry); *Sattar v. Gonzales*, No. 07-cv-02698-WDM-KLM, 2009 WL

606115, at *3 (D. Colo. March 6, 2009) (finding that confinement in a cell for 23 hours a

day for five days a week was not enough for plaintiff to allege a deprivation of any

recognized basic human need for deprivation of human contact).  Nevertheless, plaintiff

invites the Court to find, along with evolving notions of humanity, dignity, and decency,

that deprivation of environmental stimulation leads to a serious risk of harm in violation

of the Eight Amendment.  Docket No. 323-1 at 6.  However, courts require a plaintiff to

demonstrate that he has been deprived of a basic human need in order to sustain an

Eighth Amendment deprivation claim.  *Sattar*, 2009 WL 606115, at *3; *see Seiter*, 501

U.S. at 347; *Durham v. Lappin*, No. 05-cv-01282-MSK-MEH, 2006 WL 2724091, at *24

(D. Colo. September 21, 2006) (finding that because food, shelter, clothing and warmth

were provided for inmate, sensory deprivation did not amount to cruel and unusual

punishment). Thus, without deciding whether complete isolation and deprivation of all

environmental stimuli would constitute an Eighth Amendment violation, the Court finds

that, because plaintiff has had the right to five social visits per month, two 15 minute

phone calls per month, 1.5 to 2 hours of indoor or outdoor recreation five times a week,

and has always had the ability to communicate with prison staff, he is not completely

isolated or, for that matter, does not objectively face a serious risk of harm within the

context of the Eight Amendment.

Plaintiff's complaints of anxiety, memory loss and cognitive impairment fail to rise

to the level of a severe risk of serious injury because they have all been diagnosed as

mild and kept under control either through medication or therapy.  Docket No. 296-11 at

¶ 39.  Plaintiff's evidence of mental harm relies on studies performed on other prisoners, and the record is devoid of actual instances where plaintiff personally suffers from panic, rage, loss of control, paranoia.  Additionally, Dr. Denney, plaintiff's psychiatrist for over a decade, labeled plaintiff as "resilient" and found that plaintiff "maintained that sense of resilience from the move from USP Leavenworth . . . [to] ADX."  Docket No. 296 at 33-34.  Moreover, an undisputed report by Dr. Bursztjan shows that plaintiff shows no significant indication of having being harmed by the restrictions placed on him at ADX.  Docket No. 296-14 at 4, ¶ 6.  Lastly, although plaintiff alleges that his confinement is punitive, it is clear that prison conditions may be "restrictive and even harsh" without these conditions rising to the level of a constitutional violation.  *Barney*, 143 F.3d at 1311 (citation omitted).  For these reasons, plaintiff has not been deprived of any basic needs as that term was defined in *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).

### c.  Medical Care

Plaintiff alleges that he has not received adequate medical care for serious medical ailments.  Specifically, plaintiff asserts that he suffers from bleeding hemorrhoids, Hepatitis C, and a heart murmur.  Docket No. 321-4 at ¶¶ 8-9 .  Plaintiff alleges that the BOP has known about the heart murmur for a significant period and that, even after requests made in September 2009, the BOP failed to provide plaintiff with treatment until February 2010.  *Id*. at ¶ 28.  Plaintiff claims the BOP knew his Hepatitis C results were positive in May 2008, yet the BOP did not commence treatment.  Rather, the BOP ordered further testing for May 2009.  Docket No. 321-4 at 46.  Plaintiff states that the BOP has also failed to treat his hemorrhoids promptly and

that he often bleeds in his cell.  *Id*. at 34.  Based on all of these events, plaintiff claims

that the BOP has failed to provide healthcare and this has led to a serious risk of harm

to his health.  Docket No. 319 at 24.

Defendants counter that once plaintiff's heart murmur was discovered, he was

treated by Dr. Stjernholm, who concluded that plaintiff's heart was medically healthy

and did not require any further treatment.  Docket No. 296-10 at ¶¶ 11-12.  As for the

Hepatitis C, defendants argue that plaintiff is one of 150 ADX inmates with the disease

and, because of limited capacity, the government first provides treatment to those who

are in urgent need.  Docket No. 296-10 at ¶¶ 16-17.  The government insists that all

Hepatitis C patients are monitored closely and plaintiff is currently on the list for

treatment.  *Id*.  Defendants further assert that they performed plaintiff's colonoscopy on

May 25, 2010 to determine whether his hemorrhoids were the result of colon cancer.

*Id*. ¶¶ 13-15.  Dr. Yu, plaintiff's surgeon, determined after a follow up in November 2010

that plaintiff did not need a hemorrhoidectomy.  *Id*.  Overall, the BOP maintains that

since his arrival at ADX, plaintiff has been evaluated by the medical staff thirty-five

different times.  Docket No. 296-10 at 5-16.

To establish an 8th Amendment claim premised upon deliberate indifference to

his medical needs, an inmate must show: (1) he suffered from a serious medical need;

(2) the defendant deprived him of treatment of that need; and (3) that the defendant did

so with a sufficiently culpable state of mind.  *Farmer*, 511 U.S. at 834.  As to the first

element, a medical need is "serious" when it has been diagnosed by a physician as

requiring treatment or where the condition is so obvious that even a layperson would

recognize the need for a doctor's attention.  *Sealock v. Colorado*, 218 F.3d 1205, 1209

(10th Cir. 2000).  With regard to the element of intent, "deliberate indifference" requires a state of mind "more blameworthy than negligent," but this can be "something less than acts or omissions for the very purposes of causing harm or with knowledge that harm will result."  *Farmer*, 511 U.S. at 835.  It is a state of mind akin to recklessness and occurs when the defendant "knows of and disregards an excessive risk to [the] inmate['s] health or safety."  *Id.* at 837.  It is not enough to show that a defendant provided ineffective or even negligent medical treatment.  *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008).  An Eighth Amendment violation arises only where a defendant subjectively knows of an excessive risk to the plaintiff's safety, but nevertheless disregards that risk.  *Sealock*, 218 F.3d at 1209.

An Eighth Amendment violation may be based on treatment that is delayed rather than refused.  *Sealock*, 218 F.3d at 1210.  In such circumstances, the inmate is required to make an additional showing that the delay in receiving care caused "substantial harm."  *Id.; see also Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).  "Substantial harm" includes lifelong handicap, permanent loss, or considerable pain.  *Garret v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001).

The Court finds that plaintiff has shown that his heart murmur, hemorrhoids, and the Hepatitis C are all objectively serious conditions such that even a layperson would recognize the need for a doctor's attention.  *Sealock*, 218 F.3d at 1209.  Thus the Court will analyze whether plaintiff's claims for deprivation of medical care, meet the Eight Amendment's standard for "deliberate indifference."

41

### 2. Subjective Component

As noted above, for plaintiff to show that the BOP deprived him of medical care with "deliberate indifference" he must show that the BOP was more than negligent. *DeShaney*, 489 U.S. at 198 n.5.  On the other hand, if plaintiff's treatment was merely delayed, rather than refused, he must show that the delay cause him "substantial harm."  *Mata*, 427 F.3d at 751.  To prove "substantial harm," plaintiff must show some lifelong handicap, permanent loss, or considerable pain.  *Garrett*, 254 F.3d at 946.

In this case, plaintiff eventually received treatment for his Hepatitis C, his hemorrhoids, and his heart murmur.  Docket No. 296-10 ¶¶ 11-17.  Thus, plaintiff's treatment merely delayed, and  was not denied.  Consequently, plaintiff must show that defendants delay in this instance caused plaintiff "substantial harm."  *Garret*, 254 F.3d at 950.  Based on the record, the Court concludes that plaintiff was not subject to substantial harm by the BOP's delay in treating his heart murmur, his Hepatitis C and his hemorrhoids.  The Court relies on the fact that, after plaintiff was treated for both the Hepatitis C and the hemorrhoids, and the treating physicians found that the conditions were not serious and merely required constant monitoring.  Docket No. 296-10 at ¶¶ 13-17.  The Court also notes that the record highlights that some of the delay with plaintiff's treatment is not a result of deliberate indifference, but may be attributed to the BOP's institutional constraints.  Docket No. 296-10 at ¶ 16.  For these reasons, the Court finds that, although plaintiff has shown a significant risk of serious harm from his medical ailments, plaintiff has not shown that his delayed treatment was the result of deliberate indifference by the BOP.  As a result, plaintiff's Eight Amendment claim must fail.

42

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff's Motion for Leave to File a Sur-Reply to Defendant's Reply [Docket No. 365] is **GRANTED**.  Plaintiff's Sur-Reply is accepted for filing.  It is further

**ORDERED** that plaintiff's Motion for Order to Allow Oral Argument on Defendants' Motion for Summary Judgment (Doc. 296) [Docket No. 354] is **DENIED**.  It is further

**ORDERED** that defendants' Motion for Summary Judgment is **GRANTED** [Docket No. 296].  It is further

**ORDERED** that judgment shall enter in favor of defendants and against plaintiff.


DATED September 30, 2011.

BY THE COURT:


  s/Philip A. Brimmer                                  
PHILIP A. BRIMMER
United States District Judge